GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@gordonsilver.com
GABRIELLE A. HAMM, ESQ.
Nevada Bar No. 11588
E-mail: ghamm@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
Proposed Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: BK-S-11-<br>Chapter 11 |
| MURDER INC., LLC | |
| Debtor. | |
| | Date:  N/A<br>Time:  N/A |

**OMNIBUS DECLARATION OF LOUIS VENTRE IN SUPPORT OF
DEBTOR'S FIRST DAY MOTIONS AND OTHER RELIEF**

I, Louis Ventre, hereby declare as follows:

1.     I am over the age of 18 and am mentally competent to make this Omnibus Declaration (the "Omnibus Declaration") in support of the various emergency motions and applications requesting various types of relief (collectively, the "Motions")[1] filed by Murder Inc., LLC, the debtor and debtor-in-possession (the "Debtor") in the above-referenced Chapter 11 bankruptcy case (the "Chapter 11 Case"), and such other motions as may be filed and relief that may be requested from time to time in this Chapter 11 Case.

2.     The Debtor is a Nevada limited liability company formed on March 23, 2009. From the formation of the Debtor until his resignation on or about June 30, 2011, Jay Bloom ("Bloom") was the manager of the Debtor.  The equity in the Debtor was held solely by Eagle

---

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant Motions, all of which are being filed contemporaneously herewith.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

Group Holdings, LLC ("Eagle Holding"). Pursuant to a forbearance agreement discussed below, Eagle Holding now owns only 5% of the equity of the Debtor and Bloom no longer has any management authority in the Debtor. I became the managing member of the Debtor on or about July 1, 2011, and currently own 95% of the equity of the Debtor.

3.    In my capacity as manager of the Debtor and based upon my experience working with the Debtor, I am familiar with Debtor's day-to-day operations, business and financial affairs, and books and records, commencing on or about July 1, 2011. Since becoming the manager of the Debtor, I have worked diligently to investigate and become familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records as they existed prior to July 1, 2011. As a result of my investigation, I believe that I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records prior to July 1, 2011. Except as otherwise indicated, all facts set forth in this Omnibus Declaration are based on my personal knowledge, upon information supplied to me by other individuals employed or engaged by the Debtor, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations, financial condition, and history. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4.    This Omnibus Declaration provides the Court with background information concerning the Chapter 11 Case, as well as the context for the initial relief sought by Debtor by way of the First Day Motions. Accordingly, the Omnibus Declaration is organized into two parts: (a) the background on Debtor's business, including a description of its assets and liabilities; and (b) an explanation of the relief sought in the Motions.

# I.
# BACKGROUND

**A.    The Las Vegas Mob Experience**

5.    The Debtor was formed for the purpose of financing, constructing, and operating an exhibit on Las Vegas Boulevard (the "Strip") known as the Las Vegas Mob Experience (the "LVME").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

2

6.      When it originally opened, the LVME was a live interactive entertainment adventure located within the Tropicana Las Vegas Hotel & Casino on the Las Vegas Strip. The LVME includes the world's largest collection of organized crime artifacts from famous reputed mobsters including Benjamin "Bugsy" Siegel, Anthony "The Ant" Spilotro, Charles "Lucky" Luciano, Meyer Lansky, Sam "Mooney" Giancana, and Allan Sachs. In its first few months of operation, the LVME included live actors where visitors could go face-to-face with Las Vegas' most notorious gangsters with cutting edge audio visual technology. The LVME also included celebrity gangster guides to escort visitors through a tutorial on mob history.

7.      As of September 12, 2011, the LVME has scaled back its operations to only the museum portion of the LVME, which displays the artifacts. The artifacts are extensive, and include weapons, letters, photographs, jewelry, furniture, and other personal effects of reputed mobsters. Only a portion of the artifacts are on display. This scaling back of operations was a cost-cutting measure and also due to the repossession of a significant amount of audio-visual equipment used in the experience. As a result, the LVME presently has open to the public only about 11,000 of its total approximately 26,000 square feet, and the rest of it remains closed. In addition to the museum, LVME also continues to operate a souvenir shop on the premises. Murder also has a back office with a small office suite, employee room and a locked artifacts room with dedicated 24 hour security on premises.

8.      The Debtor currently has a skeletal staff of about ten (10) employees, including Ventre as president, a general manager, and various office personnel, security guards and a small number of staff on the floor in the museum itself. Current attendance averages between approximately 130 and 150 people per day, which is barely sufficient to allow LVME to cover its immediate critical operating expenses, let alone any of its debt service or rent. The LVME has and continues to require cash infusions from existing creditors in order to sustain even its current minimum level of operations.

**B.      Corporate Structure.**

9.      Murder was formed on March 23, 2009 as a wholly-owned subsidiary of Eagle Holding, owned and managed by Jay L. Bloom ("Bloom"). Bloom is married to Carolyn S.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1    Farkas ("Farkas").  Eagle is a holding company for various Bloom-controlled entities.  Bloom

2    was the manager and in control of Murder from its formation through July 1, 2011.  On or about

3    July 1, 2011, I was appointed as manager and was transferred the controlling equity interest.

4        10.    In addition to previously being the managing member and sole owner of Murder,

5    Eagle Holding is presently the managing member of various other Bloom-related entities,

6    including but not necessarily limited to, Eagle Group Marketing, a Nevada limited liability

7    company ("Eagle Marketing"), and Eagle Group Productions, LLC, a Nevada limited liability

8    company ("Eagle Productions").    Upon information and belief, Bloom formed both Eagle

9    Marketing and Eagle Productions on October 4, 2010.

10        11.    Upon information and belief, Eagle Productions is a managing member of Order

11    66 Entertainment, LLC, a Nevada limited liability company ("Order 66"), and A.D.D.

12    Productions, LLC, a Nevada limited liability company ("A.D.D.").  Upon information and belief,

13    Order 66 was formed on October 4, 2010 to serve as a vehicle for Bloom to bring a temporary

14    Star Wars exhibit to Las Vegas.[2]  Upon information and belief, A.D.D. was formed on October

15    4, 2010 to serve as a vehicle for Bloom to operate the Tiffany Theater in Tropicana.

16        12.    The Mafia Collection, LLC, is a Nevada limited liability company ("Mafia

17    Collection") formed on March 23, 2009 by Bloom.  Bloom was and remains the manager of

18    Mafia Collection.  Mafia Collection allegedly owns and leases the vast majority of the artifacts

19    used in the LVME, though Murder paid for the artifacts, insures the artifacts, and secures the

20    artifacts.

21        13.    I became involved in the LVME in approximately August of 2008, before the

22    formation of the Debtor, in order to raise capital for Jekyll & Hyde, LLC ("Jekyll & Hyde"), an

23    entity formed by Bloom for the development of a theatre in Caesar's Palace to be used for an

24    exhibition of mob artifacts.  This original concept evolved into the Las Vegas Mob Experience at

25    Tropicana, and the capital raised for Jekyll & Hyde was used to purchase the artifacts now

---

26    [2] "Order 66" is a reference to a major event in the "Star Wars" storyline.  Also known as the "The Great Jedi Purge,"
it is a plot element in the film Star Wars Episode III: Revenge of the Sith (Lucasfilm 2005).  In the film, the Jedi are
27    nearly exterminated by the order of the Sith Lord Darth Sidious, with only a limited number of Jedi, including but
not limited to Obi-Wan Kenobi and Yoda, known to survive.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7                                    4

1    allegedly owned by Mafia Collection. As a result of my role in raising capital, I received a 30%

2    equity interest in Eagle Holding.

3    14.    Prior to July 1, 2011 I had almost no role in the day-to-day management of the

4    Debtor. Until May of 2011, I spent most of my time in New York, caring for ill family

5    members. I became more actively involved in the Debtor in approximately May of 2011 after I

6    discovered certain mismanagement by Bloom. However, at that time, I had no authority to

7    manage the Debtor and Bloom retained a controlling equity interest in Eagle Holding, which

8    owned 100% of the membership interests in the Debtor. I also had no signatory authority over

9    the Debtor's bank accounts. After observing blatant mismanagement by Bloom, including

10   diverting funds from the Debtor's payroll account to pay for expenses of Order 66, I approached

11   GC-Global (defined below) regarding Bloom's conduct. Thereafter, GC-Global obtained

12   Bloom's agreement to resign as manager and transfer 95% of the Debtor's equity to GC-Global,

13   which was as discussed below.

14   15.    At the present time, I own 95% of the equity of the Debtor and 30% of the equity

15   of Eagle Holding,[3] which owns 5% of the equity in the Debtor. I am the managing member and

16   President of the Debtor.

17   **C.    LVME's Liabilities.**

18   **1.    The Initial Capital Raise.**

19   16.    The Debtor initially raised capital through two private debt issuances

20   (respectively, the "First Raise" and "Second Raise"). Though it was the original intent of the

21   Debtor to raise approximately $8 million, based upon a review of the Debtor's books and

22   records, it appears that the Debtor issued at least $13,559,363 in secured and unsecured debt to

23   private lenders (the "Noteholders"), exclusive of the debt owed to Strategic Funding Source, Inc.

24   and Vion Operations LLC, discussed below. It is unclear from the Debtor's records how much

25   of this debt was incurred in First Raise and how much was incurred in the Second Raise.

26

27

28

---

[3] Bloom has notified me that my 30% membership interest in Eagle Holding has been forfeited. To the extent my membership interest in Eagle Holding has not been forfeited, I intend to withdraw from Eagle Holding.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

5

17.    In exchange for the loans to the Debtor, many of the Noteholders received promissory notes (the "Notes") and assignments of a fraction of the Debtor's future gross income (the "Income Assignments"). Samples of the form of Notes issued by the Debtor are attached hereto as **Exhibits 2**, **3**, and **4**. A sample of the form of Income Assignment granted by the Debtor is attached hereto as **Exhibit 5**. The Debtor's books and records reflect approximately $9,464,153 in Notes and Income Assignments of approximately 42% of the Debtor's gross income.[4]

18.    Pursuant to that certain Security Agreement dated March 15, 2011 (the "Noteholders' Security Agreement"), several of the Noteholders hold a security interest in assets owned by the Debtor's affiliate, Mafia Collection, which consist of the artifacts discussed above, and a security interest in the assets of the Debtor (the "Secured Noteholders").[5] A true and correct copy of the Noteholders' Security Agreement is attached hereto as **Exhibit 6**. The Noteholders' Security Agreement secures approximately $9,687,600 of the Notes, though the Debtor's records do not contain copies of several of these Notes.[6] Some of the Noteholders received Notes, but are not parties to the Noteholders' Security Agreement. Based upon a review of the Debtor's books and records, it appears that approximately $1,577,500 in Notes are not subject to the Noteholders' Security Agreement. It also appears, based upon a review of the Debtor's books and records, that approximately $1,913,210 in additional sums were lent to the Debtor, though such loans are not secured by the Noteholders' Security Agreement and the Debtor does not have copies of the Notes, to the extent such Notes exist. Upon information and belief, some of these lenders never received a Note. Lenders who received a Note which is not

---

[4] In their lawsuit against Bloom and other defendants, Strategic Funding Source, Inc. and Vion Operations LLC have alleged that the actual debt in March of 2011 was $16,050,380.22 and Income Assignments of $46.299 had been made. See *Complaint*, Vion Operations LLC, et. al v. Jay L. Bloom, et. al, Case No. A-11-646131-C, pending in the Eighth Judicial District of Clark County, Nevada.

[5] One of the Debtor's creditors has produced a Security Agreement dated August 23, 2010 purporting to secure the Notes (the "August 23, 2010 Security Agreement"), which is attached hereto as **Exhibit 7**. However, the August 23, 2010 Security Agreement does not identify the secured creditors or the amount secured, and is unexecuted by any creditor or an agent of the Noteholders. Moreover, the Debtor's records identify a security agreement dated January 5, 2011, but no such security agreement can be located in the Debtor's records.

[6] Approximately $2,182,000 in alleged Notes are identified in the Noteholders' Security Agreement for which no Note can be located.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

subject to the Noteholders' Security Agreement and lenders whose loans are undocumented are collectively referred to as the "Unsecured Noteholders."

19.    Upon information and belief, the First Raise was used primarily to acquire the artifacts used by the Debtor in the LVME, though the artifacts allegedly are owned by Mafia Collection.    The First Raise includes funds loaned to Jekyll & Hyde.    Though Bloom has represented to me that the obligations of Jekyll & Hyde were assumed by the Debtor, the Debtor's records do not contain any documentation of an assumption and assignment.    Upon information and belief, Mafia Collection paid no consideration to the Debtor for the artifacts.

20.    The Second Raise was used primarily to fund the construction and opening of the LVME.

**2.    Acquisition of the Notes by GC-Global.**

21.    On March 15, 2011, Order 66 purchased six (6) of the First Raise Notes from the following parties in an original face amount of $2,200,000:  (i) Morgando Family Trust; (ii) Jessica Guyer; (iii) LS Marlow Trust; and (iv) Mark T. Hellner Trust.

22.    Immediately following the transfer of these Notes to Order 66, on or about March 16, 2011, GC-Global Capital Corp. ("GC-Global"), Order 66, and the Debtor entered into that certain Loan Purchase and Sale Agreement and Security Agreement (the "Loan Purchase Agreement"), whereby GC-Global purchased from Order 66 the beneficial interests in these Notes, with a balance, as of March 13, 2011, of $2,623,422.83, including accrued interest (the "GC-Global Loans").    A true and correct copy of the Loan Purchase Agreement is attached hereto as **Exhibit 8**.[7]

23.    On or about April 4, 2011, GC-Global, Order 66, Murder Inc., and Mafia Collection entered into that certain Amendment to Loan Purchase and Sale Agreement and Security Agreement (the "Amendment to Purchase Agreement"), whereby three additional loans originally made to Keith Burhdoff and Cliff Stout were acquired by GC-Global, which loans had

---

[7] Upon information and belief, the transaction was structured in this manner in order to allow GC-Global to step into the priority lien position of the Secured Noteholders without paying off the Secured Notes. Further, upon information and belief, the Secured Noteholders' received an income assignment in Order 66 in exchange for the transfer, but did not receive a replacement security interest.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

7

an original face amount of $357,600 and a balance of $418,039.11 inclusive of accrued interest, thereby increasing the amount owed to GC-Global to $3,189,061.11. A true and correct copy of the Amendment to Purchase Agreement is attached hereto as **Exhibit 9**.

24.     As security for the GC-Global Loans, GC-Global was assigned the Noteholders' Security Agreement and Financing Statements, and additional collateral was pledged, consisting of a blanket lien in the Debtor's assets, described as:

> a security interest in . . . the following properties, assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: all personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or right to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles).

GC-Global was further granted a security interest in specific collateral consisting of a certain Personal Property Lease Agreement executed on April 14, 2009 between the Debtor and Robert Bright, and a 1927 Studebaker.

25.     Pursuant to the terms of the Loan Purchase Agreement, GC-Global further obtained a security interest in certain property allegedly owned by Mafia Collection, which was evidenced by a UCC-1 Financing Statement naming Andrew Demaio as the collateral agent for the benefit of the secured parties, which was filed with the Nevada Secretary of State on January 5, 2011, as document number 2011000340-5. The UCC Financing Statement was amended on January 6, 2011 by document number 2011000404-1 to correct a typographical error, and on March 21, 2011, was amended by document number 2011006834-8 to name GC-Global as a secured party (collectively, the "Original GC-Global Financing Statement").

26.     On February 16, 2011, the Debtor was removed as a debtor under the Original Financing Statement, as evidenced by document number 2011003986-6. Thereafter, on March 21, 2011, GC-Global filed a UCC-1 Financing Statement asserting an encumbrance against all of the Debtor's personal property (the "Amended GC-Global Financing Statement"). True and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7                                        8

1  correct copies of the Original GC-Global Financing Statement and Amended GC-Global

2  Financing Statement are attached hereto as **Exhibits 10** and **11**.

3        27.    Pursuant to the Noteholders' Security Agreement, the Original GC-Global

4  Financing Statement, and the Amended GC-Global Financing Statement, GC-Global has asserted

5  a first lien position in all of the personal property of Mafia Collection and the proceeds

6  therefrom, which include the artifacts and exhibits used for the LVME, which lien, upon

7  information and belief, is *pari passu* with the lien of the Secured Noteholders. GC-Global holds

8  a blanket lien against the assets of the Debtor, which lien is, upon information and belief, junior

9  to that of Strategic and Vion, discussed below.

10        **3.**    **Murder's Factoring of Receivables with Vion and Strategic.**

11        28.    On February 25, 2011, Murder entered into a Purchase and Sale of Future

12  Receipts Agreement (the "V-S Purchase Agreement") with Strategic Funding Source, Inc.

13  ("Strategic") and Vion Operations LLC ("Vion") (together, "V-S"), a true and correct copy of

14  which is attached hereto as **Exhibit 12**. Separately, on the same day, Bloom and Ventre

15  executed a Merchant Security Agreement and Guaranty (the "V-S Security/Guaranty

16  Agreement") on behalf of Murder, thereby granting V-S a security interest in all of the Debtor's

17  personal property. Specifically, the V-S Security/Guaranty Agreement grants V-S a security

18  interest in

19          all personal property of [Debtor], including all accounts, chattel paper,

20          deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, as those terms are defined in Article 9

21          of the Uniform Commercial Code of the State of New York…whether nor hereafter acquired by [Debtor] and wherever located, and all proceeds of

22          such property…

23  A true and correct copy of the V-S Security/Guaranty Agreement is attached hereto as **Exhibit**

24  **13**.

25        29.    On March 14, 2011, Murder entered into a second Purchase and Sale of Future

26  Receivables Agreement with Strategic (the "Second Strategic Agreement"), a true and correct

27  copy of which is attached hereto as **Exhibit 14**. Separately, on the same day, Bloom and Ventre

28  executed a second Merchant Agreement and Guaranty in favor of Strategic (the "Second

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

9

Strategic Guaranty," and together with the V-S Purchase Agreement, the V-S Security/Guaranty Agreement, and the Second Strategic Agreement, the "V-S Agreements"), thereby granting V-S a security interest substantially similar to that granted under the V-S Security/Guaranty Agreement. A true and correct copy of the Second Strategic Guaranty is attached hereto as **Exhibit 15**.

30.     Pursuant to the V-S Agreements, V-S paid $3,147,824.10 to the Debtor for future credit card receipts (the "MCA Receivables") in the amount of $4,092,171.40.   The MCA Receivables include credit card payments received when admission is purchased to the LVME.

31.     On March 1, 2011, Vion and Strategic filed UCC-1 financing statements with the Nevada Secretary of State to perfect their security interest in the Debtor's assets.   In the first UCC Financing Statement filed on March 1, 2011, Strategic asserted a security interest in "all of the personal property of the Debtor," and in the second UCC Financing Statement filed on March 1, 2011, Strategic asserted a security interest in in all "right, title, and interest of the [Debtor] in and to certain accounts, contract rights, instruments, payment intangibles, and other rights to payment sold by the Debtor [] to the Secured Parties [] from time to time pursuant to the Merchant Cash Advance Agreement dated as February 25, 2011."   On March 16, 2011, V-S filed amendments to the UCC-1 financing statements, asserting a security interest in the assets of Mafia Collection (the "V-S Financing Statements").   True and correct copies of the V-S Financing Statements are attached hereto as **Exhibits 16, 17, 18**, and **19**.

### 4.     Mechanics' Liens.

32.     As of the Petition Date, approximately $5,753,339 in mechanics' and materialmen's liens have been asserted in connection with the construction of the LVME, as follows:

a.     George M. Raymond Co.: $891,521.00 (lien recorded July 6, 2011);

b.     Superior Tile & Marble, Inc., $24,051.00 (lien recorded on July 8, 2011);

c.     M.J. Dean Construction, Inc. ("M.J. Dean"):  $4,640,732.00 (lien recorded July 13, 2011);

d.     Dean Roofing: $24,420.00 (lien recorded July 11, 2011);

103164-001/1341787_7

1            e.      Scott Zemp Masonry, Inc.: $5,115.00 (lien recorded July 11, 2011);

2            f.      Statewide Fire Protection: $167,500.00 (lien recorded July 11, 2011)

3 (collectively, the "Mechanics' Lien Claimants").

4      33.     In addition, upon information and belief, various additional parties have served

5 notices of right to lien for work and services allegedly performed by the Debtor, including the

6 following: Bombard Electric, LLC (in the amount of $701,021.50), Hansen Mechanical

7 Contractors, Inc. (in the amount of $154,421.00), McFarland Door Manufacturing Company, Inc,

8 and Grani Insulation, Giroux Glass-Los Angeles, Kellys Pipe, Arizona Stone & Arch Products,

9 LLC, and Academy Glass Company, Inc. (together with the Mechanics' Lien Claimants, the

10 "Contractors"). M.J. Dean served as the general contractor and many of the immediately

11 foregoing entities were sub-contractors of M.J. Dean. Upon information and belief, the lien filed

12 by M.J Dean (the "M.J. Dean Lien") includes amounts owed to subcontractors and is thus

13 duplicative of other liens filed.

14      **5.**     **Default and Forbearance.**

15      34.     The GC-Global Notes required a principal payment by the Debtor on or before

16 June 16, 2011 in the amount of $1,000,000 Canadian Dollars. The Debtor did not make the

17 principal payment, and on June 30, 2011, GC-Global declared a default and accelerated the

18 amounts due under the GC-Global Notes.

19      35.     Further, upon information and belief, the Debtor has paid only a fraction of the

20 interest due under the Notes, and only a fraction of the Debtor's gross income payable to the

21 Noteholders pursuant to the Income Assignments.

22      36.     On July 26, 2011, GC-Global and other creditors of the Debtor entered into that

23 certain Forbearance Agreement and Option to Purchase, pursuant to which GC-Global agreed to

24 forbear filing suit or foreclosing on its collateral for a period of 60 days (the "Forbearance

25 Agreement"). Pursuant to the Forbearance Agreement, certain other parties agreed to invest

26 additional funds into the Debtor.

27      37.     Further, as a result of Bloom's mismanagement, he was forced to relinquish 95%

28 of his ownership interest to GC Global. On June 30, 2011, Bloom executed that certain

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

11

Certificate of Resignation of Officer, Director, Manager, Member, General Partner, Trustee or Subscriber, transferring 95% of the equity interest in the Debtor to GC-Global and relinquishing any and all management control, leaving me as the sole manager of the Debtor (the "Resignation Certificate"), a true and correct copy of which is attached hereto as **Exhibit 20**. The Resignation Certificate was filed with the Nevada Secretary of State as document number 20110488819-62. Ultimately, the 95% membership interest was transferred and conveyed to me by GC-Global.

38.     The Forbearance Agreement expired on September 24, 2011, and on October 5, 2011, GC-Global filed a Complaint against the Debtor and other defendants in the Eighth Judicial District of Clark County, Nevada, for breach of contract and foreclosure of its collateral, discussed below.

**D.      Murder's Lease with the Tropicana.**

39.     On or about June 7, 2010, the Debtor, as tenant, and Eagle Holding, as guarantor, entered into a lease with Tropicana Las Vegas, Inc., d/b/a Tropicana Las Vegas ("Tropicana") for approximately 25,000 square feet in an open space Pavilion at the rear of the Tropicana Las Vegas (the "Hotel/Casino") for five (5) years, commencing on or about April 1, 2011, renewable for an additional five (5) years upon the parties' agreement (the "Lease"). A true and correct copy of the Lease is attached hereto as **Exhibit 21**. Pursuant to the Lease, the Debtor is obligated to pay to Tropicana the greater of: (i) ten percent (10%) of the Debtor's gross sales, or (ii) a minimum of $1,000,000, or $83,000 per month.[8]

40.     The Debtor paid rent under the Lease only in the months of April and May, 2011, when the Debtor paid the minimum amount due under the Lease, or $83,000 per month.

41.     Pursuant to the Lease, the Debtor is responsible for reimbursing Tropicana for the utilities used by the Debtor on the premises. See Lease, Article VII. As a result, the Debtor does not have any contracts for the provision of utilities.

42.     The Debtor also is responsible for ensuring that no mechanics' or materialmen's

---

[8] Further, on June 24, 2010, the Debtor, as tenant, and Eagle Holding, as guarantor, entered into a second lease with Tropicana for the "Mob Experience Preview Center" and retail store (the "Retail Store"), on a month-to-month basis (the "Preview Lease"). Upon information and belief, the Preview Lease has terminated. The leased premises under the Preview Lease is subsumed within the leased premises under the Lease.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

liens are placed on Tropicana's property as a result of work performed for the Debtor. See Lease § 10.4. The Debtor is in breach of this provision of the Lease due to the mechanics' liens described above.

43.    Tropicana has declared a default under the Lease. As of the Petition Date, Tropicana has not elected to terminate the Lease or evict the Debtor, but has also not waived its rights and remedies. The Debtor and its creditors have been engaged in negotiations with Tropicana regarding a modification of the Lease, removal of the mechanics' liens, and resolution of Tropicana's claims against the Debtor. Due to the existing defaults under the Lease and the Debtor's limited cashflow, I believe that the consent of and concessions by Tropicana are necessary to effectuate the Debtor's reorganization.

44.    The Debtor has negotiated with Tropicana regarding a limited forbearance by Tropicana from exercising its rights and remedies under the Lease and the Bankruptcy Code, and specifically under Section 365(d)(3), in order to enable the Debtor to seek confirmation of a proposed plan of reorganization containing terms as set forth in the Plan Term Sheet (as defined below) (the "Forbearance Agreement"). A true and correct copy of the Forbearance Agreement is attached to the *Motion for Order Approving Limited Forbearance Agreement Between Debtor and Tropicana Las Vegas, Inc.*, as Exhibit A. Substantially concurrently with the filing of the Petition, the Debtor will file a motion to approve the Forbearance Agreement. The forbearance agreement is in the best interests of the Debtor and its estate given that the Debtor is in breach of the Lease, including because of the nonpayments due thereunder, is not capable of complying with the requirements of Section 365(d), and Tropicana is prepared to amend the Lease as part of the proposed restructuring discussed below. Approval of the Forbearance Agreement is essential to a successful and efficient reorganization, as Tropicana has agreed to forbear exercising rights and remedies which, if exercised, would place the Debtor's ability to continue operations in substantial jeopardy.

**E.    Operations.**

45.    When the LVME was fully operational, prior to shuttering the interactive experience component of the LVME, the LVME drew approximately 400 visitors per day. The

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

Debtor currently draws approximately 130 to 150 visitors per day. Tickets were $29.95 per person when the interactive experience was operational, but have been reduced to $15.00 per person since the interactive experience was closed and only the museum component has been open. In addition to ticket revenues, the Debtor earns revenues from the operation of the gift shop and the photo concession. From July 30, 2011 to the present, the Debtor's gross revenues have been approximately $103,000 per month, down from approximately $192,000 per month when the LVME was fully operational.

46.    In April 2011 the Debtor's accounts at Town and Country Bank were closed by Town and Country Bank, which, upon information and belief, was due to Bloom's excessive cash withdrawals and overdrafts. The Debtor currently has two bank accounts at Bank of America – an operating account (the "Operating Account") and a payroll account (the "Payroll Account"). I opened these accounts after I became manager of the Debtor, and closed other accounts originally opened by Bloom to ensure that Bloom could not access the Debtor's funds.

47.    Currently, the Debtor's income can be divided into two categories – (1) credit card receipts from ticket sales ("Ticket Card Receipts") and gift shop sales ("Retail Card Receipts," and collectively with the Ticket Card Receipts, the "Card Receipts"), and non-credit card receipts, such as cash purchases of tickets ("Ticket Cash Receipts"), gift shop items ("Retail Cash Receipts") or checks delivered by ticket brokers or from the photo concession (collectively, "Other Cash Receipts," and together with the Retail Cash Receipts, the "Cash Receipts").

48.    Prior to the Petition Date, Card Receipts were processed by Benchmark, which, after deducting its own fees, remitted the balance to a lockbox account at Citibank, from which Strategic and Vion were paid their 10% pursuant to the V-S Agreements. Thereafter, the remaining balance was remitted to the Debtor. Immediately prior to the Petition Date, the Debtor instructed Benchmark to begin depositing Card Receipts directly into the Debtor's Operating Account. The Debtor controls Non-Card Receipts, but Strategic is authorized to electronically debit 10% of the Non-Card Receipts deposited into the Debtor's account.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

14

F.    **The Pre-Petition Litigation.**

49.    Prior to the Petition Date, numerous lawsuits were filed naming the Debtor as a defendant or related to the Debtor, including:

i.    *GC-Global Capital Corp. v. Jay Bloom, et. al*, Case No. A-11-649459-C (asserting, *inter alia*, breach of the Notes, that the Debtor and various affiliates are alter egos of Bloom, and fraud and misrepresentation, and seeking to foreclose on the artifacts);

ii.    *Ralph Buzzetta v. Jay L. Bloom, et. al*, Case No. A-11-634251-C (asserting, *inter alia*, breach of a Note, fraud, and violation of state securities laws);

iii.    *SSA Architecture, et. al v. Jay Bloom, et. al*, Case No. A-11-645141-C (asserting, *inter alia*, breach of contract, fraud and misappropriation, and fraudulent transfer);

iv.    *Vion Operations, LLC, et. al v. Jay L. Bloom, et. al*, Case No. A-11-646131-C (asserting, *inter alia*, breach of contract and fraud, and demanding an accounting);

v.    *James G. Beckmann v. Jay Bloom, et. al*, Case No. A-10-627055-C (asserting, *inter alia*, an ownership interest in the Debtor, breach of fiduciary duty, fraud, and theft, and demanding an accounting);

vi.    *Antoinette McDonnell v. Jay Bloom, et. al*, Case No. A-11-635707-C (asserting, *inter alia*, breach of contract);

vii.    *George M. Raymond Company v. Tropicana Las Vegas Inc., et. al*, Case No. A-11-648186-C (seeking foreclosure on mechanic's lien);

viii.    *Superior Exhibits & Design, Inc. v. Murder Inc., LLC*, Case No. A-10-626442-C; and

ix.    *Trade Show Fabrications West, Inc. v. Eagle Group Holdings, LLC, et. al*, Case No. A-11-641093-C (asserting, *inter alia*, breach of contract).

The most significant litigation is described below.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

1     **1.**    **The Vion-Strategic Case.**

2     50.    On August 4, 2011, Vion and Strategic filed a Complaint (the "V-S Complaint")

3 in the Eighth Judicial District Court, Clark County, Nevada, Case No. 11-646131 (the "Vion-

4 Strategic Case"), asserting claims against Bloom, Farkas, Eagle Holding, Eagle Marketing,

5 A.D.D., and Order 66 (collectively, the "Bloom Defendants"). Murder and Ventre were not

6 named as defendants in the Vion-Strategic Case. The V-S Complaint alleged claims for breach

7 of guaranty against Bloom for breach of the Agreements (and breach of the Agreements by the

8 remaining Bloom Defendants as alter egos of Bloom), breach of fiduciary duty and concealment

9 of fiduciary breach against Bloom, fraud against the Bloom Defendants, and breach of the

10 covenant of good faith and fair dealing against Bloom.

11     51.    Vion and Strategic have asserted that Bloom defrauded them in connection with

12 the V-S Agreements by the following:

13          a.    Bloom submitted materially false financial statements in order to induce

14 the transaction with Vion and Strategic, which financial statements allegedly misstated

15 payables, visitor volumes, and other liabilities, including but not limited to past due

16 contractor and trade payables.

17          b.    Bloom submitted updated financials on or about July 8, 2011, which

18 revealed nothing of the true financial condition of Murder, did not reveal he was looting

19 the company, and were provided to conceal Bloom's alleged ongoing fraud.

20          c.    Bloom's attendance forecast for the LVME was based on patently

21 unrealistic and unreasonable assumptions to fraudulently induce Vion and Strategic to

22 finance Murder. Specifically, Vion and Strategic asserted that Bloom projected 4,110

23 people per day, starting in the first month, when Bloom knew the design of the exhibit

24 would make it impossible to put that many people through the exhibit in a single day.

25          d.    Bloom represented that the ticket price would be $29.95; however, when

26 the exhibit opened, the ticket price was $39.95.

27          e.    The Murder debt that Bloom disclosed was approximately $8,000,000

28 with a total Income Assignment to other parties of 25.05%, whereas the actual debt for

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

16

Murder at the time was $15,439,548.58 with a note face value (*i.e.* total payback amount) of $16,050,380,22. The income assignments to third parties associated with this level of indebtedness was 46.299%, resulting in materially less cash being available to operate the company than Bloom represented.

  f.  Bloom represented to Vion and Strategic that Murder would owe its general contractor M.J. Dean indebtedness of $250,000 per month for the period from March 2011 to October 2011 for a total of $2,000,000; however, Bloom made none of those payments, and the amount of construction indebtedness is now believed to be in excess of $4,600,000.

  g.  Bloom represented that total payroll for Murder would be $25,980.00 per month; however, the payroll was originally substantially more. Bloom also never disclosed that he has not ever paid any payroll taxes of Murder while he was in control.

  52.  Vion and Strategic have asserted that Bloom diverted funds from the Debtor in 2010 and 2011, and these diversions consisted of at least $89,700 to A.D.D., $1,835,443.92 to Eagle Holding, $124,041.00 to Eagle Marketing, and $31,400 to Order 66.

  53.  Vion and Strategic further allege Bloom diverted funds directly from the Debtor and from Eagle Holding for payment of personal expenses, including such items as car payments, credit card bills, housing expenses (cable TV, utilities, pool cleaning, maid service), groceries and the like, using categories in his own records such as "cash for Jay" and "to be accounted for later." Bloom used an on-line account transfer from the Debtor's operating account to his personal account and frequently used ATM withdrawals in the tens of thousands of dollars to accomplish these personal diversions. In addition to other indirect payments for the benefit of Bloom, Vion and Strategic allege that Bloom diverted over $455,000 directly to himself from the Debtor from April 3, 2009 to June 7, 2011, and over $203,500 from Eagle Holding in 2010 and 2011.

  54.  Vion and Strategic allege that by diverting funds to his alter egos, which were entities directly or indirectly under Bloom's management and control, Bloom rendered the Debtor insolvent and unable to meet its obligations as they became due without additional

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

17

1    financing.

2    55.    Vion and Strategic further allege in the Complaint that

3    a.    Bloom diverted from the Debtor substantially all of the operating capital

4    necessary to successfully market the LVME, leading to a need for more operating capital,

5    which resulted in further breach by the placement of junior liens on Vion's and

6    Strategic's collateral in violation of in violation of "negative pledge" provision in Section

7    2.10 of the V-S Agreements; and

8    b.    As a result of Bloom's fraudulent diversions, mechanic's liens in the

9    amount of at least $5,753,339 were recorded on the attraction and Tropicana's property

10    after Vion and Strategic had paid the Debtor all or substantially all of the $3,147,824.10

11    they funded.

12    56.    On August 25, 2011, the Bloom Defendants filed their *Answer, Counterclaim and*

13    *Third Party Complaint*, wherein certain of the Bloom Defendants asserted counterclaims against

14    Vion and Strategic, as well as third party claims against Murder, Ventre, Andrew Reiser

15    ("Reiser"), Strategic Capital Management, LLC, a New York limited liability company, MHF

16    Fund Management, LLC, a New York limited liability company, and Tropicana.  Among other

17    claims, the Bloom Defendants (or certain of them) asserted claims for fraudulent

18    misrepresentation, civil conspiracy, negligent misrepresentation, breach of contract, breach of the

19    implied covenant of good faith and fair dealing, breach of fiduciary responsibility: self-dealing,

20    abuse of process, defamation, conversion, negligence, unjust enrichment, indemnification,

21    deceptive acts and practices, and contribution.  Among other matters, the Bloom Defendants

22    attempted to divert blame for the LVME's precipitous financial condition on Ventre and his

23    team's "underperformance in their sales efforts."

24    57.    On September 16, 2011, Vion and Strategic filed a *Motion to Dismiss*

25    *Counterclaims*.

26    58.    On September 28, 2011, Noteholders Aubrey Gray Crampton, Hal Braxton,

27    Howard Puterman, Joseph Randazzo, Larry and Linda Dematteo, Vincent Mannino II, James

28    Klodt II, and Michael Regan (collectively, the "Intervenor Group") all filed motions to intervene

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

18

1    in the Vion-Strategic Case. The Intervenor Group did not assert any specific claims against any

2    specific parties, but rather asserted an alleged security interest in certain property over which a

3    receiver or third party may be appointed. The Intervenor Group also apparently asserts potential

4    claims against various unnamed parties, and with the intent on being able to seek discovery to

5    determine whether they actually did have any viable claims.

6    59.    On September 30, 2011, the Court held a hearing on the various pending matters,

7    and ordered that Larry Bertsch be appointed as special master to perform an accounting and

8    make certain other recommendations regarding the Debtor, including the qualifications of a

9    receiver to operate the property and safeguard it.

10    **2.    The GC-Global Case.**

11    60.    On October 5, 2011, GC-Global filed its *Complaint* (the "GC-Global Complaint")

12    in the Eighth Judicial District Court, Clark County, Nevada, being Case No. A-11-649459-C (the

13    "GC-Global Case") against Bloom, Murder, Mafia Collection, Order 66, and Eagle Holding.

14    The GC-Global Complaint asserts a breach of contract claim against the Debtor for failure to pay

15    the Notes allegedly acquired by GC-Global, claims for alter ego, unjust enrichment and monies

16    due and owing against all defendants, claims for foreclosure and possession as to Mafia

17    Collection and the Debtor, and a claim for fraud against Bloom.

18    61.    On October 6, 2011, GC-Global filed its *Ex Parte Petition for Writ of Possession*

19    *or, in the Alternative, Order to Show Cause Why a Writ of Possession Should Not Issue and*

20    *Temporary Restraining Order* (the "Writ Application"). GC-Global's Writ Application seeks

21    either immediate possession of Mafia Collection's property (the artifacts), or in the alternative,

22    for the Court to issue an order to show cause and issue a temporary restraining order prohibiting

23    any of the named defendants from collecting, depleting, losing, removing, relocating, concealing

24    or utilizing its collateral in which it asserts to have a properly perfected security interest. Upon

25    information and belief, the Writ Application will be heard on October 20, 2011.

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

## II.
## REASONS FOR THE BANKRUPTCY FILING

62.    The Debtor's Chapter 11 filing was a result of competing secured creditors and large liabilities incurred prior to opening while the project was under Bloom's control, some of which are unknown, as discussed above, inadequate working capital, poor operating performance once the LVME was opened, defaults under the Lease, and the numerous litigations seeking to foreclose and take other pre-judgment collection actions that could effectively shut down the LVME.  Further, the Debtor is unable to satisfy its obligations under the numerous consulting agreements between the Debtor and the family members of the mobsters which are the subject of the LVME.

63.    Further, by using the Debtor's assets for his own benefit and the benefit of the Debtor's affiliates, Bloom rendered the Debtor insolvent and unable to meet its obligations as they became due without additional financing.  As of my taking over control and management of Murder on July 1, 2011, Murder could not and still cannot pay its existing debts as they come due without additional financing.  In addition to the liabilities discussed in Section I.C, above, the Debtor has more than $3 million in trade payables and other unsecured debt.  In sum, the Debtor's liabilities exceed the value of the Debtor's assets exponentially.

## III.
## RESTRUCTURING GOALS

64.    The LVME remains a viable operation.  While the initial projections of income and debt obligations were flawed, the LVME can be restructured so that its revenues exceed its operating expenses while providing some repayment to its creditors.  However, in order to achieve positive cash flows, the LVME must (1) renegotiate the Lease with Tropicana, (2) drastically reduce its secured and unsecured debt, including eliminating its obligation to pay a significant portion of its gross revenues to creditors pursuant to the Income Assignments, (3) reject consulting agreements that are unnecessary and provide no benefit to the LVME, and (4) reopen the interactive experience component of the LVME.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

20

65.    The Debtor projects that its physical assets have a value of between $250,000 and $500,000.[9]  Much of the value of the Debtor's assets is attributable to equipment, props, and inventory which was designed and manufactured specifically for the LVME and has value only so long as the LVME continues to operate.  A liquidation of the Debtor's assets therefore would result in little to no recovery for secured creditors, and no recovery at all for unsecured creditors.

66.    In order for the Debtor's creditors to receive any material recovery, the LVME must continue operations and increase its revenues.  In order to increase its revenues, the interactive experience component of the LVME must reopen, which will more than double the number of visitors, and substantially increase its marketing investment.  In order to reopen the experience, the Debtor must obtain additional capital to invest in specialized video equipment and RFID (radio frequency identification) technology, along with additional employees.  In order to obtain additional capital, the LVME must quickly emerge from Chapter 11.  Languishing in Chapter 11 while the Debtor's creditors engage in protracted inter-creditor disputes will not only irreparably harm the Debtor's ability to reopen the experience and increase its revenues for the benefit of its creditors, but will cause Tropicana to refuse to enter into a modified lease with the Debtor, thereby requiring the Debtor to reject the Tropicana Lease pursuant to Section 365.  In that event, liquidation would be the only alternative.

67.    The Debtor has negotiated with JVLV Holdings, LLC ("JVLV") a postpetition loan pursuant to Sections 105, 363, and 364 of the Bankruptcy Code to provide needed working capital for the LVME through approximately January 30, 2012, which will be the subject of a motion concurrently filed with the Court.

68.    Moreover, the Debtor has negotiated the terms of a plan of reorganization which will provide for a sale of substantially all of the Debtor's assets to a new entity formed by JVLV ("Purchaser"), and will address each creditor consistency and has the support of Tropicana and M.J. Dean.  Within approximately one week following the Petition Date, the Debtor anticipates proposing a plan of reorganization substantially consistent with the *Proposal Regarding*

_____

[9] Exclusive of potential claims against Jay Bloom and the Debtor's affiliates for breach of fiduciary duty, fraudulent transfer, and other claims related to the conduct described in Section I.F, above

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

21

*Potential Murder Inc., LLC Chapter 11 Plan of Reorganization* (the "Plan Term Sheet"), a true and correct copy of which is attached hereto as **Exhibit 1**.

69.    As set forth in more detail in the Plan Term Sheet, on the effective date, substantially all of the assets of the Debtor, except for claims and causes of action, will be sold to the Purchaser free and clear of all liens, claims, and interests in exchange for the receipt of approximately $2,000,000 in cash to pay certain creditors.  Specifically, the Debtor's plan will provide for either, on a class basis, the issuance of equity in the Purchaser, or a *pro rata* payment of a lump sum of money in satisfaction of allowed claims.  M.J. Dean, the other Contractors, and miscellaneous secured creditors will be paid a portion of their allowed claims, which payments shall be paid funded by the Purchaser.  Claims and causes of action, including claims against Jay Bloom but exclusive of claims released pursuant to the plan, will be transferred to a liquidation trust for the benefit of the holders of general unsecured claims.

70.    As stated above, Tropicana has agreed, subject to the confirmation of a plan consistent with the Plan Term Sheet, to both forbear from asserting its rights under the Lease and Section 365 of the Bankruptcy Code and to enter into a new lease agreement with the new company formed to acquire the Debtor's assets, as more particularly set forth in the Lease Term Sheet, attached as Schedule A to the Plan Term Sheet.

## IV.
## FIRST DAY MOTIONS AND OTHER RELIEF

### A.    Generally.

71.    The Debtor commenced this Chapter 11 Case in response to its debt obligations and its inability to operate the interactive experience component of the LVME, which drastically reduces the Debtor's revenues.  The Debtor's transition into Chapter 11 proceedings must be comprehensively and effectively organized to ensure that it will be able to operate smoothly in bankruptcy and be afforded the opportunity to successfully emerge from this Chapter 11 Case.  Accordingly, it is critical that LVME maintain strong relationships with its customers, employees, partners, vendors, creditors, and such other parties that enable LVME to conduct its business.  To maintain and foster these relationships, it is important to minimize the distractions

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

22

to the Debtor's business operations that could result from LVME's petitioning for Chapter 11 relief.

72.    I have reviewed and am generally familiar with the contents of each of the First Day Motions.  Based on that familiarity and information supplied to me by other members of LVME's staff and LVME's legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in this Chapter 11 Case with minimal disruption or loss of productivity or value.  I also believe that the First Day Motions are vital to LVME's successful reorganization and are in the best interests of the Debtor and its creditors.

**B.    Motion of the Debtor Seeking Interim and Final Orders: (1) Authorizing the Debtor to Obtain Post-Petition Financing, (2) Granting Liens and Super-Priority Administrative Expense Status, (3) Modifying the Automatic Stay, and (4) Setting and Prescribing the Form and Manner of Notice for a Final Hearing.**

73.    Concurrently with the Petition, the Debtor has also filed its *Motion Seeking Interim and Final Orders: (1) Authorizing the Debtor to Obtain Post-Petition Financing, (2) Granting Liens and Super-Priority Administrative Expense Status, (3) Modifying the Automatic Stay, and (4) Setting and Prescribing the Form and Manner of Notice for a Final Hearing* (the "DIP Financing Motion").  The DIP Financing Motion seeks entry of an interim order:  (1) authorizing the Debtor to obtain post-petition financing pursuant to Sections 105, 363, and 364 of the Bankruptcy Code (the "DIP Loan") by entering into that certain Debtor-in-Possession Loan and Security Agreement (the "DIP Agreement") by and among the Debtor and JVLV Holdings, LLC (the "Post-Petition Lender"), all subject to the terms and conditions set forth herein and therein; (2) granting certain liens and super-priority administrative expense status to the Post-Petition Lender as specifically set forth therein pursuant to Sections 364(c)(1), (c)(2), (c)(3), and (d)(1) of the Bankruptcy Code; (3) modifying the automatic stay pursuant to Section 362(d) of the Bankruptcy Code; and (4) scheduling a final hearing and approving notice with respect thereto.

74.    Sections 2.1, 6.8 and 7.8 of the DIP Agreement require that the Debtor use DIP Loan proceeds in accordance with a Budget (the "Budget") attached thereto as **Exhibit A**.  Per Section 6.1 of the DIP Agreement, among other matters, the Debtor must also deliver to the Post-

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

23

1    Petition Lender, on the third Business Day of every week, a statement of all receipts and

2    disbursements and a variance statement of actual receipts and disbursements to the Budget.

3    Finally, Section 9.1(m) and (u) provide for "Events of Default" under the DIP Agreement for use

4    of loan proceeds contrary to the Budget or for substantial variances therefrom as more

5    particularly set forth therein. As such, the preparation, approval and adherence to the Budget is a

6    material and substantial factor and inducement to the Post-Petition Lender.

7        75.    I prepared the Budget in good faith and based upon my personal knowledge of the

8    Debtor's business affairs and operations. The Budget was formulated after review of the

9    Debtor's normal and ordinary course cash needs in the minimal operation and preservation of its

10   business and allows the Debtor to operate through the reorganization process and maintain the

11   integrity of its scaled-back business at present. I believe that the amounts set forth in the Budget

12   are absolutely necessary to avoid immediate and irreparable harm to the Debtor and its business

13   in the interim period and going forward in its Chapter 11 Case.

14       76.    The Debtor believes that good cause has been shown for the entry of the Interim

15   Order (as defined in the DIP Motion) to obtain the DIP Loan pending a final hearing on the relief

16   requested in the DIP Motion pursuant to Bankruptcy Rules 4001(c) and (d). The Debtor's need

17   for financing of the type requested herein and as afforded by the Interim Order is immediate and

18   critical. Entry of the Interim Order will minimize disruption of the Debtor's operations and

19   business as a going concern, will preserve the assets of the Debtor's estate, and is in the best

20   interests of the Debtor, its creditors, and its estate.

21       77.    The Debtor further believes that the terms of the financing are fair and reasonable,

22   reflect the Debtor's reasonable exercise of prudent business judgment, and are supported by

23   reasonably equivalent value and fair consideration. The DIP Agreement is necessary to maintain

24   the value of the Debtor's assets, including going-concern value, and the ability to continue its

25   business and operations. For the foregoing reasons, and in order to assure operating capital, it is

26   necessary for the Debtor to have a post-petition credit facility. Otherwise, the Debtor will be

27   forced to close its operations.

28       78.    I have discussed the Debtor's working capital needs with many of the Debtor's

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

24

1    prepetition lenders, and based upon those discussions, I have determined that a working capital

2    facility of the type needed in this case could not have been obtained on an unsecured basis.

3    Indeed, the potential sources of a credit facility for the Debtor, obtainable on an expedited basis

4    and on reasonable terms, are practically nonexistent.    The DIP Loan, the DIP Financing

5    Documents, and the Interim Order provide the only alternative available under the

6    circumstances.

7           79.    The DIP Loan is and will be the result of good faith and arm's-length negotiations

8    between the Debtor and JVLV, with all parties represented by counsel.

9    **C.**    **Debtor's Emergency Motion for Order (I) Authorizing the Debtor to Pay Wages, Salaries, Benefits, Reimbursable Business Expenses and Other Employee Obligations, and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations.**

12          80.    Concurrently with the Petition, the Debtor filed a motion seeking authorization to

13    pay its employees in the ordinary course of its business their ordinary compensation, including

14    paying reimbursable business expenses, to continue deducting taxes and garnishments from its

15    employees' paychecks pursuant to applicable nonbankruptcy law, and to continue remitting taxes

16    and garnishments pursuant to applicable nonbankruptcy law (the "Wage Motion").

17          81.    As of the Petition Date, the Debtor employed approximately sixteen (16) full and

18    part-time employees (the "Employees") in the ordinary course of its business. These employees

19    include me as President, a general manager, a bookkeeper, salespersons, security guards, and a

20    small number of staff on the floor in the museum itself.    The Debtor's semi-monthly payroll

21    expenses is currently approximately $26,362, down from $77,000 when the LVME was fully

22    operational. The Debtor does not provide benefits.

23          82.    As of the Petition Date, the Employees were owed or had accrued in their favor

24    various sums from the Debtor for wages and salaries incurred in the ordinary course of the

25    Debtor's business, including any prepetition compensation (collectively, the "Wage

26    Obligations").    The total estimated amount of Wage Obligations that will have accrued, but

27    remain unpaid, as of the Petition Date, is approximately $13,500.    The Debtor pays its

28    Employees on a bi-weekly payroll cycle with the last pay period ending October 7, 2011, for

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

25

1  which the Employees were compensated on October 14, 2011.  Thus, by the Wage Motion, the

2  Debtor is seeking authority to pay prepetition Wage Obligations for the payroll period

3  commencing on October 8, 2011 and ending October 17, 2011.

4       83.    The Debtor is required by law to withhold from its Employees' wages amounts

5  related to federal, state, and local income taxes, as well as social security and Medicare taxes and

6  to remit the same to the appropriate taxing authorities.  To the extent the Debtor has deducted

7  funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes and

8  FICA contributions attributable to Wage Obligations (the "Tax Obligations"), which are due but

9  have not been paid yet to any governmental entity, the Debtor seeks authorization to continue to

10  deduct these funds and pay them to such governmental entities in the ordinary course of

11  business.

12       84.    In addition, the Debtor is required to make matching payments from its own funds

13  on account of social security and Medicare taxes, and to pay, based on a percentage of gross

14  payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for,

15  among other things, state and federal unemployment insurance (the "Matching Obligations").

16  The Debtor seeks authorization to continue to pay these funds in the ordinary course of business.

17  The Wage Obligations, Tax Obligations, and Matching Obligations will not exceed

18  approximately $18,760 for the one week period preceding the Petition Date.

19       85.    Further, at certain times, Employees advance funds on behalf of the Debtor for

20  certain business expenses (the "Reimbursable Business Expenses" and, together with the Wage

21  Obligations, Tax Obligations and Matching Obligations, the "Employee Obligations").    The

22  Reimbursable Business Expenses are repaid to employees pursuant to certain policies and

23  procedures established by the Debtor.

24       86.    The aggregate of Wage Obligations to be paid to or for the benefit of each of the

25  Employees pursuant to the Wage Motion will not exceed $11,725.00 per Employee per the cap

26  in Section 507(a)(4) of the Bankruptcy Code.

27       87.    Continued payment of the Employees, as well as maintaining its workers'

28  compensation system, are essential to preserve the morale and to maintain positive relations

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

26

between the Debtor and its Employees. If the relief requested in the Wage Motion is not granted, the success of the Debtor's reorganization will be placed in substantial jeopardy. If the Debtor is unable to take the necessary steps to ensure that wages and taxes are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that large numbers of essential Employees will resign and that those Employees that remain will be discontented and demoralized. Continued service by the Employees is vital to the Debtor's ongoing operations.

88.    As of the Petition Date, the Debtor lacked sufficient cash on hand to honor all of the foregoing Employee Obligations as set forth herein, but through postpetition revenues and the DIP Loan, the Debtor will have sufficient cash to honor the Employee Obligations. The Debtor has approximately $9,711.93 either in cash or in its bank accounts as of the Petition Date.

**D.    Debtor's Emergency Motion for Order Authorizing Debtor to Honor Prepetition Ticket Purchases.**

89.    Concurrently with the Petition, the Debtor filed an application seeking authorization to honor purchases of tickets by customers prior to the petition date (the "Tickets Motion").

90.    Currently, the Debtor works with Travel Fun Card, LLC ("Travel Fun") dba VISITicket Power Pass (the "Pass") to offer prepaid tickets to LVME Customers (the "Prepetition Tickets").

91.    Specifically, Customers purchase a Pass which offers them access to twenty-seven different Las Vegas Attractions, including the LVME. Customers may purchase a one, two, three, or five-day pass, ranging in price from $79.99 for adults and $49.99 for children for a one-day pass and $174.99 for adults and $114.99 for children for the five-day pass.

92.    Approximately every two weeks, Debtor provides a report to Travel Fun for the number of Passes used at the LVME and, in return, Debtor receives payment from Travel Fun for the prepaid tickets.

93.    As of the Petition Date, the Debtor is unaware of the total number of Passes sold by Travel Fun and therefore, Prepetition Tickets sold. However, the LVME receives

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

1    approximately 250 customers per month through the Pass.

2        94.    As of the Petition Date, the Debtor believes that numerous tickets have been

3    purchased by customers which have not been used.  The Debtor requests that the Court enter an

4    order permitting it, without further order of this Court, to honor these Prepetition Tickets.

5        95.    Failure to honor Prepetition Tickets would have a substantial chilling effect on the

6    willingness of potential customers to purchase tickets, and maintaining the satisfaction and

7    confidence of prospective customers is imperative to the Debtor's on-going business operations

8    and consequently, the success of any reorganization by the Debtor.  Should the Debtor fail to

9    honor the Prepetition Tickets immediately upon the filing of the Petition, the loss of confidence

10   occasioned by the failure and the resulting detrimental impact on the Debtor's reorganization

11   effort would be immediate.

12   E.    **Debtor's Emergency Motion for Order Authorizing Debtor to Pay Pre-Petition**
         **Taxes and Fees Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541(d) .**

13

14       96.    Concurrently with the Petition, the Debtor filed a motion for authority to pay

15   prepetition taxes and fees (the "Taxes Motion").  In the ordinary course of business, the Debtor

16   (a) collects and incurs various taxes including business personal property, sales and use,

17   business, and other taxes in connection with the operation of its business (collectively, the

18   "Taxes"); and (b) collects or incurs fees and similar charges and assessments (collectively, the

19   "Fees").   The Taxes and Fees are payable periodically at various times to various taxing,

20   licensing, and other governmental authorities (collectively, the "Authorities").

21       97.    Taxes and Fees are paid at different times depending on the frequency of when

22   each Tax and Fee must be remitted, and are paid to the relevant Authority in accordance with

23   each Authority's requirements, including payments made by check or by electronic fund transfer.

24   These Taxes and Fees include the following:

25           i.    Sales Taxes.    The Debtor collects from customers or incur an

26           assortment of state and local sales taxes (collectively, the "Sales Taxes"), and remit

27           the Sales Taxes to the appropriate Authorities.  Sales Taxes accrue as tangible goods

28           and services are invoiced to customers and are calculated based on a statutory

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

28

1    percentage of the sale price invoiced to the customer.  If such taxes are not remitted to

2    the Authorities on a timely basis, the Authorities often impose personal liability on

3    officers of a corporation.  The Debtor remits Sales Taxes on a monthly basis.  The

4    Debtor estimates that as of the Petition Date, approximately $2,100 in Sales Taxes are

5    accrued but unpaid.

6          ii.    <u>Business Taxes</u>.   The Debtor may be responsible for payment of

7    business taxes that are levied against the seller of goods or provider of services at the

8    rate of 1.75% of gross sales.  The Debtor estimates that as of the Petition Date,

9    approximately $3,200 in Business Taxes are accrued but unpaid.

10         iii.    <u>Miscellaneous Taxes and Fees</u>.   Various state and local laws may

11    require the Debtor to obtain and pay fees for a wide range of licenses and permits

12    from a number of local, state, and federal regulatory agencies.  The amount owed, if

13    any, for these taxes and fees is *de minimis*.  To the extent there are pre-petition

14    amounts outstanding with respect to these taxes and fees, the Debtor is requesting the

15    authority to pay such amounts.

16    98.    Payment of Taxes and Fees will benefit the Debtor and its creditors by allowing

17    the Debtor to continue operations without unnecessary interruption and by reducing the amount

18    and priority of claims to be asserted against the estate.  The relief requested in the Taxes Motion

19    is integral to the continuing operation of the Debtor's business and the Debtor's successful

20    reorganization.

21    **F.**    **<u>Debtor's Emergency Motion for Entry of an Interim Order Pursuant to Bankruptcy</u>**
22    **<u>Rule 4001(b) and LR 4001(b):  (1) Initially Determining Extent of Cash Collateral</u>**
        **<u>and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral.</u>**

23    99.    Concurrently with the Petition, the Debtor has also filed an application seeking an

24    order determining that that (i) the funds in the Debtor's Operating Account and Payroll Account

25    (together, the "<u>Deposit Accounts</u>"), (ii) cash on hand ("<u>Cash</u>"), (iii) proceeds from the sale of the

26    Retail Store inventory acquired after the Petition Date ("<u>Postpetition Retail Proceeds</u>"),  and (iv)

27    postpetition receipts from tickets ("<u>Postpetition Ticket Revenues</u>"), by whatever means paid, are

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

1  not cash collateral (the "Cash Collateral Motion").

2      100.    The Debtor is not requesting the use of Cash Collateral at this time. Instead, the

3  Debtor is seeking approval of postpetition financing pursuant to Sections 105, 363, and 364 of

4  the Bankruptcy Code substantially concurrently with the Cash Collateral Motion.

5      101.    The LVME is asking for emergency relief because without an immediate

6  determination of the extent of Cash Collateral, the Debtor will be unable to pay its employees

7  and will cease operations, and the Debtor's estate will suffer irreparable harm. Though the

8  Debtor is simultaneously seeking the approval of the DIP Loan, the DIP Loan is predicated upon

9  the Deposit Accounts, Cash, Postpetition Retail Proceeds, and Postpetition Ticket Receipts being

10  available for use by the Debtor in the operation of the LVME. Therefore, the Debtor requires the

11  immediate use of the Postpetition Ticket Revenues, Deposit Accounts, and Cash.

12      102.    On the Petition Date, the Debtor had approximately $6,125 in its Operating

13  Account and Payroll Account; approximately $2,964 in Prepetition Card Receipts in process

14  with Benchmark; and $3,587 in Cash.

15      103.    LVME does not in any manner sell, lease, license, exchange, or otherwise dispose

16  of any portion of the collateral in exchange for the customers' purchase of tickets. The LVME

17  operates a predominantly service-based business, selling an educational and exciting experience.

18  No customer purchases a ticket believing he is purchasing the props, lighting equipment, or other

19  tangible collateral; instead, he is essentially buying entertainment. Moreover, the LVME, like

20  other museums and entertainment venues, such as amusement parts, offers its customers

21  ancillary goods to enhance its customers' experiences, such as photographs and retail items.

22  However, the ticket purchases are not derived from the sale, lease, or other disposition of these

23  ancillary items. Therefore, the LVME earns its Ticket Revenues through the sale of services

24  rather than through the sale of inventory, equipment, or other tangible goods.

25      104.    On the Petition Date, the Debtor had approximately $10,305.50 in inventory at

26  cost in the Retail Store. This merchandise is easily identified and consists primarily of goods

27  which have the logo of the LVME. It is the intention of the Debtor to acquire new merchandise

28  during the Chapter 11 Case and to initially sell only this merchandise. It is not Debtor's

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7

30

1    intention to sell any remaining prepetition inventory unless agreement is reached with Strategic

2    and Vion.   The Debtor can separately account for the prepetition and postpetition inventory.

3    All new inventory will be acquired with non-cash collateral revenues or DIP Loan proceeds.

4        105.    In order to ensure that Retail Receipts which are the proceeds of Retail Store

5    inventory that is secured collateral is segregated from new inventory acquired after the Petition

6    Date with Postpetition Ticket Revenues or the DIP Loan proceeds, the Debtor will use a new

7    design on the tags placed on the inventory acquired after the Petition Date.

8        106.    The photo concession is operated by Cashman Photo Enterprises, Inc.

9    ("Cashman").  Cashman paid for the build-out of the "Ellis Island" room in the LVME as well as

10    the photo stand in the Retail Store.  All of the equipment used in the photo concession belongs to

11    Cashman, and Cashman operates the photo concession.  In exchange for operating the photo

12    concession, Cashman retains the concession's revenues until its investment and advances are

13    recouped.  As such, the Debtor is entitled only to the net revenues from the photo concession,

14    and there are not net revenues projected to be generated from the Petition Date through January

15    30, 2012.

16        I declare under penalty of perjury of the laws of the United States that these facts are true

17    to the best of my knowledge and belief.

18        DATED this  _17_ day of October, 2011.

19

20                                        LOUIS VENTRE

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-001/1341787_7