NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM**
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Telephone: (702) 362-7800
Facsimile: (702) 362-9472
E-Mail: nleatham@klnevada.com
ncox@klnevada.com

DAVID I. SWAN, ESQ. – [*Pro Hac Vice to be submitted*]
JAMES E. VAN HORN, ESQ. - [*Pro Hac Vice to be submitted*]
CULLEN ANN DRESCHER, ESQ. - [*Pro Hac Vice to be submitted*]
**MCGUIREWOODS LLP**
7 Saint Paul Street, Suite 1000
Baltimore, Maryland 21202
Telephone: (410) 659-4468

Attorneys for Creditor
VION OPERATIONS, INC. and
STRATEGIC FUNDING SOURCE, INC.

KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE:<br><br>MURDER INC, LLC,<br><br>Debtor. | Case No. BK-S-11-26317-BAM<br><br>Chapter 11<br><br>**Hearing Date: October 24, 2011**<br><br>**Time: 9:30 a.m.** |

**OBJECTION OF VION OPERATIONS LLC AND STRATEGIC FUNDING SOURCE, INC. TO (I) THE DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER PURSUANT TO BANKRUPTCY RULE 4001(B) AND LR 4001(B): (1) INITIALLY DETERMINING EXTENT OF CASH COLLATERAL, AND (2) SCHEDULING A FINAL HEARING TO DETERMINE EXTENT OF CASH COLLATERAL; AND (II) THE DEBTOR'S MOTION SEEKING INTERIM AND FINAL ORDERS (1) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (2) GRANTING LIENS AND SUPER-PRIORITY ADMINSITRATIVE EXPENSE STATUS, (3) MODIFYING THE AUTOMATIC STAY, AND (4) SETTING AND PRESCRIBING THE FORM AND MANNER OF NOTICE FOR A FINAL HEARING**

Vion Operations, LLC ("Vion") and Strategic Funding Source, Inc. ("Strategic", and together with Vion, "Senior Lienholders"), by and through their undersigned counsel, file this omnibus objection (the "Objection") to (I) the Debtor's Emergency Motion for Entry of an

Interim Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b)(1) Initially Determining Extent of Cash Collateral and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral (Docket No. 9) (the "Cash Collateral Motion"); and (II) the Debtor's Motion Seeking Interim and Final Orders (1) Authorizing the Debtor to Obtain Post-Petition Financing, (2) Granting Liens and Super-Priority Administrative Expense Status, (3) Modifying the Automatic Stay, and (4) Setting and Prescribing the Form and Manner of Notice for a Final Hearing (Docket No. 12) (the "DIP Motion"),[1] and in support thereof state as follows:

KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

**PRELIMINARY STATEMENT**

Prior to the Debtor's bankruptcy filing, Vion, Strategic, and the Debtor were parties to various agreements pursuant to which the Senior Lienholders provided cash funding to the Debtor in exchange for an interest in certain future receivables of the Debtor and obtained perfected first priority security interests in all of the Debtor's personal property.

Through the Cash Collateral Motion, the Debtor requests this Court to determine the existence and extent of the Debtor's cash collateral, which necessitates this Court's determination of the validity, priority, or extent of liens and other interests in the Debtor's cash collateral. As a matter of due process and bankruptcy rule, property rights such as liens cannot be avoided by emergency motion. The determination and avoidance of liens may only be rendered within an adversary proceeding properly commenced and noticed under Fed. R. Bankr. P. 7001 *et seq*. Therefore, the Cash Collateral Motion suffers a fatal procedural defect and the relief sought therein cannot be granted under principles of due process.

Until this Court determines the extent to which the Debtor's cash and cash equivalents constitute "cash collateral," within the context of an adversary proceeding under Fed. R. Bankr. P. 7001, the Debtor cannot use the cash in its possession to secure the DIP Loan. Because the scope of the Debtor's cash collateral must be defined before any DIP facility secured by cash collateral is approved, the DIP Motion must be denied as prematurely filed. In addition, the DIP Motion should be denied for its failure to set forth meaningful information as to the Debtor's

[1] Capitalized terms not otherwise described herein shall have the meanings ascribed to them in the Cash Collateral Motion and the DIP Motion.

attempts (if any) to obtain alternative financing on less onerous terms.

## BACKGROUND

1. On February 25, 2011, the Debtor entered into a Purchase and Sale of Future Receipts Agreement (the "V-S Purchase Agreement") with Strategic and Vion. Ventre Declaration, ¶ 28. A true and correct copy of the V-S Purchase Agreement is attached hereto as Exhibit A, and attached to the Ventre Declaration at Exhibit 12. Separately, on the same day, the Debtor executed a Merchant Security Agreement and Guaranty (the "V-S Security/Guaranty Agreement"), thereby granting V-S a security interest in all of the Debtor's personal property. Ventre Declaration, ¶ 28. A true and correct copy of the V-S Security/Guaranty Agreement is attached hereto as Exhibit B, and attached to the Ventre Declaration at Exhibit 13.

2. On March 14, 2011, the Debtor entered into a second Purchase and Sale of Future Receivables Agreement with Strategic (the "Second Strategic Agreement"). Ventre Declaration, ¶ 29. A true and correct copy of the Second Strategic Agreement is attached hereto as Exhibit C, and attached to the Ventre Declaration at Exhibit 14. Separately, on the same day, the Debtor executed a second V-S Purchase Agreement and Guaranty in favor of Strategic (the "Second Strategic Guaranty," and together with the V-S Purchase Agreement, the V-S Security/Guaranty Agreement, and the Second Strategic Agreement, the "V-S Agreements"), thereby granting the Senior Lienholders a security interest substantially similar to that granted under the V-S Security/Guaranty Agreement. Ventre Declaration, ¶ 29. A true and correct copy of the Second Strategic Guaranty is attached hereto as Exhibit D, and attached to the Ventre Declaration at Exhibit 15.

3. On March 1, 2011 and March 16, 2011 Vion and Strategic filed UCC-1 financing statements (the "V-S Financing Statements") with the Nevada Secretary of State to perfect their security interests in the Debtor's assets. Ventre Declaration, ¶ 30. True and correct copies of the V-S Financing Statements are included as Exhibits 16, 17, 18, and 19 to the Ventre Declaration.

4. The V-S Agreements provide for various remedies in the event of the Debtor's default. As provided in Section 3.2 of the V-S Purchase Agreement, upon the Senior Lienholders' notice to the Debtor of any event of default under the V-S Purchase Agreement, the

KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

entire Purchased Amount outstanding under the Agreements at the time of the notice shall immediately become due and payable to the Senior Lienholders. *See* Exhibit A.

5. On July 12, 2011, and in response to numerous breaches and violations by the Debtor of the terms and conditions of the V-S Purchase Agreement, the Senior Lienholders transmitted to the Debtor a Notice of Events of Default and Acceleration of Purchased Amount Payment (the "Default Notice"). A true and correct copy of the Default Notice is attached hereto as Exhibit E. The Debtor failed to comply with Section 3.2 of the V-S Purchase Agreement and the Default Notice.

6. On October 17, 2011 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its property and is operating and managing its business as a debtor-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. On the Petition Date, the Debtor filed the Cash Collateral Motion and the DIP Motion. Hearings on the Cash Collateral Motion and the DIP Motion are scheduled for October 24, 2011.

7. As of the Petition Date, the balance due and owing to the Senior Lienholders under the V-S Agreements was $4,004,265.59.

## ARGUMENT

### I. The Cash Collateral Motion

#### A. The Cash Collateral Motion is Procedurally Defective and Must be Denied

8. The Cash Collateral Motion does not seek this Court's authority for the Debtor's use of cash collateral under Bankruptcy Code section 363(e). Cash Collateral Motion, at 8. Instead, the Cash Collateral Motion requests this Court to determine "which of the debtor's property is subject to a security interest and whether such security interest is perfected" so that the Debtor's cash collateral may be identified. Cash Collateral Motion, at 14. This Court's determination of the extent and validity of such liens and interests may only be rendered through a complaint in a properly commenced adversary proceeding under Fed. R. Bankr. P. 7001(2).

9. A proceeding "to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d). . . ." is an adversary proceeding

which must be commenced by the filing of a complaint with the bankruptcy court in order to afford due process to interested parties. *See* Fed. R. Bankr. P. 7001(2); *Expeditors Int'l v. Citicorp N. Am. (In re Colortran)*, 218 B.R. 507, 510 (B.A.P. 9th Cir. Cal. 1997) (explaining that the use of adversary proceedings to determine the validity of a lien affords due process to the parties involved).[2] Consequently, the Debtor may not deny due process to the Senior Lienholders and other interested parties by requesting this Court's determination of the extent and/or validity of liens and interests determined through the Cash Collateral Motion. Because the Debtor's request is improper in its current procedural posture, the Cash Collateral Motion must be denied.

10. In the Cash Collateral Motion, the Debtor "reserves the right to seek the use of Cash Collateral pursuant to Section 363(e) in the future." Cash Collateral Motion, ¶ 8. To the extent the Debtor requests this Court's authority to use cash collateral, now or in the future, the Senior Lienholders reserve all rights under the Bankruptcy Code and applicable nonbankruptcy law with respect to their interests in such cash collateral, including, but not limited to, the right to demand adequate protection of their interests under Bankruptcy Code section 363(e) and the right to assert perfected postpetition security interests in the debtor's collateral under Bankruptcy Code section 552(b).

## II. <u>The DIP Motion is Prematurely Filed and Must Be Denied</u>

11. In the DIP Motion, the Debtor requests this Court's authority to obtain post-petition financing from the Post-Petition Lender in the aggregate amount of $375,000. The proposed DIP Loan is to be secured by a first-priority lien on the Debtor's unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code, and a perfected junior lien in all assets of the Debtor that are subject to valid liens under section 364(c)(3) of the Bankruptcy Code. In addition, the DIP Motion proposes that the Post-Petition lender will be granted superpriority administrative expenses status pursuant to section 364(c)(1) of the Bankruptcy Code, senior to all other administrative expenses, subject only to a limited carve-out for professional fees. DIP

[2] Federal Rule of Bankruptcy Procedure 4003(d) applies only to proceedings to avoid liens or transfers under § 522(f) and is inapplicable to the facts at bar.



KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

Motion, at 3-6.

**A. This Court's Determination of Existing Liens and Interests In Cash Collateral Is a Necessary Precondition to the Debtor's Granting of Security Interests to the Post-Petition Lender**

12. Before this Court authorizes the Debtor to grant security interests in its cash and cash equivalents to the Post-Petition Lender, this Court must determine whether and to what extent cash and cash equivalents of the Debtor constitute cash collateral. The Debtor seeks such a determination in the Cash Collateral Motion; however, as discussed above, such relief may only be granted in the context of an adversary proceeding upon the Debtor's filing of a complaint under Fed. R. Bankr. P. 7001. Until the Court has considered and ruled on the merits of such a complaint, the scope of the Debtor's cash collateral cannot be defined. Until the Court has defined the scope of the Debtor's cash collateral within an adversary proceeding, the Debtor is unable to pledge its cash and cash equivalents as security for the DIP Loan. Accordingly, the DIP Motion must be denied as prematurely filed.[3]

**B. The Debtors Have Not Demonstrated the Absence of Alternative Financing Arrangements on Less Onerous Terms, Nor Adequately Proven the DIP Loan's Necessity**

13. The Senior Lienholders acknowledge that the Debtor is entitled to obtain debtor-in-possession financing under the Bankruptcy Code, but this entitlement is not without its limits. Particularly in this case, where the Debtor seeks approval of a "priming" DIP Loan, including onerous terms and substantial fees, the Debtor must make a showing that it diligently sought alternative financing arrangements on more favorable terms before accepting the DIP Loan. The DIP Motion, however, makes no such showing. Instead, the Debtor relies on mere conclusory statements to convince parties-in-interest that the Debtor's marketing efforts were sufficient. The Debtor provides no evidence regarding the terms under which it sought post-petition financing, the number of potential lenders it approached, how many potential lenders provided

---

[3] For the avoidance of doubt, the Senior Lienholders reserve all right with respect to the substance of DIP Motion under the Bankruptcy Code and applicable nonbankruptcy law, including but not limited to, the right to seek adequate protection under Bankruptcy Code section 364. Nothing contained herein is intended to waive the rights of the Senior Lienholders with respect to their interests in any assets of the Debtor. To the extent this Court grants the Debtor authority to use any of its cash or cash equivalents for any purpose (pursuant to the Cash Collateral Motion, the DIP Motion, or otherwise), the Senior Lienholders request a first priority replacement lien of equal amount that

KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

proposals and why such proposals were deemed unsatisfactory.

14. In the absence of a showing that the Debtor made reasonable efforts to obtain financing on better terms than those of the DIP Loan, this Court should not approve the DIP Motion. Such a finding is consistent with the views of other courts on this issue:

> Although a debtor is not required to seek credit from every possible source, *see In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986), a debtor must show that it made a "reasonable effort" to obtain post-petition financing from other potential lenders on less onerous terms and that such financing was unavailable. *See In re Ames Dept. Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (citations omitted). A court must make its decision as to "[h]ow extensive the debtor's efforts to obtain credit must be" on a case-by-case basis. *In re Reading Tube Industries*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

*Suntrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683, 691 (E.D.N.C. 2009); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) ("Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien."); *In re Stacy Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987) (holding that debtor failed to carry its burden under section 364(d) where there was no evidence that the debtor had applied for loans from institutions other than its pre-petition senior lender and the proposed priming lender).

15. While the courts do not appear to have established a bright-line test for evaluating the sufficiency of a debtor's efforts to obtain alternative debtor-in-possession financing, the Senior Lienholders submit that under no interpretation of applicable case law can the Debtor's disclosures be considered adequate. The Debtor has not provided any *meaningful* information concerning the number of alternative lenders approached, the terms of competing financing proposals received (if any), or evidence that in the absence of the DIP Loan, the Debtor would be unable to operate as a going concern in chapter 11. In other words, no proof has been provided that creditors are better off with the DIP Loan than without it. While it may indeed be the case

---

is not subject to priming by any liens or interests that may be granted in favor the Post-Petition Lender.

KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

that the Debtor has engaged in reasonable efforts to obtain alternative financing on less onerous terms, a full disclosure of those efforts must be made prior to this Court's approval of the DIP Motion.

WHEREFORE, for the foregoing reasons, the Senior Lienholders respectfully request that this Court (a) deny the Cash Collateral Motion; (b) deny the DIP Motion; and (c) grant such other and further relief as this Court deems just and proper.

DATED this 22nd day of October, 2011.

**KOLESAR & LEATHAM.**

By: [signature]
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145

-and-

DAVID I. SWAN, ESQ. – [*Pro Hac Vice to be submitted*]
JAMES E. VAN HORN, ESQ. - [*Pro Hac Vice to be submitted*]
CULLEN ANN DRESCHER, ESQ. - [*Pro Hac Vice to be submitted*]
**MCGUIREWOODS LLP**
7 Saint Paul Street, Suite 1000
Baltimore, Maryland 21202
Telephone: (410) 659-4468

Attorneys for Creditor
VION OPERATIONS, INC. and
STRATEGIC FUNDING SOURCE, INC.

# EXHIBIT A





Contract#
Sales Partner:

# MERCHANT CASH ADVANCE AGREEMENT

Agreement dated February 25, 2011 between **Strategic Funding Source Inc. ("SFSI")** and Vion **Operations LLC ("Vion")**, as co-purchasers (together, "**Purchaser**"), and the merchant listed below ("**Merchant**")

**MERCHANT INFORMATION**

Merchant's Legal Name: Munfer Inc., LLC

D/B/A: The Las Vegas Mob Experience | State of Incorporation/Organization: Nevada

Type of entity (check one) ( ) Corporation (X) Limited Liability Company ( ) Limited Partnership ( ) Limited Liability Partnership ( ) Sole Proprietor

Physical Address: 3801 Las Vegas Boulevard South | City: Las Vegas | State: Nevada | Zip: 89109

Mailing Address: 3801 Las Vegas Boulevard South | City: Las Vegas | State: Nevada | Zip: 89109

Date business started (mm/yy): 03/09 | Federal ID#: 26-4474831

Monthly Total Sales: Not Applicable | Monthly Card Sales: Not Applicable | Monthly Cash Sales: Not Applicable

**PURCHASE AND SALE OF FUTURE RECEIPTS**

Merchant hereby sells, assigns and transfers to Purchaser (making Purchaser the absolute owner) in consideration of the purchase price specified below (the "Purchase Price"), (i) all of Merchant's future accounts, contract rights and other rights to payment arising from or relating to the use by Merchant's customers of credit cards, charge cards, debit cards, prepaid cards and other similar payment cards in the ordinary course of Merchant's business (the "Card Receipts") and (ii) all of Merchant's future money, accounts, instruments, payment intangibles and other rights to payment arising from or relating to the use by Merchant's customers or other third party payors of cash, checks, electronic transfers or other similar methods of payment (other than cards) in the ordinary course of Merchant's business (the "Non-Card Receipts"), in each case for the payment of Merchant's sale of goods or rendition of services until the purchased amount specified below (the "Purchased Amount") has been delivered by Merchant to Purchaser, provided that the Purchase Price, the Specified Percentage (as defined below) and/or the Purchased Amount may be adjusted by Purchaser and Merchant in writing if one or more card or electronic check processing conditions are not satisfied. Purchaser may, upon Merchant's request, adjust the amount of any payment under this Agreement in Purchaser's sole discretion and as it deems appropriate.

The Purchased Amount shall be paid to Purchaser (i) in the case of Card Receipts, by Merchant's irrevocably authorizing only one card processor acceptable to Purchaser ("Processor") to remit to or for the benefit of Purchaser the percentage specified below (the "Specified Percentage") of Merchant's settlement amounts due from each card issuer with respect to the Card Receipts and (ii) in the case of Non-Card Receipts, by Merchant's irrevocably authorizing Colonial Funding Network, Inc. ("Colonial") to ACH debit from only one deposit account acceptable to Purchaser (the "ACH Account") maintained at a bank acceptable to Purchaser ("Bank") and to remit to or for the benefit of Purchaser the Specified Percentage of all Non-Card Receipts deposited to or credited to the ACH Account, in each case until such time as Purchaser receives payment in full of the Purchased Amount. Notwithstanding anything to the contrary in this Agreement or any other agreement between either Purchaser and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

**Purchase Price:** $2,747,688.58 **Specified Percentage:** SEE ADDENDUM **Purchased Amount:** $3,571,995.15

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", THE "MERCHANT SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM," EACH OF WHICH IS ATTACHED HERETO, ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.**

**MERCHANT**

By: Jay Bloom, Managing Member (Print Name and Title) — [signature] (Signature) — Sign Here

By: Louis Ventre, Managing Member (Print Name and Title) — [signature] (Signature) — Sign Here

**OWNER/GUARANTOR #1**

Jay Bloom (Print Name) — [signature] (Signature) — Sign Here

**OWNER/GUARANTOR #2**

Louis Ventre (Print Name) — [signature] (Signature) — Sign Here

By: Andrew Reiser, Chairman and CEO
(Strategic Funding Source, Inc. Officer)

(Signature)

**VION OPERATIONS LLC**

By: Stacey Schacter, Chief Executive Officer
(Vion Operations LLC Officer)

(Signature)

Each person signing this Agreement on behalf of Merchant represents that he or she is authorized to sign this Agreement on behalf of Merchant, and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor represents that the information provided herein and in all of Purchaser's forms is true, accurate and complete in all respects. Purchaser may produce a monthly statement reflecting the delivery of the Specified Percentage of Receipts from Merchant to Purchaser via Processor (in the case of Card Receipts) or via ACH debits to the ACH Account (in the case of Non-Card Receipts).

**ANY MISREPRESENTATION MADE BY MERCHANT OR ANY OWNER/GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

**AUTHORIZED SERVICING AGENT – Colonial Funding Network, Inc.**

**Colonial Funding Network, Inc. ("Colonial") is the Authorized Servicing Agent of Purchaser(s) for this contract providing administrative, bookkeeping, reporting and support services for Purchaser and Merchant. Colonial is acting as an independent agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting and remit capture. Colonial is not a credit card processor, or in the business of processing credit cards. Merchant hereby acknowledges that in no event will Colonial be liable for any claims made against Purchaser, Processor or Bank under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and each Owner/Guarantor.**

**MERCHANT**

By: Jay Bloom, Managing Member
(Print Name and Title)

(Signature) Sign Here

By: Louis Ventre, Managing Member
(Print Name and Title)

(Signature) Sign Here

## MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS

**I. TERMS OF ENROLLMENT IN PROGRAM**

1.1 **Merchant Cash Advance Agreement.** These terms and conditions shall be incorporated in and made part of the attached Merchant Cash Advance Agreement (such Merchant Cash Advance Agreement, as supplemented by these terms and conditions, this "Agreement").

1.2 **Merchant Processing Agreement.** Merchant shall execute an agreement (the "Merchant Processing Agreement") acceptable to Purchaser, with a card processor acceptable to Purchaser, to obtain card processing services. Merchant shall authorize Processor to deduct the amounts owed to Purchaser for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from Processor card transactions and to pay such amounts to Purchaser pursuant to Purchaser's instructions to Processor. The authorization shall be irrevocable without the written consent of Purchaser. Processor may rely upon the instructions of Purchaser, without any independent verification, in making such deductions and payments, and Merchant waives any claims for damages it may have against Processor in connection with such acts unless such damages were due to Processor's failure to follow Purchaser's instructions. Purchaser may, in its sole discretion, reduce the Purchase Price if one or more card processing conditions are not satisfied.

1.3 **Merchant Deposit Agreement.** Merchant shall execute an agreement acceptable to Purchaser, with a bank acceptable to Purchaser, to obtain electronic fund transfer services. Merchant shall provide Colonial with all of the authorizations, access codes, passwords and other information necessary for verifying Merchant's receivables, receipts and deposits into the ACH Account. Merchant hereby authorizes Colonial to ACH debit from the ACH Account and pay to Purchaser on each business day the Specified Percentage of all Non-Card Receipts deposited in or credited to the ACH Account on such business day, until such time as Purchaser receives payment in full of the Purchased Amount. This authorization shall be irrevocable without the written consent of Purchaser.

1.4 **Check Processing Agreement.** Merchant shall execute an agreement (the "Check Processing Agreement") acceptable to Purchaser, with an electronic check processor acceptable to Purchaser, to obtain electronic check processing services.

1.5 **Contract Servicing.** This Agreement shall be serviced by Colonial, which will provide administrative, bookkeeping, reporting and support services. Colonial has no financial investment in this transaction and is not a credit card processor. Merchant hereby authorizes and permits Colonial to service this Agreement and grants Colonial access to certain confidential and proprietary financial and business information as part of the servicing of this Agreement, which information will be maintained as confidential as part of the Colonial Privacy Policy.

1.6 **Bridge / Control Account.** Merchant may be required to open a new bank account into which the Specified Percentage of the settlement amounts will be deposited (the "Bridge / Control Account"). **Merchant appoints Colonial as "Acting Agent" over the Bridge / Control Account, and shall instruct Processor to designate the Bridge / Control Account as the deposit account for all of Merchant's customers' card transactions. Merchant assumes all responsibility for all fees, costs, charge-backs or ...icious items processed through the Bridge / Control Account** (see "Miscellaneous Service Fees" paragraph 3.7). **Merchant agrees to maintain a minimum balance in the Bridge / Control Account (the "Minimum Balance") equal to the per-month average of all fees charged to Merchant by Processor, averaged over a six-month period.**

1.7 **Financial Condition.** Merchant and each Owner/Guarantor authorize Purchaser and Colonial, the agents and representatives of Purchaser and Colonial, and any credit reporting agency engaged by Purchaser or Colonial, to investigate their creditworthiness, financial responsibility and history, and they agree to provide Purchaser and Colonial any financial statements, tax returns, references, or other credit or financial information as either Purchaser or Colonial deems necessary prior to or after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of credit and financial information. Merchant and each Owner/Guarantor authorize Purchaser and Colonial to update their credit and financial profile from time to time in the future, as either Purchaser or Colonial deems appropriate. An investigative or consumer report may be made or obtained in connection with this Agreement.

1.8 **Transactional History.** Merchant authorizes Processor to provide Purchaser and Colonial with Merchant's card history. Merchant authorizes Bank to provide Purchaser and Colonial with Merchant's banking history.

1.9 **Indemnification.** Merchant and each Owner/Guarantor jointly and severally indemnify and hold harmless Processor, Bank and Colonial and their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor, Bank or Colonial resulting from (a) claims asserted by Purchaser for monies owed to Purchaser from Merchant and (b) actions taken by Processor or Bank in reliance upon information or instructions provided by Purchaser.

1.10 **No Liability.** In no event will Processor, Bank, Colonial or Purchaser be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and each Owner/Guarantor. Merchant understands that it is responsible for any fees incurred by Colonial or either Purchaser resulting from a rejected ACH attempt or an event of default and that neither Colonial nor any Purchaser is responsible for any overdrafts or rejected transactions that may result from any ACH debit made in accordance with the terms of this Agreement.

1.11 **Reliance on Terms. Sections 1.2, 1.3, 1.9, 1.10, 2.5, and 4.6 hereof are agreed to for the benefit of Merchant, Purchaser, Colonial, Processor and Bank, and, notwithstanding the fact that none of Colonial, Processor or Bank is a party to this Agreement, Colonial, Processor and Bank may rely upon their terms and raise them as a defense in any action.**

1.12 **Sale of Receipts.** Merchant and Purchaser intend that the transfer of the interest in the Card Receipts and the Non-Card Receipts (collectively, the "Receipts") from Merchant to Purchaser constitute a sale, and not a loan, for all purposes. Merchant agrees that the Purchase Price equals the fair market value of such interest. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to Purchaser a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. In no event shall the aggregate of all amounts deemed interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that Purchaser has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Purchaser shall promptly refund to Merchant any interest received by Purchaser in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that Purchaser not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant hereby authorizes each Purchaser to file any financing statements deemed necessary by such Purchaser to perfect or maintain such Purchaser's interest in the Receipts.

1.13 **Power of Attorney.** Merchant irrevocably appoints each Purchaser and Colonial, individually, and any assignee of either Purchaser or Colonial as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Purchaser from Processor or Bank, or upon the occurrence of an Event of Default under Section 3.1 hereof, to settle all obligations due to Purchaser from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in the Merchant Security Agreement and Guaranty); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; and (v) to file any claims or take any action or institute any proceeding which Purchaser may deem necessary for the collection of any unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

1.14 **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor, in respect of himself or herself personally, authorizes each Purchaser and Colonial, individually, to disclose to any third party information concerning Merchant's and each Owner's/Guarantor's credit standing (including credit bureau reports that either Purchaser or Colonial obtains) and business conduct. Merchant and each Owner/Guarantor hereby waive to the maximum extent permitted by law any claim for damages against either Purchaser or Colonial or any of their affiliates relating to any (i) investigation undertaken by or on behalf of Purchaser or Colonial as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.15 **Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Purchaser, including this Agreement, the Merchant Security Agreement and Guaranty and any other documents executed in connection with such agreements or related to such agreements (collectively, "Confidential Information") are proprietary and confidential information of Purchaser. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided

such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to not disclose Confidential Information to any person in accordance with the terms of this Section

1.16 **Publicity.** Merchant and each Owner/Guarantor authorize Purchaser to use their respective names in a ting of clients and in advertising and marketing iterials.

.17 **D/B/A's.** Merchant and each Owner/Guarantor hereby acknowledge and agree that Purchaser may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Purchaser and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

1.18 **Financial Information**. Merchant and each Owner/Guarantor shall provide to Purchaser and/or Colonial upon request copies of financial statements representing the financial condition of Merchant and/or such Owner/Guarantor.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant and each Owner/Guarantor each represents, warrants and covenants that as of the date of this Agreement and on each date during the term of this Agreement:

2.1 **Financial Condition and Financial Information.** Its financial statements, copies of which have been furnished to Purchaser, and any financial statements furnished to Purchaser hereafter, fairly represent the financial condition of Merchant and each Owner/Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise Purchaser of any material adverse change in its financial condition, operation or ownership.

2 **Governmental Approvals.** Merchant is and will nain in compliance with all laws and has valid its, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

2.3 **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to execute this Agreement and to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 **Insurance.** Merchant has and will maintain business-interruption insurance naming Purchaser as loss payee and additional insured in such amounts and against such risks as are satisfactory to Purchaser and shall provide Purchaser proof of such insurance upon request.

2.5 **Merchant Processing Arrangements; Merchant Deposit Arrangements.** Without Purchaser's prior written consent, Merchant will not: (i) change the card processor through which the Receipts are settled from Processor to another card processor, (ii) change its electronic check processor to an electronic check processor not approved by Purchaser; (iii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another card processor; (iv) permit any event to occur that could cause diversion of any of Merchant's electronic check transactions to an electronic check processor not approved by Purchaser; (v) change its arrangements with Processor or amend the Merchant Processing Agreement in any way that is adverse to Purchaser; (vi) change its arrangements with Bank or its electronic check processor or amend the Check Processing Agreement in any way that is adverse to Purchaser; i) add card or electronic check processing terminals; use multiple card or electronic check processing minals; (ix) change its financial institution or bank account(s) (including the Bridge / Control Account, if applicable, and the ACH Account); (x) take any other action that could have any adverse effect upon Merchant's obligations under this Agreement or Purchaser's interest in the Receipts; or (xi) take any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor or the use of electronic checks that are settled through an electronic check processor approved by Purchaser, or to induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor or electronic checks that are settled through an electronic check processor approved by Purchaser, or permit any event to occur that could have an adverse effect on the use, acceptance, or authorization of cards or electronic checks for the purchase of Merchant's services and products.

2.6 **Change of Name or Location.** Merchant will not conduct its businesses under any name other than as disclosed to Processor, Bank, Colonial and Purchaser or change any of its places of business.

2.7 **Daily Batch Out.** Merchant will batch out Card Receipts with Processor on a daily basis.

2.8 **Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from either Purchaser to Merchant, execute, acknowledge and deliver to such Purchaser and/or to any other person, firm or corporation specified by such Purchaser, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates on which the Purchased Amount or any portion thereof has been paid.

2.9 **No Bankruptcy.** Merchant has not filed any petition for bankruptcy protection under Title 11 of the United States Code, no involuntary petition for bankruptcy has been brought or is pending against Merchant, Merchant has not admitted in writing its inability to pay its debts or made a general assignment for the benefit of creditors, and no other proceeding has been instituted by or against Merchant seeking to adjudicate it insolvent or seeking reorganization, arrangement, adjustment or composition of it or its debts. Merchant does not anticipate filing any such bankruptcy petition and is not aware and has no reason to believe that any such bankruptcy petition or other proceeding will be filed or brought against it.

2.10 **Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Receipts or future card or non-card sales with any party other than Purchaser.

2.11 **Unencumbered Receipts.** Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Purchaser.

2.12 **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.13 **Default Under Other Contracts.** Merchant's execution of or performance under this Agreement will not cause or create any breach or default by Merchant under any contract with another person or entity.

2.14 **Delivery of Confession of Judgment.** Upon execution of this Agreement, Merchant shall, if requested by Purchaser, deliver to Purchaser an executed Confession of Judgment (the "Confession of Judgment"), in the form provided by Purchaser, in favor of Purchaser in the amount of the Purchased Amount.

2.15 **Delivery of Assignment of Lease.** Merchant and each Owner/Guarantor authorize Purchaser to receive pertinent information regarding the commercial lease for the physical location(s) of Merchant's business (the "Premises") from any applicable leasing company and or agent. Merchant may be asked to deliver to Purchaser an executed Assignment of Lease assigning all of Merchant's right, title and interest in and to the Premises and under the lease for the Premises to Purchaser (the "Assignment of Lease").

2.16 **Sale of Business.** Merchant shall not sell, dispose, transfer or otherwise convey its business or assets without (i) the express prior written consent of Purchaser, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to Purchaser.

2.17 **Bridge / Control Account.** If Merchant is required to open a Bridge / Control Account, (i) Merchant will not, unless otherwise directed in writing by Purchaser, take any action to cause the Specified Percentage of the settlement amounts to be settled or delivered to any account other than the Bridge / Control Account and (ii) Merchant will at all times maintain the Minimum Balance in the Bridge / Control Account.

2.18 **Use of Proceeds.** Merchant will conduct its business and use the Purchase Price in the ordinary course of its business, consistent with past practice.

2.19 **Accuracy of Information.** All information provided by Merchant and each Owner/Guarantor to Purchaser herein, in the Merchant Security Agreement and Guaranty, and in all other documents executed in connection with such agreements or related to such agreements is true, accurate and complete in all respects.

## III. EVENTS OF DEFAULT AND REMEDIES

3.1 **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or any Owner/Guarantor violates any term, covenant or condition in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with either Purchaser; (b) any representation or warranty by Merchant or any Owner/Guarantor in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with either Purchaser shall prove to have been incorrect, incomplete, false or misleading in any material respect when made; (c) Merchant or any Owner/Guarantor admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) any Owner/Guarantor sends a notice of termination of the Merchant Security Agreement and Guaranty; (e) Merchant suspends, dissolves or terminates its business; (f) Merchant sells all or substantially all of its assets; (g) Merchant makes or sends notice of any intended bulk sale or transfer by Merchant; (h) Merchant performs any act that reduces the value of the Collateral or the security interest granted in the Collateral under the Merchant Security Agreement and Guaranty; (i) any Owner/Guarantor performs any act that reduces the value of the Additional Collateral (as defined in the Merchant Security Agreement and Guaranty) or the security interest granted in the Additional Collateral under the

Merchant Security Agreement and Guaranty; or (j) Merchant or any Owner/Guarantor defaults under any of the terms, covenants and conditions of any other agreement with either Purchaser.

3.2 **Remedies.** Upon the occurrence of an Event of Default that is not waived pursuant to Section 4.4 reof, Purchaser may proceed to protect and enforce rights or remedies by suit in equity or by action at w, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Merchant Security Agreement and Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Purchaser's notice to Merchant of any Event of Default, the entire Purchased Amount not already paid to Purchaser shall become immediately due and payable to Purchaser. In addition, upon an Event of Default (i) Purchaser may enforce the provisions of the Merchant Security Agreement and Guaranty against each Owner/Guarantor; (ii) Purchaser may enforce its security interest in the Collateral and Additional Collateral; (iii) Purchaser may debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise; (iv) Purchaser may enter the Confession of Judgment as a judgment with the appropriate Clerk of Court and execute thereon; and (v) Purchaser may exercise its rights under the Assignment of Lease. All rights, powers and remedies of Purchaser in connection with this Agreement and the Merchant Security Agreement and Guaranty may be exercised at any time by Purchaser after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 **Costs.** Merchant and each Owner/Guarantor shall pay to each Purchaser all costs reasonably incurred by ch Purchaser in connection with (a) any Event of fault including without limitation any breach by rchant or any Owner/Guarantor of the representations, warranties and covenants in this Agreement or the Merchant Security Agreement and Guaranty, and (b) the enforcement of Purchaser remedies set forth in Section 3.2 hereof, including but not limited to court costs and attorneys' fees.

3.4 **Required Notifications. Merchant and each Owner/Guarantor shall give each Purchaser written notice within 24 hours of any filing by Merchant or any Owner/Guarantor under Title 11 of the United States Code or of the occurrence of any other event described in Section 3.1(c) hereof. Merchant shall give each Purchaser seven days' written notice prior to the closing of any sale of all or substantially all of Merchant's assets or stock. Merchant shall give each Purchaser seven days' written notice prior to the suspension, dissolution or terminations its business.**

3.5 **Default Waiver Fee.** Upon Merchant's request, Purchaser may elect in its sole discretion to waive the occurrence of an Event of Default under this Agreement or the Merchant Security Agreement and Guaranty, provided that Merchant shall pay a default waiver fee (the "Default Waiver Fee") for each such waiver in the amount of $2,500.00 to Purchaser, which amount shall be due and payable to Purchaser on demand. Such Default Waiver Fee shall be payable for each Event of Default occurring under this Agreement or the Merchant Security Agreement and Guaranty and waived pursuant to this Section 3.5, and no such waiver of an Event of Default shall in any way be construed as waiver by Purchaser of any other occurrence of an nt of Default, or as otherwise limiting Purchaser's s or remedies provided for hereunder, under the erchant Security Agreement and Guaranty, or by law or equity.

3.6 **Processor Change Fee.** Merchant shall pay a processor change fee (the "Processor Change Fee") to Purchaser in the amount of $5,000.00 in the event that Merchant (i) uses multiple card processing terminals without the prior written consent of Purchaser, (ii) changes its card processor without the prior written consent of Purchaser or (iii) directs Processor to deliver settlement amounts to any account other than the Bridge / Control Account (if Merchant is required to open a Bridge / Control Account). Such Processor Change Fee (i) shall be due and payable to Purchaser on demand, (ii) is not exclusive of, and is cumulative with, any other fee or amount paid or payable to Purchaser by Merchant pursuant to this Agreement or the Merchant Security Agreement and Guaranty; and (iii) shall not be construed as a waiver of any Event of Default hereunder or under the Merchant Security Agreement and Guaranty or as otherwise operating to reduce or limit Purchaser's rights or remedies provided for hereunder, under the Merchant Security Agreement and Guaranty or at law or in equity.

3.7 **Miscellaneous Service Fees.** Merchant shall pay to Colonial for services related to this Agreement the fees set forth on the attached fee schedule.

**IV. MISCELLANEOUS**

4.1 **Modifications; Agreements.** No modification, amendment, or waiver of any provision of, or consent to any action under, this Agreement or the Merchant Security Agreement and Guaranty shall be effective unless the same is in writing and signed by Purchaser.

4.2 **Assignment.** Each Purchaser may assign, transfer or sell its rights to receive its share of the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3 **Notices.** All notices, requests, consent, demands and other communications hereunder and under the Merchant Security Agreement and Guaranty shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement and the Merchant Security Agreement and Guaranty at the addresses set forth in this Agreement and shall become effective only upon receipt.

4.4 **Waiver Remedies.** No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement or the Merchant Security Agreement and Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement or the Merchant Security Agreement and Guaranty preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder and under the Merchant Security Agreement and Guaranty are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Solicitations.** Merchant and each Owner/Guarantor authorize Purchaser and its affiliates to communicate with, solicit and /or market to Merchant and each Owner/Guarantor via regular mail, telephone, email and facsimile in connection with the provision of goods or services by Purchaser, its affiliates or any third party that Purchaser shares, transfers, exchanges, discloses or provides information with and will hold Purchaser, its affiliates and such third parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by and any of the methods described above.

4.6 **Terminated Merchant File and Match File.** Merchant expressly acknowledges that a Terminated Merchant File ("TMF"), or any successor thereto, is maintained by MasterCard or VISA containing the business name and names and identification of principals of merchants which have been terminated for one or more of the reasons specified in MasterCard or VISA operating regulations. Such reasons include, but are not limited to, fraud, counterfeit drafts, unauthorized transactions, excessive charge-backs and retrieval requests, money laundering, or where a high security risk exists. **MERCHANT ACKNOWLEDGES THAT PROCESSOR AND PURCHASER ARE REQUIRED TO REPORT THE BUSINESS NAME OF MERCHANT AND THE NAMES AND IDENTIFICATION OF ITS PRINCIPALS TO THE TMF WHEN A MERCHANT IS TERMINATED FOR ONE OR MORE OF THE REASONS SPECIFIED IN MASTERCARD OR VISA OPERATING REGULATIONS. MERCHANT EXPRESSLY AGREES AND CONSENTS TO SUCH REPORTING BY PROCESSOR AND PURCHASER AND RELEASES EACH FROM ANY DAMAGES FOR DOING SO IN GOOD FAITH.**

4.7 **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement and the Merchant Security Agreement and Guaranty shall be binding upon and inure to the benefit of Merchant, each Owner/Guarantor, Purchaser and their respective successors and assigns, except that Merchant and each Owner/Guarantor shall not have the right to assign their rights hereunder or under the Merchant Security Agreement and Guaranty or any interest herein or therein without the prior written consent of Purchaser which consent may be withheld in Purchaser's sole discretion. Each Purchaser may assign its rights and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty in whole or in part without prior notice to Merchant or any Owner/Guarantor. This Agreement and the Merchant Security Agreement and Guaranty shall be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable conflicts of law principles. Any suit, action or proceeding arising hereunder or under the Merchant Security Agreement and Guaranty, or the interpretation, performance or breach hereof or thereof, shall, if Purchaser so elects, be instituted in any court sitting in New York, New York, (the "Acceptable Forum"). Each of Merchant and each Owner/Guarantor agrees that any state or federal court sitting in the Acceptable Forum is convenient to it, hereby irrevocably and unconditionally submits to the personal jurisdiction of any such court and hereby waives any and all objections to jurisdiction or venue. Each of Merchant and each Owner/Guarantor agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon such party and may be enforced in any other courts to whose jurisdiction such party is or may be subject, by suit upon such judgment. Should such suit, action or proceeding be initiated in any other forum, Merchant and each Owner/Guarantor waive any right to oppose any motion or application made by either Purchaser to transfer such suit, action or proceeding to the Acceptable Forum.

4.8 **Survival of Representation, etc.** All representations, warranties and covenants herein and in the Merchant Security Agreement and Guaranty shall survive the execution and delivery of this Agreement and the Merchant Security Agreement and Guaranty and shall continue in full force until all obligations under this Agreement and the Merchant Security Agreement and Guaranty shall have been satisfied in full and this Agreement and the Merchant Security Agreement and Guaranty shall have terminated.

4.9 **Severability.** In case any of the provisions in this Agreement or the Merchant Security Agreement and Guaranty is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability

of any other provision contained herein or therein shall not in any way be affected or impaired.

4.10 **Entire Agreement.** Any provision hereof or of the Merchant Security Agreement and Guaranty prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof or thereof. This Agreement and the Merchant Security Agreement and Guaranty embody the entire agreement between Merchant, each Owner/Guarantor and Purchaser and supersede all prior agreements and understandings relating to the subject matter hereof.

4.11 **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE MERCHANT SECURITY AGREEMENT AND GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE ENFORECEMENT HEREOF OR THEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY, VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

4.12 **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANOTHER PARTY, THE PARTIES HERETO AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT OR THE MERCHANT SECURITY AGREEMENT AND GUARANTY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.13 **Counterparts; Facsimile and PDF Acceptance.** This Agreement and the Merchant Security Agreement and Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument. Signatures on this Agreement and the Merchant Security Agreement and Guaranty sent by facsimile or PDF will be treated as original signatures for all purposes.

INITIALS: ______

**COLONIAL FUNDING NETWORK, INC.**
**FEE SCHEDULE**

d Wire Fee (Purchase Price): Vion Charge

.CH Transfer Fee (Purchase Price): Vion Charge

Underwriting and Origination Fee (Deducted from Purchase Price): $4,500.00

Bridge / Control Account Fee: $495.00 (12 months)

ACH Transfer Fee (Transfers from Bridge / Control Account to Merchant Operating Account): $25.00 per month

Operating Account Change Fee: $150.00

Copy Fee (Monthly Statements): N/A

Copy Fee (Monthly Statements): N/A

Additional Fees: Monthly Accounts Reconciliation for LVME – estimate $500.00 to $750.00 maximum

INITIALS: ______

**MERCHANT CASH ADVANCE AGREEMENT**
**ADDENDUM**

The Specified Percentage shall equal 10% for the first $2,500,000 per month in revenues (the "Minimum Requirement") and 7% for all revenues in excess of $2,500,000; provided, however, that if $2,500,000 in revenue is not achieved in any given month the shortfall will be added to the Minimum Requirement in succeeding months unless and until the shortfall has been made up. For example, (i) if revenues were $2,000,000 in month one and $2,500,000 in month two, the 10% Specified Percentage in month two would apply to the $2,500,000 for month two plus the $500,000 shortfall from month one (and the 7% Specified Percentage in month two would apply to the remaining $500,000 in month two revenues) and (ii) if revenues were $2,000,000 in month one, $2,000,000 in month two, and $4,000,000 in month three, the 10% Specified Percentage in month three would apply to the $2,500,000 for month three plus the $500,000 shortfalls from month one and month two (and the 7% Specified Percentage in month three would apply to the remaining $500,000 in month three revenues). Revenues shall mean all sales proceeds including but not limited to ticket sales, merchandise sales, photo sales and any other revenue generating activity whether in cash, check, credit card, debit card, prepaid card or other form of payment.

# EXHIBIT B

**STRATEGIC FUNDING SOURCE, INC. AND VION OPERATIONS LLC**
**MERCHANT SECURITY AGREEMENT AND GUARANTY**

Merchant's Legal Name: Murder Inc., LLC D/B/A: The Las Vegas Mob Experience
Physical Address: 3801 Las Vegas Boulevard South City: Las Vegas State: Nevada Zip: 89109
Federal ID#: 26-4474831

**SECURITY AGREEMENT**

Security Interest. To secure Merchant's payment and performance obligations to Purchaser under the Merchant Cash Advance Agreement between Merchant and Purchaser (the "Merchant Agreement"), Merchant hereby grants to Purchaser a security interest in all personal property of Merchant, including all accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, as those terms are defined in Article 9 of the Uniform Commercial Code of the State of New York as amended (the "UCC"), whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of such property, as that term is defined in Article 9 of the UCC (collectively, the "Collateral").

Cross-Collateral. To secure Guarantor's payment and performance obligations to Purchaser under this Merchant Security Agreement and Guaranty (this "Agreement"), each Guarantor hereby grants Purchaser a security interest in [NOT APPLICABLE] _______________ (the "Additional Collateral"). Each Guarantor agrees and acknowledges that Purchaser will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as either Purchaser deems necessary to perfect or maintain Purchaser's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements. Each of Merchant and each Guarantor hereby authorizes each Purchaser to file any financing statements deemed necessary by such Purchaser to perfect or maintain Purchaser's security interest which financing statements may contain notification that Merchant and each Guarantor have granted a negative pledge to Purchaser with respect to the Collateral and Additional Collateral, and that any subsequent lienor may be tortiously interfering with Purchaser's rights. Merchant and each Guarantor shall be jointly and severally liable for and shall pay to each Purchaser upon demand all costs and expenses, including but not limited to attorneys' fees, which may be incurred by such Purchaser in protecting, preserving and enforcing Purchaser's security interest and rights.

Negative Pledge. Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien or other encumbrance on or with respect to any of the Collateral or Additional Collateral, as applicable.

Consent to Enter Premises and Assign Lease. Purchaser shall have the right to cure Merchant's default in the payment of rent for the Premises on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, Purchaser may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that Purchaser may enter into an agreement with Merchant's landlord giving Purchaser the right: (a) to enter the Premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at the Premises.

Remedies. Upon any Event of Default, Purchaser may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing to Purchaser, whether by acceleration or otherwise.

**GUARANTY**

Performance Guaranty. Each undersigned Guarantor ("Guarantor") hereby unconditionally guarantees to Purchaser the payment and performance by Merchant of all of its obligations under this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified from time to time (the "Guaranteed Obligations"). Guarantor shall be liable for and Purchaser may charge and collect all costs and expenses, including but not limited to attorneys' fees, which may be incurred by Purchaser in connection with the collection of any or all of the Guaranteed Obligations from Guarantor or the enforcement of this Agreement.

Guarantor Waivers. In the event that Merchant fails to make a payment when due or otherwise perform under the Merchant Agreement, Purchaser may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral Purchaser may hold pursuant to this Agreement or any other guaranty.

Purchaser does not have to notify Guarantor of any of the following events and Guarantor will not be released from any of its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any material or adverse change in Merchant's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, or any other guarantee of the Guaranteed Obligations; (iv) Purchaser's acceptance of this Agreement; or (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to Purchaser. In addition, Purchaser may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to Purchaser; (ii) release Merchant from its obligations to Purchaser; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to Purchaser under the Merchant Agreement and this Agreement are paid and performed in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that Purchaser must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount. Guarantor agrees that its obligations under this Agreement shall be irrevocable and shall be unconditional irrespective of any circumstance that might otherwise operate as a legal or equitable discharge of a guarantor or a defense of a guarantor.

Guarantor Acknowledgement. **Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Agreement and that any misrepresentation may constitute fraud; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.**

nt and Several Liability. The obligations hereunder of each Guarantor are joint and several.

INITIAL

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT. CAPITALIZED TERMS NOT DEFINED IN THIS AGREEMENT SHALL HAVE THE MEANINGS SET FORTH IN THE MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS.

**MERCHANT**

Jay Bloom, Managing Member
(Print Name and Title) — (Signature) — Sign Here
SS# 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 — Drivers License Number 1602320621 — Sign Here

By: Louis Ventre, Managing Member
(Print Name and Title) — (Signature) — Sign Here
SS# 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 — Drivers License Number 1603794122 — Sign Here

**OWNER/GUARANTOR #1**

Jay Bloom
(Print Name) — (Signature) — Sign Here
SS# 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 — Drivers License Number 1602320621 — Sign Here

**OWNER/GUARANTOR #2**

Louis Ventre
(Print Name) — (Signature) — Sign Here
SS# 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 — Drivers License Number 1603794122 — Sign Here

# EXHIBIT C

Contract# 18735
Sales Partner:




## MERCHANT CASH ADVANCE AGREEMENT

Agreement dated March 14, 2011 (Month) (Day) (Year) between Strategic Funding Source Inc. ("SFSI") and the merchant listed below ("the Merchant").

MERCHANT INFORMATION

Merchant's Legal Name: Murder Inc., LLC

D/B/A: The Las Vegas Mob Experience State of Incorporation/organization: ____

Type of entity (check one) ( ) Corporation ( ) Limited Liability Company ( ) Limited Partnership ( ) Limited Liability Partnership ( ) Sole Proprietor

Physical Address: 3801 Las Vegas Blvd South Suite A City Las Vegas State NV Zip 89109

Mailing Address: 8455 W Reno Avenue City ____ State NV Zip 89118

Date business started (mm/yy): ____ Federal ID# ____

Monthly Total Sales ____ Monthly Card Sales ____ Monthly Cash Sales ____

PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to SFSI (making SFSI the absolute owner) in consideration of the purchase price ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' use of cards (the "Receipts" defined as all credit cards, debit cards and any other medium of charge or card payment used in the ordinary course of the Merchant's business), for the payment of Merchant's sale of goods or rendition of services until the amount specified below (the "Purchased Amount") has been delivered by Merchant to SFSI.

The Purchased Amount shall be paid to SFSI by Merchant's irrevocably authorizing only one cards processor acceptable to SFSI (the "Processor") to remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each card issuer with respect to the Receipts, until such time as SFSI receives payment in full of the Purchased Amount. SFSI may, upon Merchant's request, extend the time for any payment due under this Agreement for such time as SFSI, in its sole discretion, deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between SFSI and Merchant, upon the occurrence of an Event of Default under Section 4 of the MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

Purchase Price: $ 400,136.62 Specified Percentage: 10 % Receipts Purchased Amount: $ 520,176.31

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", THE "MERCHANT SECURITY AGREEMENT AND GUARANTY" AND "ADMINISTRATIVE FORMS" [Note: Is there a separate Administrative Form?] ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

MERCHANT #1
By Louis Ventre / President (Print Name and Title) ____ (Signature) Sign Here

MERCHANT #2
By Jay Bloom / Owner (Print Name and Title) ____ (Signature) Sign Here

OWNER/GUARANTOR #1
By Louis Ventre (Print Name) ____ (Signature) Sign Here

OWNER/GUARANTOR #2
By Jay Bloom (Print Name) ____ (Signature) Sign Here

STRATEGIC FUNDING SOURCE, INC.
By ____ (Strategic Funding Source, Inc. Officer) Associate Name ____ (Signature)

Each of above-signed Merchant and Owner/Guarantor represents that he or she is authorized to sign this Agreement for Merchant and that the information provided herein and in all of SFSI's forms is true, accurate and complete in all respects. SFSI may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant via Processor.

ANY MISREPRESENTATION MADE BY MERCHANT OR ANY OWNER/GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.

# MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS

## I. TERMS OF ENROLLMENT IN PROGRAM

1.1 Merchant Processing Agreement. Merchant shall execute an agreement (the "Merchant Processing Agreement") acceptable to SFSI, with a Processor acceptable to SFSI, to obtain card processing services. Merchant shall authorize Processor to deduct the amounts owed to SFSI for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from Processor card transactions and to pay such amounts to SFSI pursuant to SFSI's instructions to Processor. The authorization shall be irrevocable without the written consent of SFSI. Processor may rely upon the instructions of SFSI, without any independent verification, in making such deductions and payments, and the Merchant waives any claims for damages it may have against Processor in connection with such acts unless such damages were due to Processor's failure to follow SFSI's instructions.

1.2 Term of Agreement. This Agreement shall have a term of one year. Upon the expiration of the term, this Agreement shall automatically renew for successive one-year terms, provided, however, that during the renewal term(s) Merchant may terminate this Agreement upon ninety days' prior written notice (effective upon receipt) to SFSI. The termination of this Agreement shall not affect Merchant's responsibility to satisfy all outstanding obligations to SFSI at the time of termination.

1.3 Future Purchases. SFSI reserves the right to rescind the offer to make promised payments hereunder, in its sole discretion.

1.4 Bridge / Control Account. Merchant may be required to open a new bank account into which the Specified Percentage of the settlement amounts will be deposited (the "Bridge / Control Account"). Merchant appoints SFSI as "Acting Agent" over the Bridge / Control Account, and shall instruct the Processor to designate the Bridge / Control Account as the depository account for all card transactions. Merchant assumes all responsibility for all fees, costs, charge-backs or suspicious items processed through the Bridge / Control Account (see "Miscellaneous Service Fees" paragraph 3.7). Merchant agrees to maintain a minimum balance in the Bridge / Control Account (the "Minimum Balance") equal to the per-month average of all fees charged to Merchant by Processor, averaged over a six-month period.

1.5 Financial Condition. Owner/Guarantor and Merchant authorize SFSI, its agents and representatives and any credit reporting agency engaged by SFSI, to investigate their creditworthiness, financial responsibility and history, and they agree to provide SFSI any financial statements, tax returns, references, or other financial information, as SFSI deems necessary prior to or after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of credit and financial information. Merchant and Owner/Guarantor authorize SFSI to update their credit and financial profile from time to time in the future, as SFSI deems appropriate. An investigative or consumer report may be made in connection with this Agreement.

1.6 Transactional History. Merchant authorizes the Processor to provide SFSI with Merchant's card history.

1.7 Indemnification. Merchant and each Owner/Guarantor jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by SFSI for monies owed to SFSI from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by SFSI.

1.8 No Liability. In no event will Processor or SFSI be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Owner/Guarantor.

1.9 Reliance on Terms. Section 1.1, 1.7, 1.8, 2.5, and 4.6 of this Agreement are agreed to for the benefit of Merchant, SFSI and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

1.10 Sale of Receipts. Merchant and SFSI agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as, a loan from SFSI to Merchant. Merchant agrees that the Purchase Price exchanged for the Receipts pursuant to this Agreement equals the fair market value of such Receipts. Payments made to SFSI in respect to the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts deemed interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that SFSI has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and SFSI shall promptly refund to Merchant any interest received by SFSI in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that SFSI not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

1.11 Power of Attorney. Merchant irrevocably appoints SFSI as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to SFSI from Processor, or upon the occurrence of an Event of Default under Section 4 hereof, to settle all obligations due to SFSI from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in the Merchant Security Agreement and Guaranty); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to SFSI; and (v) to file any claims or take any action or institute any proceeding which SFSI may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

1.12 Protection of Information. Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor, in respect of himself or herself personally, authorizes SFSI to disclose to any third party information concerning Merchant's and each Owner's/Guarantor's credit standing (including credit bureau reports that SFSI obtains) and business conduct. Merchant and each Owner/Guarantor hereby waives to the maximum extent permitted by law any claim for damages against SFSI or any of its affiliates relating to any (i) investigation undertaken by or on behalf of SFSI as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.13 Confidentiality. Merchant understands and agrees that the terms and conditions of the products and services offered by SFSI, including this Agreement, the Security Agreement and Guaranty and any other SFSI documents (collectively, "Confidential Information") are proprietary and confidential information of SFSI. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 1.13.

1.14 Publicity. Merchant and each Owner/Guarantor authorizes SFSI to use its, his or her name in a listing of clients and in advertising and marketing materials.

1.15 D/B/A's. Merchant hereby acknowledges and agrees that SFSI may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between SFSI and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant and each Owner/Guarantor represents, warrants and covenants that as of this date and during the term of this Agreement:

2.1 Financial Condition and Financial Information. Its financial statements, copies of which have been furnished to SFSI, and future statements which will be furnished hereafter at the request of SFSI, fairly represent the financial condition of Owner/Guarantor and Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise SFSI of any material adverse change in its financial condition, operation or ownership. Merchant's failure to do so is a material breach of this Agreement.

2.2 Governmental Approvals. Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

2.3 Authorization. Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to execute this Agreement and to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 Insurance. Merchant will maintain business-interruption insurance naming SFSI as loss payee and additional insured in amounts and against risks as are satisfactory to SFSI and shall provide SFSI proof of such insurance upon request.

2.5 Merchant Processing Agreement and Arrangements. Without SFSI's prior written consent, Merchant will not (i) change the card processor through which the major cards are settled from Processor to another card processor; (ii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another processor; (iii) change its arrangements with Processor or amend the Merchant Processing Agreement in any way that is adverse to SFSI; (iv) add card processing terminals; (v) use multiple card processing terminals; (vi) change its financial institution or bank account(s) (including the Bridge Account); (vii) take any other action that could have any adverse effect upon Merchant's obligations under this Agreement; or (viii) take any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which will be to discourage the use of cards that are settled through Processor, or to

induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor, or permit any event to occur that could have an adverse effect on the use, acceptance, or authorization of cards for the purchase of Merchant's services and products. Any such change, action or inaction shall be a material breach of this Agreement.

2.6 Change of Name or Location. Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and SFSI or change any of its places of business.

2.7 Daily Batch Out. Merchant will batch out receipts with the Processor on a daily basis.

2.8 Estoppel Certificate. Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from SFSI to Merchant, execute, acknowledge and deliver to SFSI and/or to any other person, firm or corporation specified by SFSI, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9 No Bankruptcy. As of the date of this Agreement, Merchant has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10 Working Capital Funding. Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Receipts or future card sales with any party other than SFSI.

2.11 Unencumbered Receipts. Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, SFSI.

2.12 Business Purpose. Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.13 Default Under Other Contracts. Merchant's execution of or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

2.14 Delivery of Confession of Judgment. Upon execution of this Agreement, Merchant shall deliver to SFSI an executed Confession of Judgment, in the form provided by SFSI, in favor of SFSI in the amount of the Purchase Price.

2.15 Delivery of Assignment of Lease. Merchant and Owner/Guarantor authorize SFSI to receive pertinent information regarding the commercial lease for the physical location of Merchant's business (the "Premises") from any applicable leasing company and or agent. Upon execution of this Agreement, Merchant shall deliver to SFSI an executed Assignment of Lease covering the Premises in favor of SFSI.

2.16 Sale of Business. Merchant shall not sell, dispose, transfer or otherwise convey its business or assets without (i) the express prior written consent of SFSI, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to SFSI.

2.17 Bridge Account. Merchant will not take any action to cause the Specified Percentage of the settlement amounts to be settled or delivered to any account other than the Bridge Account. Merchant will maintain a Minimum Balance in the Bridge Account.

2.18 Use of Proceeds. Merchant will conduct its business and use the Purchase Price in the ordinary course of its business, consistent with past practice.

2.19 Accuracy of Information. All information provided by Merchant and each Owner/Guarantor to SFSI herein, in the Security Agreement and Guaranty, and in all other SFSI forms is true, accurate and complete in all respects.

## III. EVENTS OF DEFAULT AND REMEDIES

3.1 Events of Default. The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Owner/Guarantor violates any term, covenant or condition in this Agreement or the Security Agreement and Guaranty; (b) any representation or warranty by Merchant or Owner/Guarantor in this Agreement or the Security Agreement and Guaranty shall prove to have been incorrect, incomplete, false or misleading in any material respect when made; (c) Merchant or Owner/Guarantor admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant or Owner/Guarantor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) Owner/Guarantor sends a notice of termination of the Security Agreement and Guaranty; (e) Merchant suspends, dissolves or terminates its business; (f) Merchant sells all or substantially all of its assets; (g) Merchant makes or sends notice of any intended bulk sale or transfer by Merchant; (h) Merchant performs any act that reduces the value of the Collateral or, the security interest granted in the Collateral under the Merchant Security Agreement and Guaranty; (i) Owner/Guarantor performs any act that reduces the value of the Additional Collateral (as defined in the Merchant Security Agreement and Guaranty) or the security interest granted in the Additional Collateral under the Merchant Security Agreement and Guaranty; or (j) Merchant or Owner/Guarantor defaults under any of the terms, covenants and conditions of any other agreement with SFSI.

3.2 Remedies. Upon the occurrence of an Event of Default that is not waived pursuant to Section 4.4 hereof, SFSI may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's and Owner's/Guarantor's obligations hereunder, under the Security Agreement and Guaranty, or pursuant to any other legal or equitable right or remedy. Upon SFSI's notice to Merchant of any Event of Default, the entire Purchase Price not already repaid to SFSI shall become immediately due and payable to SFSI. In addition, upon an Event of Default (i) SFSI may enforce the provisions of the Security Agreement and Guaranty against the Owner/Guarantor; (ii) SFSI may enforce its security interest in the Collateral and Additional Collateral; (iii) SFSI may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise; (iv) SFSI may enter the Confession of Judgment as a judgment with the appropriate Clerk of Court and execute thereon; and (v) SFSI may exercise its rights under the Assignment of Lease. All rights, powers and remedies of SFSI in connection with this Agreement and the Security Agreement and Guaranty may be exercised at any time by SFSI after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 Costs. Merchant and Owner/Guarantor shall pay to SFSI all reasonable costs associated with (a) a breach by Merchant or Owner/Guarantor of the representations, warranties and covenants in this Agreement and the Security Agreement and Guaranty and the enforcement thereof, and (b) the enforcement of SFSI's remedies set forth in Section 3.2 above, including but not limited to court costs and attorneys' fees.

3.4 Required Notifications. Merchant and Owner/Guarantor are required to give SFSI written notice within 24 hours of any filing by Merchant or Owner/Guarantor under Title 11 of the United States Code. Merchant is required to give SFSI seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock. Merchant is required to give SFSI [seven] days' written notice prior to the suspension, dissolution or termination of its business.

3.5 Default Waiver Fee. Upon Merchant's request, SFSI may elect in its sole and absolute discretion to waive the occurrence of an Event of Default under this Agreement or the Merchant Security Agreement and Guaranty, provided that Merchant shall pay a Default Waiver Fee for each such waiver in the amount of $2,500.00 to SFSI, which amount shall be due and payable to SFSI on demand. Such Default Waiver Fee shall be payable for each Event of Default occurring under this Agreement or the Merchant Security Agreement and Guaranty and waived pursuant to this Section, and no such waiver of an Event of Default shall in any way be construed as a waiver by SFSI of any other occurrence of an Event of Default, or as otherwise limiting SFSI's rights or remedies provided for hereunder, under the Merchant Security Agreement and Guaranty, or by law or equity.

3.6 Processor Change Fee. Merchant shall pay to SFSI $3,000.00 in the event that Merchant (i) uses multiple card processing terminals without the prior written consent of SFSI, or (ii) changes its card processor without the prior written consent of SFSI. Such Processor Change Fee (i) shall be due and payable to SFSI on demand, (ii) is not exclusive of, and is cumulative with, any other fee or amount paid or payable to SFSI by Merchant pursuant to this Agreement or the Merchant Security Agreement and Guaranty; and (iii) shall not be construed as a waiver of any Event of Default hereunder or under the Merchant Security Agreement and Guaranty or as otherwise operating to reduce or limit SFSI's rights or remedies provided for hereunder, under the Merchant Security Agreement and Guaranty or at law or in equity.

3.7 Miscellaneous Service Fees. Merchant shall pay certain fees for services related to the origination and maintenance of accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or $12.50 for a bank ACH. Current charges for the underwriting and origination of each Merchant Agreement is $295.00 paid from the funded amount; If Merchant is utilizing a Bridge / Control Account there is a one time, upfront fee of $395.00 for the related bank and administrative costs of maintaining the account for each Merchant Agreement contract. Fund transfers from Bridge / Control Accounts to Merchant's operating bank account will be charged $7.50 per month ACH. Merchant will be charged $35.00 for every additional change of their operating bank account once they are active with SFSI. Additional copies of prior monthly statements will incur a fee of $10.00 each.

INITIALS: [illegible]

## IV. MISCELLANEOUS

4.1 Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement or the Merchant Security Agreement and Guaranty shall be effective unless the same shall be in writing and signed by SFSI.

4.2 Assignment. SFSI may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3 Notices. All notices, requests, consent, demands and other communications hereunder and under the Merchant Security Agreement and Guaranty shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement and the Merchant Security Agreement and Guaranty at the addresses set forth in this Agreement and shall become effective only upon receipt.

4.4 Waiver Remedies. No failure on the part of SFSI to exercise, and no delay in exercising, any right under this Agreement or the Merchant Security Agreement and Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement or the Merchant Security Agreement and Guaranty preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder and under the Merchant Security Agreement and Guaranty are cumulative and not exclusive of any remedies provided by law or equity.

4.5 Solicitations. Merchant and each Owner/Guarantor authorizes SFSI and its affiliates to communicate with, solicit and /or market to Merchant and each Owner/Guarantor via regular mail, telephone, email and facsimile in connection with the provision of goods or services by SFSI, its affiliates or any third party that SFSI shares, transfers, exchanges, discloses or provides information with and will hold SFSI, its affiliates and such third parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other states of federal laws relating to transmissions or solicitations by and any of the methods described above.

4.6 Terminated Merchant File and Match File. Merchant expressly acknowledges that a Terminated Merchant File ("TMF"), or any successor thereto, is maintained by MasterCard or VISA containing the business name and names and identification of principals of merchants which have been terminated for one or more of the reasons specified in MasterCard or VISA operating regulations. Such reasons include, but are not limited to, fraud, counterfeit drafts, unauthorized transactions, excessive charge-backs and retrieval requests, money laundering, or where a high security risk exists. MERCHANT ACKNOWLEDGES THAT PROCESSOR AND SFSI ARE REQUIRED TO REPORT THE BUSINESS NAME OF THE MERCHANT AND THE NAMES AND IDENTIFICATION OF ITS PRINCIPALS TO THE TMF WHEN A MERCHANT IS TERMINATED FOR ONE OR MORE OF THE REASONS SPECIFIED IN MASTERCARD OR VISA OPERATING REGULATIONS. MERCHANT EXPRESSLY AGREES AND CONSENTS TO SUCH REPORTING BY PROCESSOR AND SFSI AND RELEASES EACH FROM ANY DAMAGES FOR DOING SO IN GOOD FAITH.

4.7 Binding Effect; Governing Law, Venue and Jurisdiction. This Agreement and the Merchant Security Agreement and Guaranty shall be binding upon and inure to the benefit of Merchant, Owner/Guarantor, SFSI and their respective successors and assigns, except that Merchant and Owner/Guarantor shall not have the right to assign their rights hereunder, under the Merchant Security Agreement and Guaranty or any interest herein or therein without the prior written consent of SFSI which consent may be withheld in SFSI's sole discretion. SFSI reserves the rights to assign this Agreement and the Security Agreement and Guaranty with or without prior written notice to Merchant and Owner/Guarantor. This Agreement and the Security Agreement and Guaranty shall be governed by and construed in accordance with the laws of the State of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder or under the Security Agreement and Guaranty, or the interpretation, performance or breach hereof or thereof, shall, if SFSI so elects, be instituted in any court sitting in New York, New York, (the "Acceptable Forums"). Merchant and Owner/Guarantor agree that the Acceptable Forums are convenient to them, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Owner/Guarantor waive any right to oppose any motion or application made by SFSI to transfer such proceeding to an Acceptable Forum.

4.8 Survival of Representation, etc. All representations, warranties and covenants herein and in the Security Agreement and Guaranty shall survive the execution and delivery of this Agreement and the Security Agreement and Guaranty and shall continue in full force until all obligations under this Agreement and the Security Agreement and Guaranty shall have been satisfied in full and this Agreement and the Security Agreement and Guaranty shall have terminated.

4.9 Severability. In case any of the provisions in this Agreement or the Security Agreement and Guaranty is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein or therein shall not in any way be affected or impaired.

4.10 Entire Agreement. Any provision hereof and in the Security Agreement and Guaranty prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof or thereof. This Agreement and the Merchant Security Agreement and Guaranty embody the entire agreement between Merchant, Owner/Guarantor and SFSI and supercede all prior agreements and understandings relating to the subject matter hereof.

4.11 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT AND THE SECURITY AGREEMENT AND GUARANTY IS A PART OR THE ENFORCEMENT HEREOF OR THEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.12 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANOTHER PARTY, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT OR THE SECURITY AGREEMENT AND GUARANTY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.13 Facsimile and PDF Acceptance. Facsimile and PDF signatures shall be deemed acceptable for all purposes

_____________
Initials

# EXHIBIT D

## STRATEGIC FUNDING SOURCE, INC • MERCHANT SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: Murder Inc, LLC D/B/A: The Las Vegas Mob Experience
Physical Address: 3801 Las Vegas Blvd South Suite A City Las Vegas State NV Zip 89109

Federal ID# ______________________

### SECURITY AGREEMENT

Security Interest. To secure Merchant's payment and performance obligations to SFSI under the Merchant Cash Advance Agreement (the "Merchant Agreement"), Merchant hereby grants to SFSI a security interest in (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code of the State of New York as amended (the "UCC") now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined in Article 9 of the UCC (a and b collectively, the "Collateral").

Cross-Collateral. To secure Guarantor's payment and performance obligations to SFSI under this Security Agreement and Guaranty (the "Agreement"), Guarantor hereby grants SFSI a security interest in ______________________

(the "Additional Collateral"). Guarantor understands that SFSI will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as SFSI deems necessary to perfect or maintain SFSI's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements. Merchant and Guarantor each hereby authorizes SFSI to file any financing statements deemed necessary by SFSI to perfect or maintain SFSI's security interest, which financing statement may contain notification that Merchant and Guarantor have granted a negative pledge to SFSI with respect to the Collateral and Additional Collateral, and that any subsequent lender may be tortiously interfering with SFSI's rights. Merchant and Guarantor shall be liable for and SFSI may charge and collect all costs and expenses, including but not limited to attorney's fees, which may be incurred by SFSI in protecting, preserving and enforcing SFSI's security interest and rights. Any financing statements will state that the sale of the Purchased Amount from the Receipts is intended to be a sale and not an assignment for security.

Negative Pledge. Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or Additional Collateral, as applicable.

Consent to Enter Premises and Assign Lease. SFSI shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, SFSI may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that SFSI may enter into an agreement with Merchant's landlord giving SFSI the right (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same, and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at such premises.

Remedies. Upon any Event of Default, SFSI may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise.

### GUARANTY

Performance Guaranty. The undersigned Guarantor(s) hereby guarantees to SFSI, Merchant's payment and performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").

Guarantor Waivers. In the event that Merchant fails to make a payment when due or failure of performance under the Merchant Agreement, SFSI may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral SFSI may hold pursuant to this Agreement or any other guaranty.

SFSI does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any material or adverse change in Merchant's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) SFSI's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to SFSI. In addition, SFSI may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to SFSI; (ii) release Merchant from its obligations to SFSI; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to SFSI under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that SFSI must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

Guarantor Acknowledgment. Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; and any other agreements that may constitute default; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail Himself/Herself of that opportunity.

Joint and Several Liability. The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

INITIALS: ______

Revised 01-18-11 SFS MA



MERCHANT #1
By: Louis Vantre / President
(Print Name and Title)
SS# [illegible]
(Signature)
Drivers License Number 1603794122
Sign Here

MERCHANT #2
By: Jay Bloom / Owner
(Print Name and Title)
SS#
(Signature)
Drivers License Number 1602320821
Sign Here

OWNER/GUARANTOR #1
By: Louis Vantre
(Print Name and Title)
SS#
(Signature)
Drivers License Number 1603784122
Sign Here

OWNER/GUARANTOR #2
By: Jay Bloom
(Print Name and Title)
SS#
(Signature)
Drivers License Number 1602120821
Sign Here

# EXHIBIT E

July 12, 2011

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Murder Inc., LLC d/b/a The Las Vegas Mob Experience
3801 Las Vegas Boulevard South
Las Vegas, Nevada 89109

Re: Notice of Events of Default under Merchant Cash Advance Agreement; Acceleration of Purchased Amount Payment

Dear Mr. Ventre:

This letter confirms our discussions regarding (1) the Merchant Cash Advance Agreement (the "Merchant Agreement") dated February 25, 2011 by and among Murder Inc., LLC d/b/a The Las Vegas Mob Experience ("Merchant"), Strategic Funding Source Inc. ("SFS") and Vion Operations LLC ("Vion" and collectively with SFS, "Purchaser"), and (2) the Merchant Security Agreement and Guaranty (the "Security Agreement and Guaranty") executed by Merchant and each Guarantor (as defined therein) in favor of Purchaser.

Purchaser hereby notifies Merchant by this letter that Events of Default (as defined in the Merchant Agreement) exist under the Merchant Agreement, as a result of, among other things (a) Merchant's breach of certain representations and warranties contained in the Merchant Agreement, including Merchant's provision of inaccurate and incomplete information to Purchaser in documents related to the Merchant Agreement, and (b) violations by Merchant and Guarantors of a covenant in the Security Agreement and Guaranty to not permit liens or other encumbrances to exist on any of the Collateral (as defined in the Security Agreement and Guaranty).

As permitted in Section 3.2 of the Merchant Agreement, Purchaser hereby notifies Merchant that the entire Purchased Amount (as defined in the Merchant Agreement) not already paid to Purchaser is immediately due and payable to Purchaser. Purchaser hereby demands immediate payment of the entire Purchased Amount not already paid to Purchaser by wire transfer of immediately available funds to the account described on Exhibit A hereto.

Purchaser further notifies Merchant that, pursuant to Section 3.2 of the Merchant Agreement, Purchaser has the right, among other things, to enforce the provisions of the Security Agreement and Guaranty against each Guarantor, enforce its security interest in the Collateral and debit Merchant's deposit accounts, wherever situated.

Purchaser hereby reserves its right to collect all additional fees, attorneys' fees and other reimbursable expenses that Purchaser is permitted to collect pursuant to the terms of the Merchant Agreement, the Security Agreement and Guaranty and/or applicable law, and to declare different or additional defaults and events of default under the Merchant Agreement, the Security Agreement and Guaranty or any other agreement between Merchant and Purchaser. Additionally, all rights and remedies of Purchaser under the Merchant Agreement and the Security Agreement and Guaranty are specifically reserved.

Murder Inc., LLC
July 12, 2011
Page 2

The acceptance by Purchaser of any future payments to the extent they do not represent payment in full of the entire Purchased Amount and all other amounts owed by Merchant to Purchaser, shall not constitute a waiver by Purchaser of any Events of Default that exist under the Merchant Agreement or the Security Agreement and Guaranty.

Sincerely,

VION OPERATIONS LLC

By: David Reak, Chief Operating Officer

cc: Strategic Funding Source Inc. (via email)

EXHIBIT A

Account Information

Wachovia Bank, N.A.
Duluth, Georgia
ABA# __061000227__
Account # ___2000044489892_____
Account Name: __Vion Holdings LLC_____
Reference: __Murder Inc._______