1  GORDON SILVER
   GERALD M. GORDON, ESQ.
2  Nevada Bar No. 229
   E-mail: ggordon@gordonsilver.com
3  MATTHEW C. ZIRZOW, ESQ.
   Nevada Bar No. 7222
4  E-mail: mzirzow@gordonsilver.com
   GABRIELLE A. HAMM, ESQ.
5  Nevada Bar No. 11588
   E-mail: ghamm@gordonsilver.com
6  3960 Howard Hughes Pkwy., 9th Floor
   Las Vegas, Nevada 89169
7  Telephone (702) 796-5555
   Facsimile (702) 369-2666
8  Proposed Attorneys for Debtor

9                **UNITED STATES BANKRUPTCY COURT**

10                **FOR THE DISTRICT OF NEVADA**

11  In re:                              | Case No.: BK-S-11-26317-BAM
                                        | Chapter 11
12  MURDER INC., LLC                     |
                                        |
13          Debtor.                      | Disclosure Statement Hearing:
                                        | Date:  December 13, 2011
14                                       | Time:  3:00 p.m.
15                                       |
                                        | Confirmation Hearing:
16                                       | Date:   January 9 & 11, 2012
                                        | Time:  9:30 a.m.

17          **PROPOSED DISCLOSURE STATEMENT TO ACCOMPANY
             DEBTOR'S PLAN OF REORGANIZATION**

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

1

## Table of Contents

I. INTRODUCTION ............................................................................................................. 1

II. INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT ............... 1

III. REPRESENTATIONS ................................................................................................... 3

IV. GENERAL OVERVIEW OF THE PLAN ....................................................................... 3

    (a) General Overview. ............................................................................................. 3

    (b) Summary of Plan Provisions. ........................................................................... 4

    (c) Treatment of Administrative Claims. ................................................................ 4

    (d) Treatment of Priority Tax Claims. ..................................................................... 4

    (e) Class 1 (Priority Non-Tax Claims). .................................................................... 5

    (f) Class 2 (Secured Tax Claims). ........................................................................... 5

    (g) Class 3 (Secured Note Claims). ......................................................................... 5

    (h) Class 4 (General Contractor Claim). .................................................................. 6

    (i) Class 5 (Subcontractor Claims). ......................................................................... 7

    (j) Class 6 (Other Secured Claims). ........................................................................ 7

    (k) Class 7 (General Unsecured Claims). ................................................................ 7

    (l) Class 8 (Equity Securities). ................................................................................ 8

V. SUMMARY OF VOTING PROCESS ............................................................................. 8

    (a) Who May Vote To Accept or Reject the Plan. .................................................... 8

    (b) Summary of Voting Requirements. ..................................................................... 8

VI. INFORMATION ABOUT THE DEBTOR'S BUSINESS AND THE CHAPTER 11 CASE ....... 9

    (a) Description of Debtor's Business and Ownership. .............................................. 9

    (b) The Debtor's Assets and Liabilities. ................................................................. 11

        1. The Initial Capital Raise. ......................................................................... 11

        2. Acquisition of the Notes by GC-Global. ................................................... 12

        3. Murder's Factoring of Receivables with Vion and Strategic .................... 14

        4. Mechanics' Liens. .................................................................................... 15

        5. Default and Forbearance. ......................................................................... 16

        6. Debtor's Assets. ....................................................................................... 17

    (c) Murder's Lease with the Tropicana. .................................................................. 18

    (d) Litigation Commenced Against the Debtor. ...................................................... 19

        1. The Vion-Strategic Case. ......................................................................... 20

        2. The GC-Global Case. ............................................................................... 23

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

ii

103164-002/1353394_4

(e)  Events Leading to the Bankruptcy Filing and Restructuring Goals...........................23

(f)  Commencement of the Chapter 11 Case and Significant Events..............................25

VII. DETAILED DESCRIPTION OF THE PLAN.......................................................................27

(a)  Overview of Chapter 11...............................................................................................27

(b)  Treatment of Unclassified Claims under the Plan......................................................28

1. Treatment of Administrative Claims. ....................................................................28

2. Treatment of Priority Tax Claims..........................................................................29

(c)  Treatment of Classified Claims..................................................................................29

1. Class 1 (Priority Non-Tax Claims). .......................................................................29

2. Class 2 (Secured Tax Claims)................................................................................30

3. Class 3 (Secured Note Claims). .............................................................................30

4. Class 4 (General Contractor Claim).......................................................................31

5. Class 5 (Subcontractor Claims). ............................................................................31

6. Class 6 (Other Secured Claims).............................................................................32

7. Class 7 (General Unsecured Claims). ....................................................................32

8. Class 8 (Equity Securities).....................................................................................32

(d)  Means of Implementation of the Plan. .......................................................................33

1. Newco. ....................................................................................................................33

2. Post-Effective Date Management of Reorganized Debtor......................................33

3. Effectuation of Transactions. .................................................................................33

4. Notice of Effectiveness. .........................................................................................33

5. No Governance Action Required............................................................................34

6. Sale of Assets to Newco and Assignment of Assigned Contracts to Newco. ........34

7. Amended Tropicana Lease. .....................................................................................34

8. Distribution of Newco Equity Securities. ..............................................................34

9. Disputed Claims Reserve........................................................................................35

10.   Manner of Distribution of Property Under the Plan. ..........................................35

11.   Dissolution of the Reorganized Debtor...............................................................35

12.   Filing with Nevada Secretary..............................................................................36

(e)  Executory Contracts And Unexpired Leases. .............................................................36

1. Executory Contracts................................................................................................36

2. Approval of Assumption or Rejection. ...................................................................36

3. Cure of Defaults......................................................................................................37

103164-002/1353394_4

4. Objection to Cure Amounts. ................................................................ 37

5. Confirmation Order. ............................................................................ 37

6. Post-Petition Date Contracts and Leases. .......................................... 38

7. Bar Date. ............................................................................................. 38

(f) Liquidating Trust and Liquidating Trustee. ............................................ 38

1. Liquidating Trust. ............................................................................... 38

2. Powers of the Liquidating Trustee. .................................................... 38

3. Exculpation and Indemnification. ...................................................... 41

4. Retention of Funds Prior to Distribution. .......................................... 41

5. Conflict Between Plan and Liquidating Trust Agreement. ................. 42

6. Representation of Liquidating Trust. .................................................. 42

7. Termination of the Liquidating Trust. ................................................ 42

8. The Liquidating Trust Board. ............................................................. 43

9. Resignation of the Liquidating Trustee. ............................................. 44

10.    Treatment of Beneficial Interests in the Liquidating Trust. ........... 44

11.    Actions against the Liquidating Trustee. ........................................ 44

(g) Conditions to Confirmation of the Plan. ............................................... 45

1. Conditions to Confirmation. .............................................................. 45

2. Conditions to Effectiveness. .............................................................. 45

VIII. RISK FACTORS. ........................................................................................ 46

(a) Debtor Has No Duty To Update. ........................................................... 46

(b) Information Presented Is Based on Debtor's Books and Records, and Is Unaudited. ............................................................................................. 46

(c) Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Will Vary. ................................................................. 46

(d) No Legal or Tax Advice Is Provided To You By This Disclosure Statement. .......... 47

(e) No Admissions Made. ............................................................................ 47

(f) No Waiver of Right To Object or Right to Recover Transfers and Estate Assets. .................................................................................................... 47

(g) Bankruptcy Law Risks And Considerations. ......................................... 47

1. Confirmation of the Plan is Not Assured. .......................................... 47

1. Consummation of the Asset Purchase Agreement. ............................ 48

2. No assurances as to Newco's ability to perform subsequent to the Effective Date. ................................................................................... 48

3. Newco Equity Securities. ................................................................... 48

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

iv

4. Newco Governance. ................................................................................. 48

5. The Effective Date Might Be Delayed or Never Occur. ................................... 49

6. Allowed Claims in the Various Classes May Exceed Projections. ................... 49

7. No Representations Outside of this Disclosure Statement are
Authorized. ........................................................................................... 49

(h) Risks Related to the LVME's Business Operations. ......................................... 49

1. Effect of the Chapter 11 Case. .................................................................. 49

2. Adverse Changes in the Global Economy May Negatively Impact the
LVME. ................................................................................................... 49

3. Leadership and Management. ................................................................... 50

4. Promotion. .............................................................................................. 50

IX. POST EFFECTIVE DATE OPERATIONS AND PROJECTIONS ............................. 50

(a) Summary of Title To Property and Dischargeability. .......................................... 50

1. Vesting of Assets. .................................................................................... 50

2. Preservation of Avoidance Actions and Litigation Claims. ........................... 50

3. Injunction. ............................................................................................... 52

4. Release. .................................................................................................. 53

5. Exculpation. ............................................................................................ 54

(b) Post-Confirmation Reporting and Quarterly Fees To the UST. ............................ 54

X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ..................................... 55

XI. CONFIRMATION OF THE PLAN ........................................................................ 56

(a) Confirmation Of The Plan. ............................................................................... 56

(b) Objections To Confirmation Of The Plan. ......................................................... 56

1. Best Interest of Creditors and Liquidation Analysis. .................................. 56

2. Feasibility. ............................................................................................... 59

3. Accepting Impaired Class. ........................................................................ 59

4. Acceptance of Plan. ................................................................................. 60

5. Confirmation Over Dissenting Class ("Cram Down"). .................................. 60

6. Allowed Claims. ...................................................................................... 60

7. Impaired Claims and Equity Securities. ..................................................... 61

8. Voting Procedures. ................................................................................... 61

XII. ALTERNATIVES TO THE PLAN ........................................................................ 62

(a) Debtor's Considerations. ................................................................................. 62

(b) Alternative Plans of Reorganization. ................................................................ 63

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

v

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(c)  Liquidation Under Chapter 7. .................................................................. 63

XIII. AVOIDANCE ACTIONS.................................................................................... 63

IVX. RECOMMENDATION AND CONCLUSION................................................................ 65

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

# I.
# INTRODUCTION

On October 17, 2011 (the "Petition Date"), Murder Inc., LLC, a Nevada limited liability company (the "Debtor"), filed its voluntary Chapter 11 bankruptcy petition (the "Voluntary Petition") in the United States Bankruptcy Court for the District of Nevada, Las Vegas (the "Bankruptcy Court"), thereby commencing case number BK-S-11-10148-MKN (the "Chapter 11 Case").[1]  The Debtor has prepared this Disclosure Statement (the "Disclosure Statement") in connection with the solicitation of votes on Debtor's Plan of Reorganization filed on November 4, 2011 (the "Plan") to resolve the Claims of Creditors of the Debtor and the Persons holding Equity Securities in the Debtor.[2]  The various exhibits to this Disclosure Statement attached hereto are incorporated into and are a part of this Disclosure Statement.  The Plan is included as **Exhibit "1"** hereto.  After having reviewed the Disclosure Statement and the Plan, any interested party desiring further information may contact:

GORDON SILVER
Attn:  Gabrielle A. Hamm, Esq.
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169
(702) 796-5555 Telephone
(702) 369-2666 Facsimile
Email:  ghamm@gordonsilver.com

Interested parties may also obtain further information from the Bankruptcy Court at its PACER website:  http://www.nvb.uscourts.gov.

# II.
# INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT

The objective of a Chapter 11 Case is the confirmation (i.e., approval by the bankruptcy court) of a plan of reorganization for a debtor.  A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against, and equity interests in, a debtor.  After a plan has been filed, the holders of such claims and equity securities that are

---

[1] Unless otherwise indicated herein, all references to "Chapters" or "Sections" refer to Title 11 of the U.S. Code (the "Bankruptcy Code").

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

impaired (as defined in Section 1124) are permitted to vote to accept or reject the plan.  Before a debtor or other plan proponent can solicit acceptances of a plan, Section 1125 requires the debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about Debtor and the Plan to enable Creditors to make an informed decision in exercising their rights to accept or reject the Plan.  This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has found that this Disclosure Statement provides adequate information in accordance with Section 1125 and has entered an order approving this Disclosure Statement.  Approval by the Bankruptcy Court is not an opinion or ruling on the merits of this Disclosure Statement, and it does not mean that the Plan itself has been or will be approved by the Bankruptcy Court.

After the appropriate Persons have voted on whether to accept or reject the Plan, there will be a hearing on the Plan to determine whether it should be confirmed.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including but not necessary limited to Section 1129.  The Bankruptcy Court will also receive and consider a Ballot Summary that will present a tally of the votes of Classes accepting or rejecting the Plan cast by those entitled to vote.  Once confirmed, the Plan will be treated essentially as a contract binding on all Creditors, Holders of Equity Securities, and other parties-in-interest in the Chapter 11 Case.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN.  FOR THE CONVENIENCE OF CREDITORS AND HOLDERS OF EQUITY SECURITIES, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT.   IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

2

103164-002/1353394_4

## III.
## REPRESENTATIONS

Unless otherwise specifically noted, the financial information in this Disclosure Statement has not been subject to audit. Instead, this Disclosure Statement was prepared from information compiled from records maintained in the ordinary course of the Debtor's business. The Debtor has attempted to be accurate in the preparation of this Disclosure Statement.

Other than as stated in this Disclosure Statement, the Debtor has not authorized any representations or assurances concerning Debtor and its operations or the value of its assets. Therefore, you should scrutinize any information received from any third-party and you assume any risk resulting from reliance upon such unauthorized information. In deciding whether to accept or reject the Plan, you should therefore not rely on any information relating to the Debtor or the Plan other than that contained in this Disclosure Statement or in the Plan itself.

## IV.
## GENERAL OVERVIEW OF THE PLAN

(a)    **General Overview.**

The Plan provides for the sale of all or substantially all of the Assets of the Debtor, except for Litigation Claims, to Newco free and clear of all liens, claims, and interests, in exchange for the receipt of approximately $2,000,000 in cash and Newco equity securities to pay certain creditors. Specifically, the Plan will provide for either, on a Class basis, the issuance of equity in Newco, or a *pro rata* payment of a lump sum of money in satisfaction of Allowed Claims to the General Contractor, M.J. Dean, Subcontractors with valid mechanic's and materialmen's liens, and miscellaneous Secured Creditors. Holders of Allowed General Unsecured Claims will participate as beneficiaries in the Liquidating Trust. Litigation Claims, including claims against Jay Bloom but exclusive of claims released pursuant to the Plan, will be transferred to the Liquidating Trust for the benefit of the Holders of General Unsecured Claims. Further, the Debtor will enter into the Amended Lease Agreement with Tropicana, which Amended Tropicana Lease will be assumed and assigned to Newco. Upon the substantial consummation of the Plan, the LVME will have been transferred to Newco and the Debtor will

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

3

cease business.

 (b) **Summary of Plan Provisions.**

 The following is a general overview of the provisions of the Plan, and is qualified in its entirety by reference to the provisions of the Plan itself.  The Plan's treatment of each Class of Claims is summarized in the following table:

| Class | Description | Treatment |
|-------|-------------|-----------|
| Class 1 | Priority Non-Tax Claims | Unimpaired.  Deemed to have accepted. |
| Class 2 | Secured Tax Claims | Unimpaired.  Deemed to have accepted. |
| Class 3 | Secured Note Claims | Impaired.  Entitled to vote. |
| Class 4 | General Contractor Claims | Impaired.  Entitled to vote. |
| Class 5 | Subcontractor Claims | Impaired.  Entitled to vote. |
| Class 6 | Other Secured Claims | Impaired.  Entitled to vote. |
| Class 7 | General Unsecured Claims | Impaired.  Entitled to vote. |
| Class 8 | Equity Securities | Impaired.  Deemed to have rejected. |

 (c) **Treatment of Administrative Claims.**

 Each Allowed Administrative Claim, except for Allowed Professional Claims, shall be paid by the Reorganized Debtor (or otherwise satisfied in accordance with its terms) upon the latest of:  (i) the Effective Date or as soon thereafter as is practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the fourteenth (14th) Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the Holder of such Claim and Debtor shall agree upon.

 Holders of Allowed Administrative Claims related to Professional services rendered (including compensation and reimbursement of Debtor's Professionals not in excess of $200,000, including all pre-Petition Date amounts held on retainer by the such Professionals, and, in the event a Committee is appointed, an amount not in excess of $50,000 for compensation and reimbursement of the Committee's Professionals) will be paid in full on the later of (i) the Effective Date of the Plan, and (ii) the date on which such Claims become Allowed Administrative Claims.

 (d) **Treatment of Priority Tax Claims.**

 Holders of Allowed Priority Tax Claims will receive (i) payment in full in Cash of such Allowed Priority Tax Claims incurred between July 1, 2011 and the Petition Date on the later of

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

(1) the Effective Date, and (2) the date on which such Claims become Allowed Priority Tax Claims, and (ii) with regard to all other Allowed Priority Tax Claims incurred prior to July 1, 2011, quarterly installment payments in Cash, over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the amount of such claim.  The Debtor believes that Allowed Priority Tax Claims incurred prior to July 1, 2011 will be approximately $113,000 and Allowed Priority Tax Claims incurred after July 1, 2011 will be approximately $134,500.

(e)     **Class 1 (Priority Non-Tax Claims).**

Holders of Allowed Priority Non-Tax Claims will be paid in full on the later of (i) the Effective Date of the Plan, and (ii) the date on which such Claims become Allowed Claims.  It is anticipated that Class 1 Priority Non-Tax Claims will be in amount of less than $25,000.  Class 1 is Unimpaired under the Plan.  Holders of Class 1 Claims are not entitled to vote on the Plan.

(f)     **Class 2 (Secured Tax Claims).**

Holders of Allowed Secured Tax Claims will receive either (i) payment in full in Cash of such Claims on the later of (1) the Effective Date of the Plan, and (2) the date on which such Claims become Allowed Claims, or (ii) quarterly installment payments in Cash, over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date of the Plan, equal to the amount of such Allowed Claims.  Class 2 is Unimpaired under the Plan.  Holders of Class 2 Claims are not entitled to vote on the Plan.

(g)     **Class 3 (Secured Note Claims).**

Each sub-Class shall be treated similarly. Each Holder of  an Allowed Secured Note Claim shall receive either:  (i) in the event all Holders of Secured Note Claims in each sub-Class by the requisite percentages elect to receive distribution of equity in Newco, such Holders will receive on the Effective Date, in full and complete satisfaction of the Secured Claim portion of their Allowed Secured Note Claims, a Pro Rata distribution of the Class B membership interests in Newco, with any General Unsecured Claim portion being treated as a Class 7 General Unsecured Claim (the "Equity Election"), or alternatively, (ii) in the event that all Holders of a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

5

Secured Note Claim  in each sub-Class forego the Equity Election but by the requisite majorities elect to receive a Cash payment, then each such Holder will receive a Pro Rata distribution of $250,000 in full satisfaction of the Secured Claim portion of their Allowed Secured Note Claims, with any General Unsecured Claim portion being treated as a Class 7 General Unsecured Claim (the "Cash Election").   In the event of either the Equity Election or the Cash Election, all Liens of such Creditors against the Assets will be released as of the Effective Date; however, in the event that Holders of Allowed Secured Note Claims cannot agree, by the Effective Date, upon allocation of the Distribution to be made under either option (i) or (ii) above, the Bankruptcy Court shall resolve any such disputes after the Effective Date with all consideration to be distributed on account of Allowed Secured Note Claims to be held in reserve pending such resolution. All Liens of such Creditors against the Assets will be released as of the Effective Date.

In the event that the requisite majority of the Holders of Allowed Secured Note Claims in each sub-Class fail to make either the Equity Election or the Cash Election, the Debtor reserves the right under Section 13.17 of the Plan to seek to invoke the provisions of Section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the Plan.

Distributions otherwise payable under the Plan to Holders of Allowed Class 3 Secured Note Claims shall be subject and subordinated to any Allowed Class 3 Secured Note Claim with higher or superior priority in identical Collateral securing such Secured Note Claims.

Each sub-Class of Class 3 is Impaired under the Plan.  Holders of Class 3 Claims are entitled to vote on the Plan.

(h)     **Class 4 (General Contractor Claim).**

The Holder of the Allowed General Contractor Claim shall receive on the Effective Date in full and complete satisfaction of its Allowed Claim against Debtor (i) $350,000 in Cash, and (ii) all Class C membership interests in Newco in consideration for which such Holder waives its Section 363(k) credit bid right and shall as of the Effective Date release and waive with prejudice (x) all Liens of such Holder, and (y) all Tropicana Mechanics' Liens and Claims such Holder has or may have against Tropicana or any of Tropicana's real or personal property.  Class 4 is

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

6

103164-002/1353394_4

1    Impaired under the Plan. The Holder of the Class 4 Claim is entitled to vote on the Plan.

2    (i)    **Class 5 (Subcontractor Claims).**

3    Holders of Allowed Subcontractor Claims shall receive on the Effective Date in full and

4    complete satisfaction of their Allowed Claims against Debtor a Cash payment in an amount

5    equal to the lesser of (a) 75% of their Allowed Subcontractor Claims, and (b) a Pro Rata share of

6    $1,650,000, in consideration for which such Holders waive their Section 363(k) credit bid rights

7    and shall as of the Effective Date release and waive with prejudice (x) all Liens of such Holders,

8    and (y) all Tropicana Mechanics' Liens and Claims such Holder has or may have against

9    Tropicana or any of Tropicana's real or personal property.  In the event that the Holders of

10    Allowed Subcontractor Claims cannot agree upon allocation of the distribution by the

11    Confirmation Date, the Bankruptcy Court shall resolve any such disputes after the Effective Date

12    with all consideration to be distributed on account of Allowed Subcontractor Claims to be held in

13    reserve pending such resolution.  Class 5 is Impaired under the Plan.  Holders of Class 5 Claims

14    are entitled to vote on the Plan.

15    (j)    **Class 6 (Other Secured Claims).**

16    Each Other Secured Claim will be in its own sub-Class under Class 6.  Each sub-Class

17    shall be treated similarly.  Each Holder of an Allowed Other Secured Claim will receive on the

18    Effective Date a Pro Rata distribution, up to the amount of its Allowed Other Secured Claim, of

19    $50,000 in full satisfaction of its Allowed Other Secured Claim, with any unsecured Claim

20    portion being treated as a Class 7 General Unsecured Claim.  All Liens related to such Other

21    Secured Claims will be released on the Effective Date.  Each sub-Class in Class 6 is Impaired

22    under the Plan.  Holders of the Class 6 Claim are entitled to vote on the Plan.

23    (k)    **Class 7 (General Unsecured Claims).**

24    Holders of Allowed General Unsecured Claims will receive on the Effective Date a Pro

25    Rata distribution of the beneficial interests of the    Liquidating Trust to be established for the

26    benefit of Holders of Allowed General Unsecured Claims.  Class 7 is Impaired under the Plan.

27    Holders of Class 7 Allowed General Unsecured Claims are entitled to vote on the Plan.

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

7

103164-002/1353394_4

(l)     **Class 8 (Equity Securities).**

On the Effective Date all Equity Securities shall, without any further action, be cancelled, annulled and extinguished.  Holders of Class 8 Equity Securities shall receive nothing under the Plan, are deemed to have rejected the Plan, and are not entitled to vote on the Plan.

**V.**
**SUMMARY OF VOTING PROCESS**

(a)     **Who May Vote To Accept or Reject the Plan.**

Generally, holders of allowed claims or Equity Securities that are "impaired" under a plan are permitted to vote on the plan.  A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor.  An equity security represents an ownership stake in a debtor, such as a share.  In order to vote, a creditor must first have an allowed claim.

The solicitation of votes on the Plan will be sought only from those Holders of Allowed Claims whose Claims are impaired and which will receive property or rights under the Plan.  As explained more fully below, to be entitled to vote, a Claim must be both "Allowed" and "Impaired."

(b)     **Summary of Voting Requirements.**

In order for a plan to be confirmed, the plan must be accepted by at least one non-insider, impaired class of claims, excluding the votes of insiders.  A class of claims is deemed to have accepted a plan when allowed votes representing at least two-thirds (2/3) in amount and a majority in number of the claims of the class actually voting cast votes in favor of a plan.  A class of equity securities has accepted a plan when votes representing at least two-thirds (2/3) in amount of the outstanding equity securities of the class actually voting cast votes in favor of a plan.

Debtor is soliciting votes from Holders of Allowed Claims in the following Classes:

| Class | Description |
|-------|-------------|
| Class 3 | Secured Note Claims |
| Class 4 | General Contractor Claim |
| Class 5 | Subcontractor Claim |
| Class 6 | Other Secured Claims |

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

8

103164-002/1353394_4

| Class 7 | General Unsecured Claims |
|---------|--------------------------|

The Debtor has the right to supplement this Disclosure Statement as to additional Impaired Classes, if any.

**A VOTE FOR ACCEPTANCE OF THE PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT.   DEBTOR ASSERTS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR CREDITORS, AND THUS DEBTOR RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN DO VOTE IN FAVOR OF THE PLAN.**

**VI.**
**INFORMATION ABOUT THE DEBTOR'S BUSINESS AND THE CHAPTER 11 CASE**

(a)    **Description of Debtor's Business and Ownership.**

Murder was formed on March 23, 2009 as a wholly-owned subsidiary of Eagle Group Holdings, LLC, which is 70% owned and solely managed by Jay L. Bloom ("Bloom").[3] The Debtor was formed for the purpose of financing, constructing, and operating an exhibit on Las Vegas Boulevard (the "Strip") known as the Las Vegas Mob Experience (the "LVME").  Bloom was the manager and in control of Murder from its formation through approximately June 30, 2011.  On or about July 1, 2011, Louis Ventre ("Ventre") was appointed as manager and was transferred the controlling equity interest.

When it originally opened, the LVME was a live interactive entertainment adventure located within the Tropicana Las Vegas Hotel & Casino on the Las Vegas Strip.  The LVME includes the world's largest collection of organized crime artifacts from famous reputed mobsters including Benjamin "Bugsy" Siegel, Anthony "The Ant" Spilotro, Charles "Lucky" Luciano, Meyer Lansky, Sam "Mooney" Giancana, and Allan Sachs.  In its first few months of operation, the LVME included live actors where visitors could go face-to-face with Las Vegas' most

---

[3] The remaining 30% is owned by Louis Ventre. Bloom notified Ventre shortly before the Petition Date that his 30% membership interest in Eagle Holding has been forfeited.  To the extent his membership interest in Eagle Holding has not been forfeited, Mr. Ventre has indicated that he intends to withdraw from Eagle Holding.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

notorious gangsters with cutting edge audio visual technology.  The LVME also included celebrity gangster guides to escort visitors through a tutorial on mob history.

The Mafia Collection, LLC, is a Nevada limited liability company ("Mafia Collection") formed on March 23, 2009 by Bloom.  Bloom was and remains the manager of Mafia Collection.  Mafia Collection was formed to own the artifacts purchased for display in the LVME, and it allegedly owns and leases the vast majority of the artifacts used in the LVME, though Murder paid for, insures, and secures the artifacts.

Ventre, the managing member of the Debtor, became actively involved in the Debtor's management in approximately May of 2011 after discovering certain mismanagement by Bloom.  After observing blatant mismanagement by Bloom, including diverting funds from the Debtor's payroll account to pay for expenses of Order 66 Entertainment, LLC, another Bloom-controlled affiliate of the Debtor, Ventre approached GC-Global (defined below) regarding Bloom's conduct.  Thereafter, GC-Global obtained Bloom's agreement to resign as manager and transfer 95% of the Debtor's equity to GC-Global.  Thereafter, GC-Global transferred the 95% equity interest to Ventre.

At the present time, Ventre owns 95% of the equity of the Debtor and 30% of the equity of Eagle Holding,[4] which owns 5% of the equity in the Debtor.  Ventre is paid a salary of $150,000.

As of September 12, 2011, the LVME scaled back its operations to only the museum portion of the LVME, which displays the artifacts.  The artifacts are extensive, and include weapons, letters, photographs, jewelry, furniture, and other personal effects of reputed mobsters.  Only a portion of the artifacts are on display.  This scaling back of operations was a cost-cutting measure and also due to the repossession of a significant amount of audio-visual equipment used in the experience.  As a result, the LVME presently has open to the public only about 11,000 of its total approximately 26,000 square feet, and the rest of it remains closed.  In addition to the museum, LVME also continues to operate a souvenir shop on the premises.  Murder also has a

---

[4] Bloom has notified me that my 30% membership interest in Eagle Holding has been forfeited.  To the extent my membership interest in Eagle Holding has not been forfeited, I intend to withdraw from Eagle Holding.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

10

103164-002/1353394_4

back office with a small office suite, employee room and a locked artifacts room with dedicated 24 hour security on premises. The Debtor also continues to operate a gift shop on the premises that sells LVME-themed and mob-themed t-shirts and other miscellanea (the "Retail Store").

As of the Petition Date, the Debtor had a skeletal staff of about ten (10) employees, including Ventre as president, a general manager, and various office personnel, security guards and a small number of staff on the floor in the museum itself. Current attendance averages between approximately 130 and 150 people per day, which is barely sufficient to allow LVME to cover its immediate critical operating expenses, let alone any of its debt service or rent. The LVME has and continues to require cash infusions in order to sustain even its current minimum level of operations. See Section VI.f, below (discussion of the DIP Loan).

    (b)    **The Debtor's Assets and Liabilities.**

        1.    The Initial Capital Raise.

The Debtor initially raised capital through two private debt issuances (respectively, the "First Raise" and "Second Raise"). Though it was the original intent of the Debtor to raise approximately $8 million, based upon a review of the Debtor's books and records, it appears that the Debtor issued at least $13,559,363 in secured and unsecured debt to private lenders (the "Noteholders"), exclusive of the debt owed to Strategic Funding Source, Inc. and Vion Operations LLC, discussed below. It is unclear from the Debtor's records how much of this debt was incurred in First Raise and how much was incurred in the Second Raise.

In exchange for the loans to the Debtor, many of the Noteholders received promissory notes (the "Notes") and assignments of a fraction of the Debtor's future gross income (the "Income Assignments"). The Debtor's books and records reflect approximately $9,464,153 in Notes and Income Assignments of approximately 42% of the Debtor's gross income.[5]

Pursuant to that certain Security Agreement dated March 15, 2011 (the "Noteholders' Security Agreement"), several of the Noteholders hold a security interest in assets owned by the

---

[5] In their lawsuit against Bloom and other defendants, Strategic Funding Source, Inc. and Vion Operations LLC have alleged that the actual debt in March of 2011 was $16,050,380.22 and Income Assignments of $46.299 had been made. See Complaint, Vion Operations LLC, et. al v. Jay L. Bloom, et. al, Case No. A-11-646131-C, pending in the Eighth Judicial District of Clark County, Nevada.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

11

103164-002/1353394_4

Debtor's affiliate, Mafia Collection, which consist of the artifacts discussed above, and a security interest in the assets of the Debtor (the "Secured Noteholders").[6]  The Noteholders' Security Agreement secures approximately $9,687,600 of the Notes, though the Debtor's records do not contain copies of several of these Notes.   Some of the Noteholders received Notes, but are not parties to the Noteholders' Security Agreement.  Approximately $1,577,500 in Notes are not subject to the Noteholders' Security Agreement.  Approximately $1,913,210 in additional sums were lent to the Debtor, though such loans are not secured by the Noteholders' Security Agreement and the Debtor does not have copies of the Notes, to the extent such Notes exist. Approximately $2,182,000 in alleged Notes are identified in the Noteholders' Security Agreement for which no Note can be located.  Some of these lenders may have never received a Note.  Lenders who received a Note which is not subject to the Noteholders' Security Agreement and lenders whose loans are undocumented are collectively referred to as the "Unsecured Noteholders."   The Debtor's records reflect a total of approximately $13,600,000 million in secured and unsecured obligations pursuant to the First Raise and Second Raise, exclusive of interest.

The First Raise was used primarily to acquire the artifacts used by the Debtor in the LVME, though the artifacts allegedly are owned by Mafia Collection.  The First Raise includes funds loaned to Jekyll & Hyde, LLC ("Jekyll & Hyde"), an entity formed by Bloom for the development of a theatre in Caesar's Palace to be used for an exhibition of mob artifacts.  This original concept evolved into the Las Vegas Mob Experience at Tropicana, and the capital raised for Jekyll & Hyde was used to purchase the artifacts now allegedly owned by Mafia Collection.

The Second Raise was used primarily to fund the construction and opening of the LVME.

2.    Acquisition of the Notes by GC-Global.

On March 15, 2011, Order 66 purchased six (6) of the First Raise Notes from the

---

[6] One of the Debtor's creditors has produced a Security Agreement dated August 23, 2010 purporting to secure the Notes (the "August 23, 2010 Security Agreement").  However, the August 23, 2010 Security Agreement does not identify the secured creditors or the amount secured, and is unexecuted by any creditor or an agent of the Noteholders.  Moreover, the Debtor's records identify a security agreement dated January 5, 2011, but no such security agreement can be located in the Debtor's records.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

12

following parties in an original face amount of $2,200,000:  (i) Morgando Family Trust; (ii) Jessica Guyer; (iii) LS Marlow Trust; and (iv) Mark T. Hellner Trust.

Immediately following the transfer of these Notes to Order 66, on or about March 16, 2011, GC-Global Capital Corp. ("GC-Global"), Order 66, and the Debtor entered into that certain Loan Purchase and Sale Agreement and Security Agreement (the "Loan Purchase Agreement"), whereby GC-Global purchased from Order 66 the beneficial interests in these Notes, with a balance, as of March 13, 2011, of $2,623,422.83, including accrued interest (the "GC-Global Loans").

On or about April 4, 2011, GC-Global, Order 66, Murder Inc., and Mafia Collection entered into that certain Amendment to Loan Purchase and Sale Agreement and Security Agreement (the "Amendment to Purchase Agreement"), whereby three additional loans originally made to Keith Burhdoff and Cliff Stout were acquired by GC-Global, which loans had an original face amount of $357,600 and a balance of $418,039.11 inclusive of accrued interest, thereby increasing the amount owed to GC-Global to $3,189,061.11.

As security for the GC-Global Loans, GC-Global was assigned the Noteholders' Security Agreement and Financing Statements, and additional collateral was pledged, consisting of a blanket lien in the Debtor's assets, described as:

> a security interest in . . . the following properties, assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof:  all personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or right to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles).

GC-Global was further granted a security interest in specific collateral consisting of a certain Personal Property Lease Agreement executed on April 14, 2009 between the Debtor and Robert

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

13

103164-002/1353394_4

1   Bright, and a 1927 Studebaker.

2          Pursuant to the terms of the Loan Purchase Agreement, GC-Global further obtained a

3   security interest in certain property allegedly owned by Mafia Collection, which was evidenced

4   by a UCC-1 Financing Statement naming Andrew Demaio as the collateral agent for the benefit

5   of the secured parties, which was filed with the Nevada Secretary of State on January 5, 2011, as

6   document number 2011000340-5.  The UCC Financing Statement was amended on January 6,

7   2011 by document number 2011000404-1 to correct a typographical error, and on March 21,

8   2011, was amended by document number 2011006834-8 to name GC-Global as a secured party

9   (collectively, the "Original GC-Global Financing Statement").

10         On February 16, 2011, the Debtor was removed as a debtor under the Original Financing

11  Statement, as evidenced by document number 2011003986-6.  Thereafter, on March 21, 2011,

12  GC-Global filed a UCC-1 Financing Statement asserting an encumbrance against all of the

13  Debtor's personal property (the "Amended GC-Global Financing Statement").

14         Pursuant to the Noteholders' Security Agreement, the Original GC-Global Financing

15  Statement, and the Amended GC-Global Financing Statement, GC-Global has asserted a first

16  lien position in all of the personal property of Mafia Collection and the proceeds therefrom,

17  which include the artifacts and exhibits used for the LVME, which lien is *pari passu* with the

18  lien of the Secured Noteholders.  GC-Global holds a blanket lien against the assets of the Debtor,

19  which lien is junior to that of Strategic and Vion, discussed below.

20                  3.       Murder's Factoring of Receivables with Vion and Strategic.

21         On February 25, 2011, Murder entered into a Purchase and Sale of Future Receipts

22  Agreement (the "V-S Purchase Agreement") with Strategic Funding Source, Inc. ("Strategic")

23  and Vion Operations LLC ("Vion") (together, "V-S").  Separately, on the same day, Bloom and

24  Ventre executed a Merchant Security Agreement and Guaranty (the "V-S Security/Guaranty

25  Agreement") on behalf of Murder, thereby granting V-S a security interest in all of the Debtor's

26  personal property.  Specifically, the V-S Security/Guaranty Agreement grants V-S a security

27  interest in

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

14

103164-002/1353394_4

1
2
3
4

> all personal property of [Debtor], including all accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, as those terms are defined in Article 9 of the Uniform Commercial Code of the State of New York…whether nor hereafter acquired by [Debtor] and wherever located, and all proceeds of such property…

5
6
7
8
9
10
11

On March 14, 2011, Murder entered into a second Purchase and Sale of Future Receivables Agreement with Strategic (the "Second Strategic Agreement").  Separately, on the same day, Bloom and Ventre executed a second Merchant Agreement and Guaranty in favor of Strategic (the "Second Strategic Guaranty," and together with the V-S Purchase Agreement, the V-S Security/Guaranty Agreement, and the Second Strategic Agreement, the "V-S Agreements"), thereby granting V-S a security interest substantially similar to that granted under the V-S Security/Guaranty Agreement.

12
13
14

Pursuant to the V-S Agreements, V-S paid $3,147,824.10 to the Debtor for future credit card receipts (the "MCA Receivables") in the amount of $4,092,171.40.  The MCA Receivables include credit card payments received when admission is purchased to the LVME.

15
16
17
18
19
20
21
22
23
24

On March 1, 2011, Vion and Strategic filed UCC-1 financing statements with the Nevada Secretary of State to perfect their security interest in the Debtor's assets.  In the first UCC Financing Statement filed on March 1, 2011, Strategic asserted a security interest in "all of the personal property of the Debtor," and in the second UCC Financing Statement filed on March 1, 2011, Strategic asserted a security interest in in all "right, title, and interest of the [Debtor] in and to certain accounts, contract rights, instruments, payment intangibles, and other rights to payment sold by the Debtor [] to the Secured Parties [] from time to time pursuant to the Merchant Cash Advance Agreement dated as February 25, 2011."   On March 16, 2011, V-S filed amendments to the UCC-1 financing statements, asserting a security interest in the assets of Mafia Collection (the "V-S Financing Statements").

25

    4.  Mechanics' Liens.

26
27

As of the Petition Date, approximately $5,753,339 in mechanics' and materialmen's liens have been asserted in connection with the construction of the LVME, as follows:

28

    (i)  George M. Raymond Co.:  $891,521.00 (lien recorded July 6, 2011);

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

15

1    (ii)    Superior Tile & Marble, Inc., $24,051.00 (lien recorded on July 8, 2011);

2    (iii)    M.J. Dean Construction, Inc. ("M.J. Dean"):  $4,640,732.00 (lien recorded

3    July 13, 2011);

4    (iv)    Dean Roofing:  $24,420.00 (lien recorded July 11, 2011);

5    (v)    Scott Zemp Masonry, Inc.:  $5,115.00 (lien recorded July 11, 2011);

6    (vi)    Statewide Fire Protection:  $167,500.00 (lien recorded July 11, 2011)

7    (collectively, the "Mechanics' Lien Claimants").

8 In addition, various additional parties have served notices of right to lien for work and

9 services allegedly performed by the Debtor, including the following:  Bombard Electric, LLC (in

10 the amount of $701,021.50), Hansen Mechanical Contractors, Inc. (in the amount of

11 $154,421.00), McFarland Door Manufacturing Company, Inc., and Grani Insulation, Giroux

12 Glass-Los Angeles, Kellys Pipe, Arizona Stone & Arch Products, LLC, and Academy Glass

13 Company, Inc. (together with the Mechanics' Lien Claimants, the "Contractors").  M.J. Dean

14 served as the general contractor and many of the immediately foregoing entities were sub-

15 contractors of M.J. Dean.  The lien filed by M.J Dean (the "M.J. Dean Lien") includes amounts

16 owed to subcontractors, and thus the remaining liens are duplicative.  The Debtor believes that

17 the total amount owed to contractors, including M.J. Dean, is between $4,000,000 and

18 $4,600,000.

19    5.    Default and Forbearance.

20 The GC-Global Notes required a principal payment by the Debtor on or before June 16,

21 2011 in the amount of $1,000,000 Canadian Dollars.  The Debtor did not make the principal

22 payment, and on June 30, 2011, GC-Global declared a default and accelerated the amounts due

23 under the GC-Global Notes.

24 Further, the Debtor has paid only a fraction of the interest due under the Notes, and only

25 a fraction of the Debtor's gross income payable to the Noteholders pursuant to the Income

26 Assignments.

27 On July 26, 2011, GC-Global and other creditors of the Debtor entered into that certain

28 Forbearance Agreement and Option to Purchase, pursuant to which GC-Global agreed to forbear

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

16

1   filing suit or foreclosing on its collateral for a period of 60 days (the "GC-Global Forbearance

2   Agreement").    Pursuant to the GC-Global Forbearance Agreement, certain parties invested

3   additional funds into the Debtor.    Specifically, Vion invested $50,000, Strategic invested

4   $10,000, Paul Buller invested $25,000, and John Vipulis, the controlling member of JVLV,

5   invested $75,000.

6           Further, as a result of Bloom's mismanagement, he was forced to relinquish 95% of his

7   ownership interest to GC Global.  On June 30, 2011, Bloom executed that certain Certificate of

8   Resignation of Officer, Director, Manager, Member, General Partner, Trustee or Subscriber,

9   transferring 95% of the equity interest in the Debtor to GC-Global and relinquishing any and all

10  management control, leaving Ventre as the sole manager of the Debtor (the "Resignation

11  Certificate").    The Resignation Certificate was filed with the Nevada Secretary of State as

12  document number 20110488819-62.   Ultimately, the 95% membership interest was transferred

13  and conveyed to Ventre by GC-Global.

14          The Forbearance Agreement expired on September 24, 2011, and on October 5, 2011,

15  GC-Global filed a Complaint against the Debtor and other defendants in the Eighth Judicial

16  District of Clark County, Nevada, for breach of contract and foreclosure of its collateral,

17  discussed below.

18          In sum, the Debtor has approximately $18.7 million in known secured liabilities.  Of this,

19  approximately $7,350,000 million, exclusive of interest, is owed to the Secured Noteholders,

20  approximately $3.2 million, exclusive of interest, is owed to GC-Global, approximately $4.1

21  million is owed to Vion/Strategic, and approximately $4 million is owed to contractors.  The

22  priority of these competing security interests is likely disputed by the Secured Noteholders, GC-

23  Global, and Vion/Strategic.  The Debtor believes, based upon its review of the applicable

24  security agreements and UCC Financing Statements, that the liens of the Secured Noteholders

25  and GC-Global are pari passu with one another and subordinate to the lien of Vion/Strategic.

26              6.      Debtor's Assets.

27          The Debtor's assets are limited, and consist primarily of (i) equipment and trade fixtures

28  used in the LVME, (ii) Retail Store inventory, (iii) accounts receivable in the approximately

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

17

amount of $26,000, and (iv) causes of action. The Debtor believes the equipment, trade fixtures, and Retail Store inventory have a fair market value of no more than $265,000. The causes of action consist of claims against Bloom and various affiliates of Bloom, including Eagle Holding, Mafia Collection, Eagle Group Marketing, LLC, Eagle Group Productions, LLC, Order 66, and A.D.D. Productions, LLC (collectively, the "Bloom Affiliates") for, *inter alia*, the avoidance and recovery of fraudulent transfers, breach of fiduciary duty, and conversion. The Debtor does not know whether any judgments against Bloom or the Bloom Affiliates are collectable, nor whether other avoidable transfers may be recoverable.

Additionally, the Debtor transferred approximately $100,000 to one creditor, Video Equipment Rentals, during the 90-day period preceding the Petition Date on account of antecedent debt that likely is avoidable under Section 547 of the Bankruptcy Code. The Debtor does not know whether any avoided transfer will be recoverable.

The artifacts on display at the LVME are purportedly owned by Mafia Collection, an affiliate of Bloom. Bloom is the manager of Mafia Collection. The Debtor believes that the artifacts were fraudulent transferred to Mafia Collection, as the Debtor paid for the artifacts, insures the artifacts, and secures the artifacts. The Debtor intends to commence proceedings to have title to the artifacts transferred to the Debtor. The Debtor does not know the value of the artifacts.

(c)     **Murder's Lease with the Tropicana.**

On or about June 7, 2010, the Debtor, as tenant, and Eagle Holding, as guarantor, entered into a lease with Tropicana Las Vegas, Inc., d/b/a Tropicana Las Vegas ("Tropicana") for approximately 25,000 square feet in an open space Pavilion at the rear of the Tropicana Las Vegas (the "Hotel/Casino") for five (5) years, commencing on or about April 1, 2011, renewable for an additional five (5) years upon the parties' agreement (the "Lease"). Pursuant to the Lease, the Debtor is obligated to pay to Tropicana the greater of: (i) ten percent (10%) of the Debtor's gross sales, or (ii) a minimum of $1,000,000, or $83,000 per month.[7]

---

[7] Further, on June 24, 2010, the Debtor, as tenant, and Eagle Holding, as guarantor, entered into a second lease with Tropicana for the "Mob Experience Preview Center" and the Retail Store, on a month-to-month basis (the "Preview

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

18

The Debtor is in default under the Lease.  The Debtor paid rent under the Lease only in the months of April and May, 2011, when the Debtor paid the minimum amount due under the Lease, or $83,000 per month.  Pursuant to the Lease, the Debtor is responsible for reimbursing Tropicana for the utilities used by the Debtor on the premises.  As a result, the Debtor does not have any contracts for the provision of utilities.  However, the Debtor has not reimbursed Tropicana for the utilities it has consumed. Moreover, the Debtor is in default as a result of the filing of mechanics' liens against Tropicana, at it is responsible for ensuring that no mechanics' or materialmen's liens are placed on Tropicana's property as a result of work performed for the Debtor.

Based upon a review of its books and records, the Debtor believes that exclusive of any damages resulting from the filing of mechanics' liens against the property, Tropicana is owed approximately $442,000, as of the Petition Date.

(d)     **Litigation Commenced Against the Debtor.**

Prior to the Petition Date, numerous lawsuits were filed naming the Debtor as a defendant or related to the Debtor, including:

i.  *GC-Global Capital Corp. v. Jay Bloom, et. al*, Case No. A-11-649459-C (asserting, *inter alia*, breach of the Notes, that the Debtor and various affiliates are alter egos of Bloom, and fraud and misrepresentation, and seeking to foreclose on the artifacts);

ii.  *Ralph Buzzetta v. Jay L. Bloom, et. al*, Case No. A-11-634251-C (asserting, *inter alia*, breach of a Note, fraud, and violation of state securities laws);

iii.  *SSA Architecture, et. al v. Jay Bloom, et. al*, Case No. A-11-645141-C (asserting, *inter alia*, breach of contract, fraud and misappropriation, and fraudulent transfer);

iv.  *Vion Operations, LLC, et. al v. Jay L. Bloom, et. al*, Case No. A-11-646131-C (asserting, *inter alia*, breach of contract and fraud, and demanding an

_____ (continued)
Lease").  It is the Debtor's understanding that the Preview Lease has terminated.  The leased premises under the Preview Lease is subsumed within the leased premises under the Lease.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

accounting);

        v. *James G. Beckmann v. Jay Bloom, et. al*, Case No. A-10-627055-C (asserting, *inter alia*, an ownership interest in the Debtor, breach of fiduciary duty, fraud, and theft, and demanding an accounting);

        vi. *Antoinette McDonnell v. Jay Bloom, et. al*, Case No. A-11-635707-C (asserting, *inter alia*, breach of contract);

        vii. *George M. Raymond Company v. Tropicana Las Vegas Inc., et. al*, Case No. A-11-648186-C (seeking foreclosure on mechanic's lien);

        viii. *Superior Exhibits & Design, Inc. v. Murder Inc., LLC*, Case No. A-10-626442-C; and

        ix. *Trade Show Fabrications West, Inc. v. Eagle Group Holdings, LLC, et. al*, Case No. A-11-641093-C (asserting, *inter alia*, breach of contract).

The most significant litigation is described below.

        1.    <u>The Vion-Strategic Case.</u>

        On August 4, 2011, Vion and Strategic filed a Complaint (the "<u>V-S Complaint</u>") in the Eighth Judicial District Court, Clark County, Nevada, Case No. 11-646131 (the "<u>Vion-Strategic Case</u>"), asserting claims against Bloom, Farkas, Eagle Holding, Eagle Marketing, A.D.D., and Order 66 (collectively, the "<u>Bloom Defendants</u>").  Murder and Ventre were not named as defendants in the Vion-Strategic Case.  The V-S Complaint alleged claims for breach of guaranty against Bloom for breach of the Agreements (and breach of the Agreements by the remaining Bloom Defendants as alter egos of Bloom), breach of fiduciary duty and concealment of fiduciary breach against Bloom, fraud against the Bloom Defendants, and breach of the covenant of good faith and fair dealing against Bloom.

        Vion and Strategic have asserted that Bloom defrauded them in connection with the V-S Agreements by the following:

        a.    Bloom submitted materially false financial statements in order to induce the transaction with Vion and Strategic, which financial statements allegedly misstated payables, visitor volumes, and other liabilities, including but not limited to past due contractor and trade payables.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

b.    Bloom submitted updated financials on or about July 8, 2011, which revealed nothing of the true financial condition of Murder, did not reveal he was looting the company, and were provided to conceal Bloom's alleged ongoing fraud.

c.    Bloom's attendance forecast for the LVME was based on patently unrealistic and unreasonable assumptions to fraudulently induce Vion and Strategic to finance Murder.  Specifically, Vion and Strategic asserted that Bloom projected 4,110 people per day, starting in the first month, when Bloom knew the design of the exhibit would make it impossible to put that many people through the exhibit in a single day.

d.    Bloom represented that the ticket price would be $29.95; however, when the exhibit opened, the ticket price was $39.95.

e.    The Murder debt that Bloom disclosed was approximately $8,000,000 with a total Income Assignment to other parties of 25.05%, whereas the actual debt for Murder at the time was $15,439,548.58 with a note face value (*i.e.* total payback amount) of $16,050,380,22. The income assignments to third parties associated with this level of indebtedness was 46.299%, resulting in materially less cash being available to operate the company than Bloom represented.

f.    Bloom represented to Vion and Strategic that Murder would owe its general contractor M.J. Dean indebtedness of $250,000 per month for the period from March 2011 to October 2011 for a total of $2,000,000; however, Bloom made none of those payments, and the amount of construction indebtedness is now believed to be in excess of $4,600,000.

g.    Bloom represented that total payroll for Murder would be $25,980.00 per month; however, the payroll was originally substantially more.  Bloom also never disclosed that he has not ever paid any payroll taxes of Murder while he was in control.

Vion and Strategic have asserted that Bloom diverted funds from the Debtor in 2010 and 2011, and these diversions consisted of at least $89,700 to A.D.D., $1,835,443.92 to Eagle Holding, $124,041.00 to Eagle Marketing, and $31,400 to Order 66.

Vion and Strategic further allege Bloom diverted funds directly from the Debtor and from Eagle Holding for payment of personal expenses, including such items as car payments, credit card bills, housing expenses (cable TV, utilities, pool cleaning, maid service), groceries and the like, using categories in his own records such as "cash for Jay" and "to be accounted for later." Bloom used an on-line account transfer from the Debtor's operating account to his personal account and frequently used ATM withdrawals in the tens of thousands of dollars to accomplish these personal diversions.  In addition to other indirect payments for the benefit of Bloom, Vion and Strategic allege that Bloom diverted over $455,000 directly to himself from the Debtor from

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

1    April 3, 2009 to June 7, 2011, and over $203,500 from Eagle Holding in 2010 and 2011.

2    Vion and Strategic allege that by diverting funds to his alter egos, which were entities

3    directly or indirectly under Bloom's management and control, Bloom rendered the Debtor

4    insolvent and unable to meet its obligations as they became due without additional financing.

5    Vion and Strategic further allege in the Complaint that:

6    a.   Bloom diverted from the Debtor substantially all of the operating capital
     necessary to successfully market the LVME, leading to a need for more operating capital,

7    which resulted in further breach by the placement of junior liens on Vion's and
     Strategic's collateral in violation of in violation of "negative pledge" provision in Section

8    2.10 of the V-S Agreements; and

9    b.   As a result of Bloom's fraudulent diversions, mechanic's liens in the
     amount of at least $5,753,339 were recorded on the attraction and Tropicana's property

10   after Vion and Strategic had paid the Debtor all or substantially all of the $3,147,824.10
     they funded.

11

12   On August 25, 2011, the Bloom Defendants filed their *Answer, Counterclaim and Third*

13   *Party Complaint*, wherein certain of the Bloom Defendants asserted counterclaims against Vion

14   and Strategic, as well as third party claims against Murder, Ventre, Andrew Reiser ("Reiser"),

15   Strategic Capital Management, LLC, a New York limited liability company, MHF Fund

16   Management, LLC, a New York limited liability company, and Tropicana.  Among other claims,

17   the Bloom Defendants (or certain of them) asserted claims for fraudulent misrepresentation, civil

18   conspiracy, negligent misrepresentation, breach of contract, breach of the implied covenant of

19   good faith and fair dealing, breach of fiduciary responsibility: self-dealing, abuse of process,

20   defamation, conversion, negligence, unjust enrichment, indemnification, deceptive acts and

21   practices, and contribution.  Among other matters, the Bloom Defendants attempted to divert

22   blame for the LVME's precipitous financial condition on Ventre and his team's

23   "underperformance in their sales efforts."  On September 16, 2011, Vion and Strategic filed a

24   *Motion to Dismiss Counterclaims*.

25   On September 28, 2011, Noteholders Aubrey Gray Crampton, Hal Braxton, Howard

26   Puterman, Joseph Randazzo, Larry and Linda Dematteo, Vincent Mannino II, James Klodt II,

27   and Michael Regan (collectively, the "Intervenor Group") all filed motions to intervene in the

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

22

103164-002/1353394_4

1  Vion-Strategic Case.   The Intervenor Group did not assert any specific claims against any

2  specific parties, but rather asserted an alleged security interest in certain property over which a

3  receiver or third party may be appointed.  The Intervenor Group also apparently asserts potential

4  claims against various unnamed parties, and with the intent on being able to seek discovery to

5  determine whether they actually did have any viable claims.

6       On September 30, 2011, the Court held a hearing on the various pending matters, and

7  ordered that Larry Bertsch be appointed as special master to perform an accounting and make

8  certain other recommendations regarding the Debtor, including the qualifications of a receiver to

9  operate the property and safeguard it.

10       2.    <u>The GC-Global Case.</u>

11       On October 5, 2011, GC-Global filed its *Complaint* (the "<u>GC-Global Complaint</u>") in the

12  Eighth Judicial District Court, Clark County, Nevada, being Case No. A-11-649459-C (the "<u>GC-</u>

13  <u>Global Case</u>") against Bloom, Murder, Mafia Collection, Order 66, and Eagle Holding.  The GC-

14  Global Complaint asserts a breach of contract claim against the Debtor for failure to pay the

15  Notes allegedly acquired by GC-Global, claims for alter ego, unjust enrichment and monies due

16  and owing against all defendants, claims for foreclosure and possession as to Mafia Collection

17  and the Debtor, and a claim for fraud against Bloom.

18       On October 6, 2011, GC-Global filed its *Ex Parte Petition for Writ of Possession or, in*

19  *the Alternative, Order to Show Cause Why a Writ of Possession Should Not Issue and Temporary*

20  *Restraining Order* (the "<u>Writ Application</u>").   GC-Global's Writ Application sought either

21  immediate possession of Mafia Collection's property (the artifacts), or in the alternative, for the

22  Court to issue an order to show cause and issue a temporary restraining order prohibiting any of

23  the named defendants from collecting, depleting, losing, removing, relocating, concealing or

24  utilizing its collateral in which it asserts to have a properly perfected security interest.  The Writ

25  Application was heard on October 20, 2011.  GC-Global has not taken possession of the artifacts.

26       (e)    **Events Leading to the Bankruptcy Filing and Restructuring Goals.**

27       The Debtor's Chapter 11 filing was a result of competing secured creditors and large

28  liabilities incurred prior to opening while the project was under Bloom's control, some of which

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

23

are unknown, as discussed above, inadequate working capital, poor operating performance once the LVME was opened, defaults under the Lease, and the numerous litigations seeking to foreclose and take other pre-judgment collection actions that could effectively shut down the LVME. Further, the Debtor is unable to satisfy its obligations under the numerous consulting agreements between the Debtor and the family members of the mobsters which are the subject of the LVME.

Further, by using the Debtor's assets for his own benefit and the benefit of the Debtor's affiliates, Bloom rendered the Debtor insolvent and unable to meet its obligations as they became due without additional financing. As of Ventre taking over control and management of Murder on July 1, 2011, Murder could not and still cannot pay its existing debts as they come due without additional financing. In sum, the Debtor's liabilities exceed the value of the Debtor's assets exponentially.

Despite these problems, the Debtor believes that LVME remains a viable operation. While the initial projections of income and debt obligations were flawed, the LVME can be restructured so that its revenues exceed its operating expenses while providing some repayment to its creditors. However, in order to achieve positive cash flows, the Debtor believes the LVME must (1) renegotiate the Lease with Tropicana, (2) drastically reduce its secured and unsecured debt, including eliminating its obligation to pay a significant portion of its gross revenues to creditors pursuant to the Income Assignments, (3) reject consulting agreements that are unnecessary and provide no benefit to the LVME, and (4) reopen the interactive experience component of the LVME.

The Debtor believes that in order for the Debtor's creditors to receive any material recovery, the LVME must continue operations and increase its revenues. In order to increase its revenues, the interactive experience component of the LVME must reopen, which will more than double the number of visitors, and substantially increase its marketing investment. In order to reopen the experience, the Debtor must obtain additional capital to invest in specialized video equipment and RFID (radio frequency identification) technology, along with additional employees. In order to obtain additional capital, the LVME must quickly emerge from Chapter

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

24

103164-002/1353394_4

11.  The Debtor believes that languishing in Chapter 11 while the Debtor's creditors engage in protracted inter-creditor disputes will not only irreparably harm the Debtor's ability to reopen the experience and increase its revenues for the benefit of its creditors, but will cause Tropicana to refuse to enter into a modified lease with the Debtor, thereby requiring the Debtor to reject the Tropicana Lease pursuant to Section 365.   In that event, liquidation would be the only alternative.

      (f)      **Commencement of the Chapter 11 Case and Significant Events.**

On October 17, 2011, the Debtor filed its Chapter 11 Case.  Also on October 17, 2011, the Debtor filed several motions (the "First Day Motions"), requesting immediate relief, as follows:

(i)      *Emergency Motion for Order (1) Authorizing the Debtor to Pay Wages, Salaries, and Other Employee Obligations, and (2) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* [ECF No. 4], requesting authorization to pay its employees for services rendered prior to the Petition Date.  The motion was granted on November 3, 2011.  ECF No. 60.

(ii)      *Emergency Motion For Order Authorizing Debtor To Honor Prepetition Ticket Purchases* [ECF No. 6], requesting authorization to honor tickets purchased prior to the Petition Date.  The motion was granted on November 3, 2011.  ECF No. 59.

(iii)      *Emergency Motion for Order Authorizing Debtor to Pay Pre-Petition Taxes and Fees Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541(d)* [ECF No. 5], requesting authorization to continue paying taxes and other governmental obligations in the ordinary course of business.  The motion was granted on November 3, 2011.  ECF No. 58.

(iv)      *Emergency Motion for Entry of an Interim Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b):   (1) Initially Determining Extent of Cash Collateral, and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral* [ECF No. 9], requesting a determination by the Court that Cash on hand and funds in the Debtor's Deposit Accounts, along with Postpetition Retail Proceeds and Postpetition Ticket Revenue, were not "cash collateral" within the meaning of Section 363 of the Bankruptcy Code.  On November 3, 2011, the Court

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

25

103164-002/1353394_4

granted the motion on an interim basis, and set the motion for a final hearing on November 7, 2011 at 8:30 a.m.  The Court ruled that any security interest which might otherwise exist on or after the Petition Date in the Postpetition Retail Proceeds and Postpetition Ticket Revenue pursuant to 11 U.S.C. § 552(b), if any, shall be deemed severed as of the Petition Date based upon the equities of the case, and required the Debtor to segregate or account for Cash and the funds in the Debtor's Deposit Accounts, as of the Petition Date, pending the final hearing.  ECF No. 56.  The final hearing will be held on November 7, 2011 at 8:30 a.m.

(v)  *Motion for Order Approving Limited Forbearance Agreement Between Debtor and Tropicana Las Vegas, Inc.* [ECF No. 7], requesting approval of a limited forbearance agreement (the "Forbearance Agreement") between the Debtor and Tropicana, whereby Tropicana agreed to forbear from exercising its rights and remedies under the Lease and the Bankruptcy Code, and specifically under Section 365(d)(3), in order to enable the Debtor to seek confirmation of its Plan.  The motion was granted on November 3, 2011.  ECF No. 57.

(vi)  *Motion of the Debtor Seeking Interim and Final Orders: (1) Authorizing the Debtor to Obtain Post-Petition Financing, (2) Granting Liens and Super-Priority Administrative Expense Status, (3) Modifying the Automatic Stay, and (4) Setting and Prescribing the Form and Manner of Notice for a Final Hearing* [ECF No. 12], requesting (a) entry of an interim order and final order authorizing the Debtor:  (i) to obtain post-petition financing of up to $375,000 at a fixed interest rate of 12% per annum pursuant to Sections 363 and 364 of the Bankruptcy Code from JVLV Holdings, LLC ("JVLV") by entering into a postpetition financing agreement (the "DIP Agreement"); (ii) to grant liens and super-priority claims to and on behalf of and for the benefit of JVLV to secure the obligations; and (iii) pending a final hearing, to obtain emergency post-petition loans and financing in the approximate amount of $95,588 (through November 13, 2011); and (b) in accordance with Bankruptcy Rule 4001(c)(2), that this Court schedule a final hearing and approve notice with respect thereto.  On October 24, 2011, the Court approved the financing on an interim basis and set the motion for a final hearing on November 7, 2011 at 8:30 a.m.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

26

103164-002/1353394_4

# VII.
## DETAILED DESCRIPTION OF THE PLAN

(a)    **Overview of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity interest holders. The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and equity securities in, a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity interest holder in, the debtor, regardless of whether such creditor or equity interest holder (i) is impaired under, or has accepted, the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the bankruptcy court's confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against, or equity interest in, a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote on the plan. Any classes that would receive a distribution of property under the plan, but are not unimpaired, will be solicited to vote to accept or reject the plan.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims into various Classes and sets forth the treatment for each Class. A debtor is also required under Section 1122 of the Bankruptcy Code to place a claim and equity security into a particular class only if such claim or equity security is substantially similar to other claims and equity securities in such class. The Debtor believes that the Plan has classified all Claims in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim will challenge the Plan's classifications and that the Bankruptcy Court will find that different classifications are required in order for the Plan to be confirmed. In such event, the Debtor intends, to the extent permitted by the Bankruptcy Court, to make reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holders are ultimately deemed members. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The Debtor (and its agents, officers, employees, advisors and attorneys) has, and upon confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions under the Plan, and therefore is not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(b)     **Treatment of Unclassified Claims under the Plan.**

1.     Treatment of Administrative Claims.

Each Allowed Administrative Claim, except for Allowed Professional Claims, shall be paid by the Reorganized Debtor (or otherwise satisfied in accordance with its terms) upon the latest of: (i) the Effective Date or as soon thereafter as is practicable; (ii) such date as may be

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

28

fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the fourteenth (14th) Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the Holder of such Claim and Debtor shall agree upon.

Holders of Allowed Administrative Claims related to Professional services rendered (including compensation and reimbursement of Debtor's Professionals not in excess of $200,000, including all pre-Petition Date amounts held on retainer by the such Professionals, and, in the event a Committee is appointed, an amount not in excess of $50,000 for compensation and reimbursement of the Committee's Professionals) will be paid in full on the later of (i) the Effective Date of the Plan, and (ii) the date on which such Claims become Allowed Administrative Claims.

    2.    <u>Treatment of Priority Tax Claims.</u>

Holders of Allowed Priority Tax Claims will receive (i) payment in full in Cash of such Allowed Priority Tax Claims incurred between July 1, 2011 and the Petition Date on the later of (1) the Effective Date, and (2) the date on which such Claims become Allowed Priority Tax Claims, and (ii) with regard to all other Allowed Priority Tax Claims incurred prior to July 1, 2011, quarterly installment payments in Cash, over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the amount of such claim.  The Debtor believes that Allowed Priority Tax Claims incurred prior to July 1, 2011 will be approximately $113,000 and Allowed Priority Tax Claims incurred after July 1, 2011 will be approximately $134,500.

    (c)    **Treatment of Classified Claims.**

    1.    <u>Class 1 (Priority Non-Tax Claims).</u>

Holders of Allowed Priority Non-Tax Claims will be paid in full on the later of (i) the Effective Date of the Plan, and (ii) the date on which such Claims become Allowed Claims.  It is anticipated that Class 1 Priority Non-Tax Claims will be in amount of less than $25,000.  Class 1 is Unimpaired under the Plan.  Holders of Class 1 Claims are not entitled to vote on the Plan.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

29

103164-002/1353394_4

2.      Class 2 (Secured Tax Claims).

Holders of Allowed Secured Tax Claims will receive either (i) payment in full in Cash of such Claims on the later of (1) the Effective Date of the Plan, and (2) the date on which such Claims become Allowed Claims, or (ii) quarterly installment payments in Cash, over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date of the Plan, equal to the amount of such Allowed Claims.  Class 2 is Unimpaired under the Plan.  Holders of Class 2 Claims are not entitled to vote on the Plan.

3.      Class 3 (Secured Note Claims).

Each sub-Class shall be treated similarly. Each Holder of  an Allowed Secured Note Claim shall receive either:  (i) in the event all Holders of Secured Note Claims in each sub-Class by the requisite percentages elect to receive distribution of equity in Newco, such Holders will receive on the Effective Date, in full and complete satisfaction of the Secured Claim portion of their Allowed Secured Note Claims, a Pro Rata distribution of the Class B membership interests in Newco, with any General Unsecured Claim portion being treated as a Class 7 General Unsecured Claim (the "Equity Election"), or alternatively, (ii) in the event that all Holders of a Secured Note Claim  in each sub-Class forego the Equity Election but by the requisite majorities elect to receive a Cash payment, then each such Holder will receive a Pro Rata distribution of $250,000 in full satisfaction of the Secured Claim portion of their Allowed Secured Note Claims, with any General Unsecured Claim portion being treated as a Class 7 General Unsecured Claim (the "Cash Election").   In the event of either the Equity Election or the Cash Election, all Liens of such Creditors against the Assets will be released as of the Effective Date; however, in the event that Holders of Allowed Secured Note Claims cannot agree, by the Confirmation Date, upon allocation of the distribution to be made under either option (i) or (ii) above, the Bankruptcy Court shall resolve any such disputes after the Effective Date.  All Liens of such Creditors against the Assets will be released as of the Effective Date.  In the event that Holders of Allowed Secured Note Claims cannot agree, by the Confirmation Date, upon allocation of the Distribution to be made under either option (i) or (ii) above, the Bankruptcy Court shall resolve

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

30

any such disputes after the Effective Date with all consideration to be distributed on account of Allowed Secured Note Claims to be held in reserve pending such resolution.

In the event that that the requisite majorities of the Holders of Allowed Secured Note Claims in each sub-Class fail to make the Equity Election or the Cash Election, the Debtor reserves the right under Section 13.17 of the Plan seek to invoke the provisions of Section 1129(b) of the Bankruptcy Code to satisfy the requirements of confirmation of the Plan.

Distributions otherwise payable under the Plan to Holders of Allowed Class 3 Secured Note Claims shall be subject and subordinated to any Allowed Class 3 Secured Note Claim with higher or superior priority in identical Collateral securing such Secured Note Claims.

Each sub-Class of Class 3 is Impaired under the Plan. Holders of Class 3 Claims are entitled to vote on the Plan.

4. Class 4 (General Contractor Claim).

The Holder of the Allowed General Contractor Claim shall receive on the Effective Date in full and complete satisfaction of its Allowed Claim against Debtor (i) $350,000 in Cash, and (ii) all Class C membership interests in Newco in consideration for which such Holder waives its Section 363(k) credit bid right and shall as of the Effective Date release and waive with prejudice (x) all Liens of such Holder, and (y) all Tropicana Mechanics' Liens and Claims such Holder has or may have against Tropicana or any of Tropicana's real or personal property. Class 4 is Impaired under the Plan. The Holder of the Class 4 Claim is entitled to vote on the Plan.

5. Class 5 (Subcontractor Claims).

Holders of Allowed Subcontractor Claims shall receive on the Effective Date in full and complete satisfaction of their Allowed Claims against Debtor a Cash payment in an amount equal to the lesser of (a) 75% of their Allowed Subcontractor Claims, and (b) a Pro Rata share of $1,650,000, in consideration for which such Holders waive their Section 363(k) credit bid rights and shall as of the Effective Date release and waive with prejudice (x) all Liens of such Holders, and (y) all Tropicana Mechanics' Liens and Claims such Holder has or may have against Tropicana or any of Tropicana's real or personal property. In the event that the Holders of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

31

103164-002/1353394_4

Allowed Subcontractor Claims cannot agree upon allocation of the distribution by the Confirmation Date, the Bankruptcy Court shall resolve any such disputes after the Effective Date with all consideration to be distributed on account of Allowed Subcontractor Claims to be held in reserve pending such resolution. Class 5 is Impaired under the Plan. Holders of Class 5 Claims are entitled to vote on the Plan.

The Class 5 Claims may include, but are not limited to, Las Vegas Awning, LLC, George M. Raymond Company, Wood Resources of Nevada, Inc., Superior Tile & Marble, Inc., Hansen Mechanical Contractors, Inc., J&R Flooring Inc., dba J Picini Flooring, Dean Roofing, Statewide Fire Protection, Scott Zemp Masonry, Inc., M.J. Dean Construction Inc., Bombard Electric, LLC, Simplexgrinnell, LP, and Northwestern Inc. The Debtor anticipates that the Allowed Subcontractor Claims will be approximately $2.2 million.

6.      Class 6 (Other Secured Claims).

Each Other Secured Claim will be in its own sub-Class under Class 6. Each sub-Class shall be treated similarly. Each Holder of an Allowed Other Secured Claim will receive on the Effective Date a Pro Rata distribution, up to the amount of its Allowed Other Secured Claim, of $50,000 in full satisfaction of its Allowed Other Secured Claim, with any unsecured Claim portion being treated as a Class 7 General Unsecured Claim. All Liens related to such Other Secured Claims will be released on the Effective Date. Each sub-Class in Class 6 is Impaired under the Plan. Holders of the Class 6 Claim are entitled to vote on the Plan.

7.      Class 7 (General Unsecured Claims).

Holders of Allowed General Unsecured Claims will receive on the Effective Date a Pro Rata distribution of the beneficial interests of the    Liquidating Trust to be established for the benefit of Holders of Allowed General Unsecured Claims. Class 7 is Impaired under the Plan. Holders of Class 7 Allowed General Unsecured Claims are entitled to vote on the Plan.

8.      Class 8 (Equity Securities).

On the Effective Date all Equity Securities shall, without any further action, be cancelled, annulled and extinguished. Holders of Class 8 Equity Securities shall receive nothing under the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

32

103164-002/1353394_4

1    Plan, are deemed to have rejected the Plan, and are not entitled to vote on the Plan.

2        (d)    **Means of Implementation of the Plan.**

3            1.    Newco.

4        Prior to the commencement of the Confirmation Hearing, JVLV will cause Newco to be

5    organized and authorized to conduct business under applicable law.  Newco will have the

6    following classes of equity interests:  (a) Class A voting membership interests (57.5% of

7    Newco); (b) Class B non-voting membership interests (10% of Newco); (c) Class C voting

8    membership interests (12.5% of Newco); and (d) Class D voting membership interests (20% of

9    Newco).  Management of Newco will be determined by Newco's articles of organization, by-

10    laws, and/or operating agreement, as applicable.  It is contemplated by JVLV that Ventre will

11    continue to have a management roll with Newco, and the Ventre and JVLV continue to negotiate

12    the terms of Ventre's future employment.  The Debtor will supplement the Plan prior to

13    confirmation to disclose the terms of Ventre's employment.

14            2.    Post-Effective Date Management of Reorganized Debtor.

15        From and after the Effective Date until dissolution, Reorganized Debtor will continue to

16    be managed by Debtor's pre-petition managers, which management may subsequently be

17    modified to the extent provided by Reorganized Debtor's articles of organization, by-laws, and

18    operating agreement (as amended, supplemented, or modified).

19            3.    Effectuation of Transactions.

20        On and after the Effective Date, the appropriate managers or members of Reorganized

21    Debtor are authorized to issue, execute, deliver, and consummate the transactions contemplated

22    by or described in the Plan in the name of and on behalf of Reorganized Debtor without further

23    notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order,

24    rule, or any requirements of further action, vote, or other approval or authorization by any

25    Person.

26            4.    Notice of Effectiveness.

27        When all of the steps contemplated by Section 8.2 have been completed or waived,

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

33

Reorganized Debtor shall file with the Bankruptcy Court and serve upon all Creditors and all potential Holders of Administrative Claims known to Reorganized Debtor (whether or not disputed), a notice of Effective Date of Plan.  The notice of Effective Date of Plan shall include notice of the Administrative Claim Bar Date.

5.    No Governance Action Required.

As of the Effective Date: (i) the adoption, execution, delivery, and implementation or assignment of all contracts, leases, instruments, releases, and other agreements related to or contemplated by the plan; and (ii) the other matters provided for under or in furtherance of the plan involving corporate action to be taken by or required of Debtor shall be deemed to have occurred and be effective as provided in the Plan, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the members or managers of Debtor.

6.    Sale of Assets to Newco and Assignment of Assigned Contracts to Newco.

On the Effective Date the Asset Purchase Agreement shall be executed to the extent not yet executed and shall be effectuated in its entirety.  Reorganized Debtor shall transfer and convey the Purchased Assets and assign the Assigned Contracts in accordance with the Asset Purchase Agreement to Newco in consideration for the Purchase Price and other consideration provided therein.  The Asset Purchase Agreement will be attached to this Disclosure Statement as **Exhibit "4."**

7.    Amended Tropicana Lease.

On the Effective Date, the Amended Tropicana Lease will be assumed by Reorganized Debtor and assigned to Newco.  The Amended Tropicana Lease shall contain substantially the same terms as the Modified Tropicana Lease Terms, attached hereto as **Exhibit "3."**

8.    Distribution of Newco Equity Securities.

On the Effective Date, the following Newco equity interests received as part of the Purchase Price under the Asset Purchase Agreement shall be distributed by Reorganized Debtor in accordance with the Plan as follows:  (i)  provided the Equity Election is made, all Class B

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

34

103164-002/1353394_4

membership interests will be distributed to the Holders of Allowed Secured Note Claims in accordance with Section 4.3 of the Plan;  and (ii) all Class C membership interests will be distributed pursuant to the Plan to the Holder of the General Contractor Claims in accordance with Section 4.4 of the Plan.

9.    Disputed Claims Reserve.

Reorganized Debtor shall establish and maintain the Disputed Claim Reserve.

10.    Manner of Distribution of Property Under the Plan.

Reorganized Debtor shall be responsible for making the Distributions described in the Plan.  Reorganized Debtor may make such Distributions before the allowance of each Claim  has been resolved if Reorganized Debtor has a good faith belief that the Disputed Claims Reserve is sufficient for all Disputed Claims.  Except as otherwise provided in the Plan or the Confirmation Order, the Cash necessary for Reorganized Debtor to make payments pursuant to the Plan may be obtained from existing Cash balances, Debtor's operations and the proceeds of the Asset Purchase Agreement.

Reorganized Debtor shall maintain a record of the names and addresses of all Holders of Allowed Claims as of the Effective Date for purposes of mailing Distributions to them. Reorganized Debtor may rely on the name and address set forth in Debtor's Schedules and/or proofs of Claim as of the Record Date as being true and correct unless and until notified in writing.   Reorganized Debtor shall file all tax returns and other filings with governmental authorities on behalf of Reorganized Debtor and the Assets it holds.

11.    Dissolution of the Reorganized Debtor.

As soon after the Effective Date as practicable and upon consummation of the transactions contemplated by or described in the Plan, the Reorganized Debtor shall be dissolved in accordance with applicable law. The articles of organization, by-laws, and/or operating agreement, as applicable, of Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

35

103164-002/1353394_4

12.    <u>Filing with Nevada Secretary.</u>

To the extent applicable, in accordance with NRS Chapter 86, on or as soon as reasonably practical after the Effective Date, a certified copy of the Plan and the Confirmation Order shall be filed with the Nevada Secretary.  Again, to the extent applicable, Debtor, from the Confirmation Date until the Effective Date, is authorized and directed to take any action or carry out any proceeding necessary to effectuate the Plan pursuant to NRS Chapter 86 and other applicable corporate law.

(e)    **Executory Contracts And Unexpired Leases.**

1.    <u>Executory Contracts.</u>

Except for Executory Contracts specifically addressed in the Plan or set forth on the schedule of Assumed Executory Contracts and Unexpired Leases attached as Schedule 6.1 hereto (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order), all Executory Contracts that exist on the Confirmation Date shall be deemed rejected by Debtor on the Effective Date.

2.    <u>Approval of Assumption or Rejection.</u>

Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval, pursuant to Bankruptcy Code Section 365(a), of the assumption by Reorganized Debtor of each Executory Contract to which Debtor is a party that is listed on Schedule 6.1 or otherwise provided for in the Plan or assumed by separate order of the Bankruptcy Court prior to the Effective Date, and all of which are assigned to Newco; and (ii) rejection by Debtor of each Executory Contract to which Debtor is a party that is not listed on Schedule 6.1.  Upon the Effective Date, each counter party to an assumed Executory Contract listed on Schedule 6.1 shall be deemed to have consented to an assumption contemplated by Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption, and to the assignment thereof to Newco.  To the extent applicable, all Executory Contracts of Reorganized Debtor assumed pursuant to Article 6 shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," regardless of how such term may be

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

36

103164-002/1353394_4

defined in the relevant Executory Contract and any required consent under any such Executory Contract shall be deemed satisfied by confirmation of the Plan.

3.    Cure of Defaults.

Reorganized Debtor shall Cure any defaults respecting each Executory Contract assumed pursuant to Section 6.1 of the Plan upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such dates as may be fixed by the Bankruptcy Court or agreed upon by Debtor, and after the Effective Date, Reorganized Debtor; or (iii) the fourteenth (14th) Business Day after the entry of a Final Order resolving any dispute regarding: (a) a Cure amount; (b) the ability of Reorganized Debtor and Newco to provide "adequate assurance of future performance" under the Executory Contract assumed pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; or (c) any matter pertaining to assumption, assignment, or the Cure of a particular Executory Contract.

4.    Objection to Cure Amounts.

Any party to an Executory Contract who objects to the Cure amount determined by Debtor to be due and owing must file and serve an objection on Debtor's counsel and Newco's counsel no later than ten (10) days prior to the commencement of the Confirmation Hearing.. Failure to file and serve a timely objection shall be deemed consent to the Cure amounts paid by Debtor or  Reorganized Debtor, as applicable, in accordance with Section 6.3 of the Plan.  If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of Reorganized Debtor and Newco to provide "adequate assurance of future performance" under the Executory Contract  to be assumed or assigned; or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption and assignment.

5.    Confirmation Order.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions and assignments to Newco described in this Article 6 pursuant to Section 365 of the Bankruptcy Code as of the Effective Date.  Notwithstanding the forgoing, if, as of the date the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

37

Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the cure amount or adequate assurance for any particular Executory Contract, the assumption of such Executory Contract shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by Debtor.

6. Post-Petition Date Contracts and Leases.

Executory Contracts set forth on Schedule 6.1 entered into after the Petition Date by Debtor shall be assumed by Reorganized Debtor and assigned to Newco on the Effective Date.

7. Bar Date.

All proofs of Claims with respect to Claims arising from the rejection of any Executory Contract shall be filed no later than thirty (30) calendar days after the Effective Date. Any Claim not filed within such time shall be forever barred.

(f) **Liquidating Trust and Liquidating Trustee.**

1. Liquidating Trust.

On the Effective Date, (a) the Liquidating Trust will be established, (b) the members of the Liquidating Trust shall assume their obligations in accordance with the terms of the Liquidating Trust Agreement, and (c) all Litigation Claims shall be transferred to such trust to be pursued for the benefit of Holders of Class 7 Allowed Claims.

No less than five days prior to the commencement of the Confirmation Hearing, Debtor shall select the three members of the Liquidating Trust Board and the Liquidating Trustee.

The Liquidating Trustee shall commence serving as the Liquidating Trustee on the Effective Date; provided however, that the party appointed as Liquidating Trustee shall be permitted to act in accordance with the terms of the Liquidating Trust Agreement from the Confirmation Date through the Effective Date and shall be entitled to seek compensation in accordance with the terms of the Liquidating Trust Agreement and the Plan.

2. Powers of the Liquidating Trustee.

Subject to the provisions of the Liquidating Trust Agreement, which will be attached to this Disclosure Statement as **Exhibit "5,"** and with all the powers of a trustee under applicable

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

38

law, the Liquidating Trustee shall have the power and authority to perform the following acts, among others:

       i)     Accept the Liquidating Trust Assets transferred and provided to the Liquidating Trust pursuant to the Liquidating Trust Agreement and the Plan;

       ii)     File, settle, compromise, withdraw, or litigate to judgment any objections to Claims;

       iii)     File, settle, compromise, withdraw, or litigate to judgment any motions, applications, adversary proceedings, contested matters and other litigation matters, whether filed or commenced by Debtor after the Petition Date or by the Liquidating Trustee after the Effective Date, including proceedings with respect to the rights and claims of Debtor to recover property or the prosecution of any Litigation Claims, or otherwise seeking to collect or recover on account of any Litigation Claims;

       iv)     Distribute Liquidating Trust Assets to holders of Allowed Claims (the Beneficiaries, as defined in the Liquidating Trust Agreement) in accordance with the terms of the Plan and the Liquidating Trust Agreement;

       v)     Perfect and secure his/her right, title and interest to any and all Liquidating Trust Assets;

       vi)     Reduce all of the Liquidating Trust Assets to his or her possession and conserve, protect, collect and liquidate or otherwise convert all Liquidating Trust Assets into Cash;

       vii)     Release, convey, subordinate or assign any right, title or interest in or to the Liquidating Trust Assets;

       viii)     Pay and discharge any costs, expenses, fees or obligations deemed necessary to preserve the Liquidating Trust Assets, and to protect the Liquidating Trust and the Liquidating Trustee from liability;

       ix)     Deposit Liquidating Trust funds and draw checks and make disbursements thereof;

       x)     Employ such attorneys, accountants, engineers, agents, tax specialists, other professionals, and clerical assistance as the Liquidating Trustee may deem necessary. The Liquidating Trustee shall be entitled to rely upon the advice of retained professionals and shall not be liable for any action taken in reliance of such advice; the fees and expenses of all such professionals shall be charges as expenses of the Liquidating Trust and shall be paid upon approval of the Liquidating Trustee;

       xi)     Employ brokers, investment brokers, sales representatives or agents, or other Persons necessary to manage the Liquidating Trust Assets;

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

xii)     Exercise any and all powers granted the Liquidating Trustee by any agreements or otherwise applicable law or any statute that serves to increase the extent of the powers granted to the Liquidating Trustee hereunder;

xiii)    Take any action required or permitted by the Plan or the Liquidating Trust Agreement;

xiv)     Execute obligations, whether negotiable or non-negotiable;

xv)      Sue and be sued;

xvi)     Settle, compromise or adjust by arbitration, or otherwise, any disputes or controversies in favor or against the Liquidating Trust;

xvii)     Waive or release rights of any kind;

xviii)   Appoint, remove and act through agents, managers and employees and confer upon them such power an authority as may be necessary or advisable;

xix)      Negotiate, renegotiate or enter into any contract or agreements binding the Liquidating Trust, and to execute, acknowledge and deliver any and all investments that are necessary, required or deemed by the Liquidating Trustee to be advisable in connection with the performance of his/her duties;

xx)      Borrow such sums of money at any time and from time to time for such periods of time upon such terms and conditions from such persons or corporations (including any fiduciary hereunder) for such purposes as may be deemed advisable, and secure such loans with any of the Liquidating Trust Assets, so long as the terms of any such borrowing provide that no recourse shall be had to the Liquidating Trustee, or the Reorganized Debtor or  beneficiary of the Liquidating Trust on any such debt; and

xxi)     In general, without in any manner limiting any of the foregoing, deal with the Liquidating Trust Assets or any part or parts thereof in all other ways as would be lawful for any person owing the same to deal therewith, whether similar to or different from the ways above specified, at any time or times hereafter.

xxii)    Payment of Expenses Incurred by the Liquidating Trust.

xxiii)   The Liquidating Trustee, including any successor Liquidating Trustee, may pay the Liquidating Trustee, from the Liquidating Trust Assets, reasonable compensation, as approved by the Liquidating Trust Board, for the Liquidating Trustee's services rendered and reimbursement of expenses incurred.  Professionals retained by the Liquidating Trust shall be entitled to reasonable compensation from the Liquidating Trust Assets for services rendered and reimbursement of expenses incurred.  The payment of the fees and expenses of the professionals retained by the Liquidating Trustee shall be made in the ordinary course of business from the Liquidating Trust Assets.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

### 3. <u>Exculpation and Indemnification.</u>

The Liquidating Trustee shall perform the duties and obligations imposed on the Liquidating Trustee by the Plan and the Liquidating Trust Agreement with reasonable diligence and care. The Liquidating Trustee, the Liquidating Trust Board, and any member, officer, director or employee of, or attorney or other professional for the foregoing shall not be liable for actions taken or omitted in their respective capacities under the terms of the Liquidating Trust Agreement or the Plan, except to the extent those acts are determined by a final order of a court with jurisdiction to arise out of fraud, willful misconduct, or gross negligence, willful disregard of their duties, or materially detrimental and willful breach of the Plan or the Liquidating Trust Agreement. The Liquidating Trustee, the Liquidating Trust Board, and any member, officer, director or employee of, or attorney or other professional for the foregoing shall be entitled to indemnification and reimbursement for all losses, fees, and expenses, including but not limited to, attorney's fees and costs, in defending any and all of their actions or inactions except to the extent those acts are determined by a final order of a court with jurisdiction to arise out of fraud, willful misconduct, or gross negligence, willful disregard of their duties, or materially detrimental and willful breach of the Plan or the Liquidating Trust Agreement. In all respects, each of the foregoing parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities and shall be fully protected in acting or in refraining from action in accordance with such advice. Any indemnification claim of the Liquidating Trustee, the Liquidating Trust Board, and any member, officer, director or employee of, or attorney or other professional for the foregoing shall be satisfied solely from the assets of the Liquidating Trust.

### 4. <u>Retention of Funds Prior to Distribution.</u>

The Liquidating Trustee shall collect all Cash constituting Liquidating Trust Assets and, pending distribution, shall deposit such Cash with a FDIC-insured financial institution regularly providing banking services. The Liquidating Trustee will deposit Cash so that it is adequately insured. Notwithstanding the foregoing, the Liquidating Trustee may invest all Cash funds (including any earnings thereon or proceeds therefrom) in the same manner as Chapter 7 trustees

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

41

are required to invest funds pursuant to the guidelines of the United States Trustee's Office, provided that the Liquidating Trustee shall invest funds held only in demand and time deposits, such as short-term certificates of deposit, in banks or savings institutions, or other temporary, liquid and low-risk investments, such as short-term U.S. Treasury bills. The Liquidating Trustee shall hold all such funds until they are distributed pursuant to the Plan.

The Liquidating Trustee will not be required to post a bond or be audited or monitored except as otherwise may be expressly provided in the Liquidating Trust Agreement. Forty-five (45) days after termination of the Liquidating Trust, the Liquidating Trustee will (i) file with the Bankruptcy Court, if the Chapter 11 Case is still open, an unaudited written report and accounting showing a summary of the revenues, expenses and distributions of the Liquidating Trust from the Effective Date until the termination of the Liquidating Trust.

5.    Conflict Between Plan and Liquidating Trust Agreement.

In the event of any direct conflict between the terms of the Plan and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall prevail.

6.    Representation of Liquidating Trust.

The professionals employed by the Liquidating Trust are expressly authorized to simultaneously represent any party on any matter not directly adverse to the Liquidating Trust with respect to the particular representation of the Liquidating Trust.

7.    Termination of the Liquidating Trust.

The Liquidating Trust shall remain and continue in full force and effect until the earlier of three (3) years from the Effective Date or the date on which (1) all Liquidating Trust Assets have been distributed or abandoned, (2) all costs, expenses, and obligations incurred in administering the Liquidating Trust have been fully paid, and (3) all remaining income and proceeds of the Liquidating Trust Assets have been distributed in accordance with the provisions of the Plan; provided, however, that if the complete liquidation of the Liquidating Trust Assets and satisfaction of all remaining obligations, liabilities and expenses of the Liquidating Trust pursuant to the Plan has not been completed prior to three (3) years from the Effective Date, the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

42

Liquidating Trustee may, with the approval of the Liquidating Trust Board extend the termination date of the Liquidating Trust for a specified period of time in order to complete the purpose of the Liquidating Trust as set forth in the Plan and the Liquidating Trust Agreement. The Liquidating Trustee shall at all times endeavor to liquidate the Trust Assets expeditiously, and in no event shall the Liquidating Trustee unduly prolong the duration of the Trust.

On the termination date of the Liquidating Trust, the Liquidating Trustee will execute and deliver any and all documents and instruments reasonably requested to evidence such termination. Upon termination of the Liquidating Trust, the Liquidating Trustee will be forever discharged and released from all power, duties, responsibilities and liabilities pursuant to the Liquidating Trust other than those attributable to fraud, gross negligence or willful misconduct of the Liquidating Trustee.

8.    The Liquidating Trust Board.

i)    The Liquidating Trust Board's role shall be to advise and consult with the Liquidating Trustee as more particularly set forth in the Liquidating Trust Agreement. The Liquidating Trust Board shall have the rights and duties set forth in the Liquidating Trust Agreement.

ii)    The members of the Liquidating Trust Board shall serve, receive compensation, and will be reimbursed for their reasonable expenses from the Liquidating Trust in accordance with the Liquidating Trust Agreement.

iii)    The fiduciary duties, as well as the privileges, immunities and protections, that apply to a statutory committee appointed in a case under the Bankruptcy Code shall apply to the Liquidating Trust Board after the Effective Date. The duties and powers of the Liquidating Trust Board shall terminate upon the termination of the Liquidating Trust.

iv)    The Liquidating Trustee shall be required by the Liquidating Trust Agreement to consult with and report to the Liquidating Trust Board and the authority of the Liquidating Trust Board shall be as set forth in the Plan and the Liquidating Trust Agreement.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

43

9.      Resignation of the Liquidating Trustee.

The Liquidating Trustee may resign at any time by giving written notice to the Liquidating Trust Board and such resignation shall be effective upon the date provided in such notice (which effective date shall not be less than fifteen (15) Business Days following the date of delivery of such notice).  In the case of the resignation of the Liquidating Trustee, a successor Liquidating Trustee shall thereafter be appointed by the Liquidating Trust Board in accordance with the terms of the Liquidating Trust Agreement, whereupon such resigning Liquidating Trustee shall, to the extent necessary, convey, transfer and set over to such successor Liquidating Trustee by appropriate instrument or instruments all of the Liquidating Trust Assets then not conveyed or otherwise disposed of and all other assets then in his or her possession in accordance with the Liquidating Trust Agreement.  Without further act, deed or conveyance, a successor Liquidating Trustee shall be vested with all the rights, privileges, powers and duties of the Liquidating Trustee, except that the successor Liquidating Trustee shall not be liable for the acts or omissions of his or her predecessor(s).  Each succeeding Liquidating Trustee may in like manner resign and another may in like manner be appointed in his or her place.

10.      Treatment of Beneficial Interests in the Liquidating Trust.

The beneficial interests of the Liquidating Trust issued pursuant to the Plan shall be issued pursuant to the exemption from securities registration contained in Section 1145 of the Bankruptcy Code.  Any securities issued to or transferred by the Liquidating Trust shall be issued or transferred pursuant to the exemption from securities registration contained in Section 1145 of the Bankruptcy Code and shall be exempt from taxes pursuant to Section 1146(a) of the Bankruptcy Code.

11.      Actions against the Liquidating Trustee.

Absent the express permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced against the Liquidating Trustee in his or her official capacity, with respect to his or her status, duties, powers, acts or omissions as Liquidating Trustee in any forum other than the Bankruptcy Court.  From and after the Effective

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

Date, the Liquidating Trustee and the Liquidating Trust Board and their professionals shall be exculpated by the Estate and all holders of Claims or Interests from any and all claims or causes of action and assertions of liability arising out of their performance of the duties conferred upon them by the Plan, the Liquidating Trust Agreement, or any orders of the Bankruptcy Court, except to the extent an act constitutes bad faith, gross negligence, willful misconduct, or actual fraud.  No holder of a Claim or Interest or representative thereof shall have or pursue any claim or cause of action against the Liquidating Trustee and the Liquidating Trust Board or their professionals for taking any action in accordance with the Plan, the Liquidating Trust Agreement, or to implement the provisions of the Plan or any order of the Bankruptcy Court. Nothing in this provision shall be deemed to alter the provisions of the Liquidating Trust Agreement.

    (g)    **Conditions to Confirmation of the Plan.**

        1.    <u>Conditions to Confirmation.</u>

The Confirmation Order shall have been entered and be in form and substance reasonably acceptable to Debtor, JVLV and Tropicana.

        2.    <u>Conditions to Effectiveness.</u>

The following are conditions precedent to occurrence of the Effective Date:

    i)    The Confirmation Order shall be a Final Order, except that Debtor reserves the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order, under circumstances that would moot such appeal;

    ii)    No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending, including any appeal, except that Debtor reserves the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order, under circumstances that would moot such appeal;

    iii)    All documents necessary to implement the transactions contemplated by the Plan shall be in form and substance reasonably acceptable to Debtor, JVLV  and Tropicana;

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

iv)     Tropicana has confirmed in writing to Debtor that all Tropicana Mechanics' Liens And Claims have been waived and released with prejudice;

v)     The Amended Tropicana Lease shall have been executed by all parties and in full force and effect; and

vi)     Reorganized Debtor shall hold sufficient Cash to pay when due all Allowed Administrative Claims as required under Sections 2.3, 2.4 and 2.5 of the Plan.

## VIII.
## RISK FACTORS

In addition to risks discussed elsewhere in this Disclosure Statement, the Plan involves the following risks, which should be taken into consideration.

(a)     **Debtor Has No Duty To Update.**

The statements in this Disclosure Statement are made by Debtor as of the date hereof, unless otherwise specified herein. The delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Debtor has no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.

(b)     **Information Presented Is Based on Debtor's Books and Records, and Is Unaudited.**

While the Debtor has endeavored to present information fairly and accurately in this Disclosure Statement, there is no assurance that the Debtor's books and records upon which this Disclosure Statement is based are complete and accurate. The financial information contained herein has not been audited.

(c)     **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Will Vary.**

Certain information in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and projections which may differ materially from actual future results. There are uncertainties associated with all assumptions, projections, and estimates, and they should not be considered assurances or guarantees of the amount of Claims in the various Classes that will be allowed. The allowed

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

46

amount of Claims in each Class, as well as Administrative Claims, could be significantly more than projected, which in turn, could cause the value of Distributions to be reduced or to be tendered over a longer period of time than anticipated.

(d)    **No Legal or Tax Advice Is Provided To You By This Disclosure Statement.**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Creditor or Holder of an Equity Security should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Equity Security.

(e)    **No Admissions Made.**

Nothing contained herein shall constitute an admission of any fact or liability by any party (including the Debtor) or shall be deemed evidence of the tax or other legal effects of the Plan on the Debtor or on Holders of Claims or Equity Securities.

(f)    **No Waiver of Right To Object or Right to Recover Transfers and Estate Assets.**

A Creditor's vote for or against the Plan does not constitute a waiver or release of any claims or rights of the Debtor (or any other party in interest) to object to that Creditor's Claim, or recover any preferential, fraudulent, or other voidable transfer of Estate assets to such Creditor, regardless of whether any claims of the Debtor or its Estate is specifically identified herein.

(g)    **Bankruptcy Law Risks And Considerations.**

1.    <u>Confirmation of the Plan is Not Assured.</u>

Confirmation requires, among other things, a finding by the Bankruptcy Court that it is not likely there will be a need for further financial reorganization and that the value of distributions to dissenting members of Impaired Classes of Creditors and Holders of Equity Securities would not be less than the value of distributions such Creditors and Holders of Equity Securities would receive if Debtor were liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtor believes that the Plan will not be followed by a need for further financial reorganization and that dissenting members of Impaired Classes of Creditors will receive

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

47

103164-002/1353394_4

distributions at least as great as they would receive in a liquidation under Chapter 7, there can be no assurance that the Bankruptcy Court will conclude that these tests have been met.

Although the Debtor believes the Plan satisfies all additional requirements for Confirmation, the Bankruptcy Court might not reach that conclusion. It is also possible that modifications to the Plan will be required for Confirmation and that such modifications would necessitate a resolicitation of votes.

1.    Consummation of the Asset Purchase Agreement.

The Plan provides for the sale of substantially all of the Assets to Newco on the Effective Date of the Plan. There is no assurance all of the conditions to closing of the sale will occur.

2.    No assurances as to Newco's ability to perform subsequent to the Effective Date.

The Plan proposes a sale of the Assets to Newco pursuant to the Asset Purchase Agreement to be consummated on the Effective Date of the Plan. There is no assurance that Newco will be able to meet its obligations to Tropicana or its creditors after it assumes the operation of the LVME.

3.    Newco Equity Securities.

Part of the consideration to be received by Creditors will be equity securities of Newco, There is no assurance that the value of such equity securities will be on the Effective date as estimated herein by Newco. Similarly, there is no assurance or representation as to the value of such equity securities subsequent to the Effective Date, nor is there any representation as to the marketability or transferability of such equity securities after the Effective Date.

4.    Newco Governance.

Newco will be governed in accordance with its organizational documents with majority control in JVLV New Holdings LLC, a Delaware limited liability company. As such, there is no assurance or representations made regarding the governance or rights of the Creditors receiving Newco equity securities after the Effective Date. Newco's organizational documents will be annexed as exhibits to this Disclosure Statement.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

48

103164-002/1353394_4

5.    The Effective Date Might Be Delayed or Never Occur.

There is no assurance as to the timing of the Effective Date or that it will occur.  If the conditions precedent to the Effective Date have not occurred or been waived within the prescribed time frame, the Confirmation Order will be vacated.  In that event, the Holders of Claims and Equity Securities would be restored to their respective positions as of the day immediately preceding the Confirmation Date, and the Debtor's obligations for Claims and Equity Securities would remain unchanged as of such day.

6.    Allowed Claims in the Various Classes May Exceed Projections.

The Debtor has projected the amount of Allowed Claims in each Class in the Best Interests Analysis.  Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected.

7.    No Representations Outside of this Disclosure Statement are Authorized.

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with this Disclosure Statement should not be relied upon by you in arriving at your decision.

(h)    **Risks Related to the LVME's Business Operations.**

1.    Effect of the Chapter 11 Case.

So long as the Chapter 11 Case continues, the Debtor's management will be required to spend a significant amount of time and effort dealing with the Debtor's reorganization instead of focusing exclusively on business operations and generating income for the benefit of its creditors.  Further, so long as the Chapter 11 Case continues, Debtor will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.

2.    Adverse Changes in the Global Economy May Negatively Impact the LVME.

The LVME is primarily dependent upon tourism and visitor volumes, including convention attendance.  Beginning in 2008, the economy in the United States began to sharply

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

49

decline, not only in the hotel and gaming industry, but throughout virtually every business sector. This severe world-wide recession had a dramatic impact on the Las Vegas economy given its reliance on hotel, gaming and convention business.  Visitor volume and convention attendance figures are only now beginning to show signs of recovery.  The projections are premised upon a continued recovery of visitor volumes and convention attendance over the next several years. There can be no assurance that the Las Vegas hotel and gaming industry and visitor volumes, including convention attendance, will recover to pre-2008 levels or that the LVME will be able to meet its projected operating results.

     3.  <u>Leadership and Management.</u>

   The projected financial performance is conditioned upon Newco's ability to retain a dedicated management team and its continued ability to operate in an efficient, customer-oriented manner.

     4.  <u>Promotion.</u>

   The projected financial performance is conditioned upon Newco's ability to maintain a continuous and comprehensive promotion program which is adequately funded and which targets a broad customer base.

**IX.**
**POST EFFECTIVE DATE OPERATIONS AND PROJECTIONS**

(a)  **Summary of Title To Property and Dischargeability.**

     1.  <u>Vesting of Assets.</u>

   Subject to the provisions of the Plan, pursuant to Section 5 of the Plan as permitted by Section 1123(a)(5)(B), the Assets shall be transferred to Reorganized Debtor on the Effective Date and then immediately the Purchased Assets shall be transferred to Newco pursuant to the Asset Purchase Agreement.  As of the Effective Date, all such property shall be free and clear of all Liens, Claims, and Equity Securities except as otherwise provided in the Plan.

     2.  <u>Preservation of Avoidance Actions and Litigation Claims.</u>

   In accordance with Section 1123(b)(3), and except as otherwise expressly provided in the Plan, all Litigation Claims shall be assigned and transferred to the Liquidating Trust pursuant to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

50

103164-002/1353394_4

Section 10 of the Plan.  On and after the Effective Date, prosecution of the Litigation Claims lies in the sole and absolute discretion of the Liquidating Trust.  Litigation Claims shall exclude any and all Claims and causes of action, whether known or unknown, matured or unmatured, contingent or not contingent, against Tropicana, JVLV or the Holder of General Contractor Claims and each of their respective its members, shareholders, officers, directors, employees, agents, professionals, representatives, successors and assigns, all of which shall be released pursuant to the Plan.

There may also be other Litigation Claims which currently exist or may subsequently arise that are not set forth in this Disclosure Statement or the Plan because the facts underlying such Litigation Claims are not currently known or sufficiently known by Debtor.  The failure to list any such unknown Litigation Claim in the Disclosure Statement or Plan is not intended to limit the rights of the Debtor or the Liquidating Trust to pursue any unknown Litigation Claim to the extent the facts underlying such unknown Litigation Claim become more fully known in the future.  Furthermore, any potential net proceeds from Litigation Claims identified in the Disclosure Statement or any notice filed with the Bankruptcy Court, or which may subsequently arise or otherwise be pursued, are speculative and uncertain.

Unless Litigation Claims against any individual or entity are expressly waived, relinquished, released, compromised, or settled by the Plan or any Final Order, the Debtor expressly reserves for its benefit, and the benefit of the Liquidating Trust, all Litigation Claims, including, without limitation, all unknown Litigation Claims for later adjudication and therefore no preclusion doctrine (including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches) shall apply to such Litigation Claims after the confirmation or consummation of the Plan. In addition, the Debtor expressly reserves for its benefit, and the benefit of the Liquidating Trust, the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any individual or entity, including plaintiffs and co-defendants in such lawsuits.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

51

103164-002/1353394_4

3.    Injunction.

From and after the Effective Date, and except as provided in the Plan and the Confirmation Order, (a) all Persons that have held, currently hold, or may hold a Claim or an Equity Security or other right of an Equity Security Holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of any such Claims or terminated Equity Securities or rights: (i) commencing or continuing in any manner any action or other proceeding against Reorganized Debtor or its property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Reorganized Debtor or its property; (iii) creating, perfecting, or enforcing any Lien or encumbrance against Reorganized Debtor or its property; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to Reorganized Debtor or its property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code; and (B) to the extent allowed by applicable law, all Persons that have held, currently hold, or may hold Tropicana Mechanics' Liens And Claims are permanently enjoined from taking any of the following actions on account of any such Tropicana Mechanics' Liens And Claims: (i) commencing or continuing in any manner any action or other proceeding against Tropicana or its property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Tropicana or its property; (iii) creating, perfecting, or enforcing any Lien or encumbrance against Tropicana or its property; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to Tropicana or its property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.  By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth herein.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

52

103164-002/1353394_4

4.    <u>Release.</u>

Debtor and Reorganized Debtor, on behalf of itself and its employees, agents, officers, directors, representatives, predecessors, successors, transferees and assigns (including the Liquidating Trust), unconditionally, irrevocably, freely, voluntarily and after consultation with counsel and becoming fully and adequately informed as to the relevant facts, circumstances and consequences, knowingly releases, waives and forever discharges (and further agrees not to allege, claim or pursue) (a) any and all liabilities, indebtedness and obligations, whether known or unknown, of any kind whatsoever of JVLV, Newco or Tropicana to Debtor, except for (i) any obligations remaining to be performed by Tropicana under the Tropicana Lease Forbearance Agreement and any obligations to be performed by Tropicana under the Amended Tropicana Lease from and after the Effective Date, and (ii) any obligations remaining to be performed by JVLV and Newco under the Asset Purchase Agreement, from and after the Effective Date; (b) any legal, equitable or other obligations of any kind whatsoever, whether known or unknown, of (i) Tropicana to Debtor other than any obligations remaining to be performed by under the Tropicana Lease Forbearance Agreement and any obligations to be performed by Tropicana under the Amended Tropicana Lease from and after the Effective Date, and (ii) JVLV and Newco to be performed under the Asset Purchase Agreement, from and after the Effective Date; (c) any and all claims, whether known or unknown, under any oral or implied agreement with or obligation or undertaking of any kind whatsoever of, (i) Tropicana which is different from or in addition to the express terms of the Tropicana Lease Forbearance Agreement or the Amended Tropicana Lease from or after the Effective Date and (ii) JVLV and Newco which is different from or in addition to the express terms of the Asset Purchase Agreement; and (d) all other claims, rights, causes of action, counterclaims or defenses of any kind whatsoever, in contract or in tort, in law or in equity, whether known or unknown, direct or derivative, which Debtor or Reorganized Debtor or any predecessor, successor or assign might otherwise have or may have against Tropicana, JVLV or Newco on account of any conduct, condition, act, omission, event,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

contract, liability, obligation, demand, covenant, promise, indebtedness, claim, right, cause of action, suit, damage, defense, circumstance or matter of any kind whatsoever which existed, arose or occurred at any time prior to the Effective Date.  The releases, waivers, and discharges set forth in this section shall apply in all respects to JVLV's, Newco's and Tropicana's respective employees, agents, officers, directors, managers, representatives, predecessors, successors, transferees and assigns.

5.    Exculpation.

From and after the Effective Date, neither Debtor, JVLV, Tropicana, the Professionals employed on behalf of the Estate, nor any of their respective present or former members, directors, officers, managers, employees, advisors, attorneys, or agents, shall have or incur any liability, including derivative claims, but excluding direct claims, to any Holder of a Claim or Equity Security or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (from the Petition Date forward), the Chapter 11 Case, Reorganized Debtor, the pursuit of confirmation of the Plan, or the consummation of the Plan, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Chapter 11 Case.

(b)    **Post-Confirmation Reporting and Quarterly Fees To the UST.**

Until the entry of the final decree closing the Chapter 11 Case, Reorganized Debtor and the Liquidating Trustee shall comply with the post-confirmation reporting requirements under the Bankruptcy Code, Bankruptcy Rules, and local rules of the Bankruptcy Court.  Additionally, to the extent required, Reorganized Debtor and the Liquidating Trustee shall file post-confirmation quarterly operating reports in accordance with the United States Trustee Guidelines, paragraph 7.2.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

54

## X.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

THE FOLLOWING SUMMARY DOES NOT CONSTITUTE EITHER A TAX OPINION OR TAX ADVICE TO ANY PERSON.  NO REPRESENTATIONS REGARDING THE EFFECT OF IMPLEMENTATION OF THE PLAN ON INDIVIDUAL CREDITORS ARE MADE HEREIN OR OTHERWISE.   RATHER, THE TAX DISCLOSURE IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL CREDITORS ARE URGED TO CONSULT THEIR RESPECTIVE TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN.

Creditors, Holders of Equity Securities, and any Person affiliated with the foregoing are strongly urged to consult their respective tax advisors regarding the federal, state, local, and foreign tax consequences which may result from the confirmation and consummation of the Plan. This Disclosure Statement shall not in any way be construed as making any representations regarding the particular tax consequences of the confirmation and consummation of the Plan to any Person.  This Disclosure Statement is general in nature and is merely a summary discussion of potential tax consequences and is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), and pertinent regulations, rulings, court decisions, and treasury decisions, all of which are potentially subject to material and/or retroactive changes.  Under the IRC, there may be federal income tax consequences to the Debtor, its Creditors, its Equity Security Holders, and/or any Person affiliated therewith as a result of confirmation and consummation of the Plan.

Upon the confirmation and consummation of the Plan, the federal income tax consequences to Creditors and their affiliates arising from the Plan will vary depending upon, among other things, the type of consideration received by the Creditor in exchange for its Claim, whether the Creditor reports income using the cash or accrual method of accounting, whether the Creditor has taken a "bad debt" deduction with respect to its Claim, whether the Creditor received consideration in more than one tax year, and whether the Creditor is a resident of the United States.  If a Creditor's Claim is characterized as a loss resulting from a debt, then the extent of the deduction will depend on whether the debt is deemed wholly worthless or partially

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

1 worthless, and whether the debt is construed to be a business or nonbusiness debt as determined

2 under the 26 U.S.C. § 166, and/or other applicable provisions of the Internal Revenue Code.

3     CREDITORS SHOULD CONSULT THEIR TAX ADVISOR REGARDING THE TAX

4 TREATMENT (INCLUDING FEDERAL, STATE, LOCAL, AND FOREIGN TAX

5 CONSEQUENCES) OF THEIR RESPECTIVE ALLOWED CLAIMS.  THIS DISCLOSURE IS

6 NOT A SUBSTITUTE FOR TAX PLANNING AND SPECIFIC ADVICE FOR PERSONS

7 AFFECTED BY THE PLAN.

## XI.
## CONFIRMATION OF THE PLAN

    (a)    **Confirmation Of The Plan.**

    Pursuant to Section 1128(a), the Bankruptcy Court will hold a hearing regarding confirmation of the Plan at the U.S. Bankruptcy Court, 300 Las Vegas Blvd. South, Las Vegas, Nevada 89101, commencing on January 9, 2012, at 9:30 a.m., and continuing thereafter on January 11, 2012, at 9:30 a.m.

    (b)    **Objections To Confirmation Of The Plan.**

    Section 1128(b) provides that any party-in-interest may object to confirmation of a plan. Any objections to confirmation of the Plan must be in writing, must state with specificity the grounds for any such objections, and must be timely filed with the Bankruptcy Court and served upon counsel for Debtor at the following address:

GORDON SILVER
Attn:  Gabrielle A. Hamm, Esq.
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169
Email:  ghamm@gordonsilver.com

    For the Plan to be confirmed, the Plan must satisfy the requirements stated in Section 1129.  In this regard, the Plan must satisfy, among other things, the following requirements.

    1.    <u>Best Interest of Creditors and Liquidation Analysis.</u>

    Pursuant to Section 1129(a)(7), for the Plan to be confirmed, it must provide that Creditors and Holders of Equity Securities will receive at least as much under the Plan as they

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

56

1  would receive in a liquidation of Debtor under Chapter 7 of the Bankruptcy Code (the "Best

2  Interest Test").  The Best Interest Test with respect to each impaired Class requires that each

3  holder of an Allowed Claim or Equity Security of such Class either: (i) accepts the Plan; or (ii)

4  receives or retains under the Plan property of a value, as of the Effective Date, that is not less

5  than the value such Holder would receive or retain if Debtor was liquidated under Chapter 7 of

6  the Bankruptcy Code.  The Bankruptcy Court will determine whether the value received under

7  the Plan by the Holders of Allowed Claims in each Class of Creditors or Equity Securities equals

8  or exceeds the value that would be allocated to such Holders in a liquidation under Chapter 7 of

9  the Bankruptcy Code.  Based upon the representations of JVLV regarding the value of the

10  Newco equity securities and the other consideration to be received by the Debtor pursuant to the

11  Asset Purchase Agreement, the Debtor believes that the Plan meets the Best Interest Test and

12  provides value which is not less than that which would be recovered by each such holder in a

13  Chapter 7 bankruptcy proceeding.

14      Generally, to determine what Holders of Allowed Claims and Equity Securities in each

15  impaired Class would receive if Debtor were liquidated, the Bankruptcy Court must determine

16  what funds would be generated from the liquidation of Debtor's Assets and property in the

17  context of a Chapter 7 liquidation case, which for unsecured creditors would consist of the

18  proceeds resulting from the disposition of the Assets of the Debtor, including the unencumbered

19  Cash held by Debtor at the time of the commencement of the liquidation case.  Such Cash

20  amounts would be reduced by the costs and expenses of the liquidation and by such additional

21  Administrative Claims and Priority Claims as may result from the termination of the Debtor's

22  businesses and the use of Chapter 7 for the purpose of liquidation.

23      In a Chapter 7 liquidation, Holders of Allowed Claims would receive distributions based

24  on the liquidation of the assets of the Debtor.  Such assets would include the same assets being

25  sold to Newco and otherwise collected and liquidated under the Plan.  However, the net proceeds

26  from the collection of property of the Estate available for distribution to Creditors would be

27  reduced by any commission payable to the Chapter 7 trustee and the trustee's attorneys' and

28  accounting fees, as well as the administrative costs of the Chapter 11 estate (such as the

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

57

103164-002/1353394_4

compensation for Chapter 11 professionals).  In a Chapter 7 case, the Chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee to creditors, even though the Debtor has already incurred some of the expenses associated with generating those funds.  Accordingly, there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by the Debtor because the Chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed from the Estate.

It is further anticipated that a Chapter 7 liquidation would result in significant delay in the payment to Creditors.  Among other things, a Chapter 7 case could trigger a new bar date for filing Claims that would be more than ninety (90) days following conversion of the Chapter 11 Case to Chapter 7.  Hence, a Chapter 7 liquidation would not only delay distribution but raises the prospect of additional claims that were not asserted in the Chapter 11 Case.  Moreover, Claims that may arise in the Chapter 7 case or result from the Chapter 11 Case would be paid in full from the Assets before the balance of the Assets would be made available to pay pre-Chapter 11 Allowed Priority Claims, Allowed General Unsecured Claims, and Equity Securities.

The distributions from the Assets would be paid Pro Rata according to the amount of the aggregate Claims held by each Creditor.  The Debtor believes that the most likely outcome under Chapter 7 would be the application of the "absolute priority rule."  Under that rule, no junior Creditor may receive any distribution until all senior Creditors are paid in full, with interest, and no Equity Interest holder may receive any distribution until all Creditors are paid in full.

The Debtor has determined that confirmation of the Plan will provide each Holder of a Claim in an Impaired Class[8] with no less of a recovery than such Creditor would receive if Debtor were liquidated under a Chapter 7.  As set forth in the Liquidation Analysis[9] and accompanying notes annexed hereto as **Exhibit "2,"** in liquidation under Chapter 7, there would be substantially less funds available for distribution to the Holders of Allowed General

---

[8] The Impaired Classes are Class 3 (Secured Note Claims); Class 4 (General Contractor Claim); Class 5 (Subcontractor Claims); Class 6 (Other Secured Claims); Class 7 (General Unsecured Claims); and Class 8 (Equity Securities).

[9] The Liquidation Analysis sets forth Debtor's best estimates as to value and recoveries in the event that the Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code and the Debtor's assets are liquidated.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

58

103164-002/1353394_4

Unsecured Claims because under the Plan various Allowed General Unsecured Claims, including (a) the Allowed General Contractor Claim which is being settled for Cash and Newco equity securities and (b) the Claims of the Tropicana under the Tropicana Lease are being compromised in part and the Tropicana Lease is being amended, assumed and assigned to Newco.

As evidenced by the Liquidation Analysis, the Debtor believes that the value provided under the Plan to the Holders of Claims and Equity Securities in the Impaired Classes is substantially greater than they would receive under a Chapter 7 liquidation.

### 2.    Feasibility.

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor, <u>unless</u> such liquidation or reorganization is proposed in the plan (the "<u>Feasibility Test</u>").  11 U.S.C. §1129(a)(11) (emphasis added).  Thus, the focus under this section is on the viability of the reorganized debtor, and its ability to meet its future obligations, both as provided for in the plan and as may be incurred in operations.  For the Plan to meet the Feasibility Test, the Bankruptcy Court must find by a preponderance of the evidence that the Reorganized Debtor has the resources to meet its obligations under the Plan.

Feasibility is not a concern with the  Plan, as it seeks to sell all or substantially all of the Assets to Newco free and clear of Liens, with Allowed Claims to be paid from the consideration to be received from the sale to Newco, recoveries by the Liquidating Trust, or a combination thereof .  The source of the payments to fund the Plan demonstrate that the Debtor can establish, and the Bankruptcy Court will find, that the Plan is feasible within the meaning of section 1129(a)(11).

### 3.    Accepting Impaired Class.

Since various Classes of Claims are impaired under the Plan, for the Plan to be confirmed, the Plan must be accepted by at least one impaired Class of Claims (not including the votes of insiders of the Debtor).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

59

4.     <u>Acceptance of Plan.</u>

For an impaired Class (or sub-Class) of Claims to accept the Plan, those representing at least two-thirds (2/3) in amount and a majority in number of the Allowed Claims voted in that Class (or sub-Class) must be cast for acceptance of the Plan.

5.     <u>Confirmation Over Dissenting Class ("Cram Down").</u>

If there is less than unanimous acceptance of the Plan by Impaired Classes of Claims or Equity Securities, the Bankruptcy Court nevertheless may confirm the Plan at Debtor's request. Section 1129(b) provides that if all other requirements of Section 1129(a) are satisfied and if the Bankruptcy Court finds that: (i) the Plan does not discriminate unfairly; and (ii) the Plan is fair and equitable with respect to the rejecting Class(es) of Claims or Equity Securities impaired under the Plan, the Bankruptcy Court may confirm the Plan despite the rejection of the Plan by dissenting impaired Class of Claims or Equity Securities.

The Debtor will request confirmation of the Plan pursuant to Section 1129(b) with respect to any Impaired Class (or sub-Class) of Claims that does not vote to accept the Plan.  The Debtor believes that the Plan satisfies all of the statutory requirements for Confirmation, that the Debtor has complied with or will have complied with all the statutory requirements for Confirmation of the Plan, and that the Plan is proposed in good faith.  At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the statutory requirements for Confirmation.

6.     <u>Allowed Claims.</u>

You have an Allowed Claim if:  (i) you or your representative timely file a proof of Claim and no objection has been filed to your Claim within the time period set for the filing of such objections; (ii) you or your representative timely filed a proof of Claim and an objection was filed to your Claim upon which the Bankruptcy Court has ruled and Allowed your Claim; (iii) your Claim is listed by the Debtor in its Schedules or any amendments thereto (which are on file with the Bankruptcy Court as a public record) as liquidated in amount and undisputed and no objection has been filed to your Claim; or (iv) your Claim is listed by Debtor in its Schedules as

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

1    liquidated in amount and undisputed and an objection was filed to your Claim upon which the

2    Bankruptcy Court has ruled to Allow your Claim.

3        Under the Plan, the deadline for filing objections to Claims is ninety (90) calendar days

4    following the Effective Date.  If your Claim is not an Allowed Claim, it is a Disputed Claim and

5    you will not be entitled to vote on the Plan unless the Bankruptcy Court temporarily or

6    provisionally allows your Claim for voting purposes pursuant to Bankruptcy Rule 3018.  If you

7    are uncertain as to the status of your Claim or Equity Interest or if you have a dispute with the

8    Debtor, you should check the Bankruptcy Court record carefully, including the Schedules filed

9    by the Debtor, and you should seek appropriate legal advice.  Neither the Debtor nor its

10   professionals can advise you about such matters.

11                      7.      Impaired Claims and Equity Securities.

12       Impaired Claims and Impaired Equity Securities include those whose legal, equitable, or

13   contractual rights are altered by the Plan, even if the alteration is beneficial to the Creditor or

14   Equity Interest Holder.  Holders of Claims which are not impaired under the Plan are deemed to

15   have accepted the Plan pursuant to Section 1126(f) and the Debtor need not solicit acceptances

16   of the Plan from the holders such unimpaired Claims.  Holders of Claims or Equity Securities

17   which are to receive nothing under the Plan are deemed to have voted to reject the Plan, and the

18   Debtor need not solicit acceptances of the Plan from the holders of such impaired Claims.  As

19   such, only Holders of Claims in impaired Classes 3, 4, 5, 6, and 7 under the Plan are entitled to

20   vote.

21                      8.      Voting Procedures.

22              a)      Submission of Ballots.

23       All Creditors entitled to vote will be sent a Ballot, together with instructions for voting, a

24   copy of this approved Disclosure Statement, and a copy of the Plan.  You should read the Ballot

25   carefully and follow the instructions contained therein.  Please use only the Ballot that was sent

26   with this Disclosure Statement.  You should complete your Ballot and return it as follows:

27

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

61

103164-002/1353394_4

GORDON SILVER
Attn: Gabrielle A. Hamm, Esq.
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169

TO BE COUNTED, YOUR BALLOT MUST BE **_RECEIVED_** AT THE ADDRESS LISTED ABOVE BY _____.

> b)    Incomplete Ballots.

Unless otherwise ordered by the Bankruptcy Court, Ballots which are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will be counted as a vote to accept the Plan.

> c)    Withdrawal of Ballots.

A Ballot may not be withdrawn or changed after it is cast unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

> d)    Questions and Lost or Damaged Ballots.

If you have any questions concerning these voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact Debtor's counsel as listed above regarding the submission of Ballots.

## XII.
## ALTERNATIVES TO THE PLAN

(a)    **Debtor's Considerations.**

The Debtor believes that the Plan provides Creditors with the best and most complete form of recovery available.  As a result, the Debtor believes that the Plan serves the best interests of all Creditors and parties-in-interest in the Chapter 11 Case.  In formulating and developing the Plan, the Debtor has explored other alternatives.  The Debtor believes not only that the Plan, as described herein, fairly adjusts the rights of various Classes of Creditors and enables the Creditors to realize the greatest sum possible under the circumstances, but also that rejection of the Plan in favor of some theoretical alternative method of reconciling the Claims and Equity Securities of the various Classes will not result in a better recovery for any Class.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

(b)      **Alternative Plans of Reorganization.**

Under Section 1121, a debtor has an exclusive period of one hundred twenty (120) days and an additional vote solicitation period of sixty (60) days from the entry of the order for relief during which time, assuming that no trustee has been appointed by the Bankruptcy Court, only a debtor may propose and confirm a plan.  After the expiration of the initial one hundred eighty (180) day period, and any extensions thereof, any other party-in-interest may propose a different plan provided the exclusivity period is not further extended by the Bankruptcy Court.  In this case, the Debtor filed its Plan well before the expiration of the exclusive period.

(c)      **Liquidation Under Chapter 7.**

If a plan cannot be confirmed, a Chapter 11 case most likely will be converted to a case under Chapter 7, in which a Chapter 7 trustee would be elected or appointed to liquidate the assets of debtor for distribution to their creditors and holders of equity interests in accordance with the priorities established by the Bankruptcy Code.

As previously stated, Debtor believes that a liquidation under Chapter 7 would result in a substantially reduced recovery of funds by its Estate because of:  (i) additional Administrative Expenses involved in the appointment of a trustee for the Debtor and attorneys and other professionals to assist such trustee; (ii) additional expenses and Claims, some of which may be entitled to priority, which would be generated during the liquidation; and (iii) the substantial possibility that Greystone would be entitled to relief from the automatic stay in such Chapter 7 bankruptcy case, thereby allowing it to proceed with a foreclosure sale of the Property and depriving the Debtor of its only means to generate recovery for its other Creditors.  Accordingly, the Debtor believes that Holders of Claims may be expected to receive a substantially smaller distribution, and, possibly no distribution, under a Chapter 7 liquidation.

**XIII.**
**AVOIDANCE ACTIONS**

A bankruptcy trustee (or the entity as debtor-in-possession) may avoid as a preference a transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor was insolvent, where that creditor receives more than it would have received in a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

liquidation of the entity under Chapter 7 of the Bankruptcy Code had the payment not been made, if: (i) the payment was made within ninety (90) days before the date the Chapter 11 Case was commenced; or (ii) if the creditor is found to have been an "insider" as defined in the Bankruptcy Code, within one (1) year before the commencement of the Chapter 11 Case. A debtor is presumed to have been insolvent during the ninety (90) days preceding the commencement of the case. Under the Plan, all preference actions will be transferred to the Liquidating Trust for the benefit of the Holders of Class 7 Claims.

A bankruptcy trustee (or the entity as debtor-in-possession) may avoid as a fraudulent transfer a transfer of property made by a debtor within two (2) years (and under applicable Nevada law, four (4) years) before the date the Chapter 11 Case was commenced if: (i) the debtor received less than a reasonably equivalent value in exchange for such transfer; and (ii) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left the debtor with an unreasonably small capital, or the debtor intended to incur debts that would be beyond its ability to pay as such debts matured. In addition, this reachback may be extended further to within one (1) year of reasonable discovery of the facts underlying the transfer and its actual fraudulent nature. Under the Plan, all fraudulent transfer actions will be transferred to the Liquidating Trust for the benefit of the Holders of Class 7 Claims.

Based upon the Debtor's and its professionals' preliminary analysis of its prepetition transactions during the 90-day period, one-year period, and two-year period preceding the Petition Date, as applicable, the Debtor believes that a small number of prepetition transfers are avoidable as preferences, and that numerous prepetition transfers to affiliates of the Debtor, including Bloom, Eagle Holding, Mafia Collection, Eagle Group Marketing, LLC, Order 66, and A.D.D. Productions, LLC, are avoidable as fraudulent transfers. However, the Debtor has not yet fully analyzed various potential preference or other avoidance actions, and it is possible that additional prepetition transactions may be avoidable and recoverable under various theories in Chapter 5 of the Bankruptcy Code. The Debtor thus hereby expressly reserves its right, on behalf of the Liquidating Trust, to commence any appropriate actions pursuant to Chapter 5 of the Bankruptcy Code.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4

## IVX.
## <u>RECOMMENDATION AND CONCLUSION</u>

In the Debtor's opinion, the Plan provides the best possible recovery for all Creditors as a whole, and therefore recommends that all Creditors who are entitled to vote on the Plan vote to accept the Plan.

DATED this 4th day of November, 2011.

MURDER INC., LLC,
a Nevada limited liability company

By: _____
LOUIS VENTRE

Prepared and Submitted by:

GORDON SILVER

By: _____
GERALD M. GORDON, ESQ.
MATTHEW C. ZIRZOW, ESQ.
GABRIELLE A. HAMM, ESQ.
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Proposed Attorneys for Debtor

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103164-002/1353394_4